## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| **LARRY DONALD GEORGE,** | ) | |
| *Petitioner,* | ) | |
| | ) | |
| v. | ) | No. _____ |
| | ) | |
| **JEFFERSON S. DUNN, Commissioner,** | ) | **CAPITAL CASE** |
| **Alabama Department of Corrections,** | ) | |
| *Respondent.* | ) | |

---

## PETITION FOR WRIT OF HABEAS CORPUS
## BY A PRISONER IN STATE CUSTODY UNDER SENTENCE OF
## DEATH

---

Petitioner, LARRY DONALD GEORGE, incarcerated on death row at William C. Holman Correctional Facility in Atmore, Alabama, petitions this Court, pursuant to 28 U.S.C. § 2254, for relief from his unconstitutionally obtained convictions of capital murder and attempted murder and corresponding capital and life sentences. Mr. George requests an evidentiary hearing to further develop the allegations set forth below.

# INTRODUCTION

Larry George—an Army Veteran with schizotypal personality disorder and mild brain injury—had no criminal history prior being convicted of capital murder in this case. Because of his mental illness, Mr. George has a distorted perception of how he views the world. In the weeks leading up to the crime, Mr. George believed that his mother-in-law had put a hex on him. He then began tracking his wife, and found evidence, in his own mind, that corroborated his paranoia. These events caused him great distress, which ultimately resulted in a psychotic break on the night of the crime. On February 12, 1988, in the throes of his disease and without any understanding of reality, Mr. George went to the apartment complex and shot his wife, and while doing so, shot and killed two neighbors. He was subsequently charged with capital murder.

Mr. George was initially appointed a single inexperienced attorney with no capital training; Steve Giddens. Only two months before trial, the trial court appointed co-counsel Jeb Fannin - an attorney who had been practicing law for only four years and who also had no capital experience. The court did so because it "thought [Giddens] might need some assistance." Counsel's inexperience and lack of specialized training was apparent from the first day of representation. Mr. George's trial was predictably flawed and its final outcome was a foregone conclusion.

Before trial, Giddens requested that Mr. George receive a psychiatric examination at a State facility. Despite receiving an evaluation stating that Mr. George had reported possible past and present psychotic symptoms, defense counsel never

requested appointment of a defense expert. Instead, the defense opted to rely on a report created by a forensic examiner at a State facility, notwithstanding the fact that standard procedures were not followed.

Defense counsel's entire investigation regarding the guilt phase of the case took place on *one day* and lasted *less than three hours*. Giddens later claimed that his strategy "was to try to get the jury to recommend life without parole, because the facts were very bad for Mr. George." In keeping with this "strategy," Giddens' investigation focused on finding mitigating evidence. On the portion of trial that counsel deemed most important, he spent *less than an hour and a half* researching and investigating. The entire penalty phase investigation consisted of Giddens making four phone calls less than a week before trial: a 24-minute call to Mr. George's mother, another 24-minute call to one of Mr. George's sisters, and two 18-minute calls to Mr. George's sisters.

Once the trial started, the State used peremptory strikes to remove four of the six prospective black male jurors. The guilt phase of the trial lasted less than one day, defense counsel presented no defense, and the jury convicted Mr. George after 45 minutes of deliberation. During the penalty phase, which took place the same day as the guilt phase, Giddens told the jury he would present "character evidence" and evidence of Mr. George's mental state at the time of the offense by way of mitigation. By way of character evidence, Giddens called two of Mr. George's sisters, without having prepared either to testify. Because neither sister was aware of what sort of

testimony might be helpful, they gave little more than dry timelines of Mr. George's childhood and young adulthood.

To show that Mr. George was under the influence of an extreme mental or emotional disturbance at the time of the offense, Giddens stated that he intended to call the state forensic examiner, Dr. Kathleen Ronan, who had not yet arrived. The trial court originally indicated that, after Giddens called Mr. George's sisters, it would "stop off" until Dr. Ronan arrived. Yet when the time came, the State offered to call three of its own witnesses to *rebut* Dr. Ronan's as-of-yet undelivered testimony. Without objecting or even asking a question about the scope of the "rebuttal" witnesses' testimony, Giddens rested subject to being allowed to call Dr. Ronan once she arrived.

The State's witnesses—an investigator and two detectives who had no involvement with the case other than apprehending Mr. George in Delaware six years *after* the indictment was issued—painted a picture for the jury of a modern-day John Rambo living in a self-constructed "fortress," armed with everything from a sawed-off shotgun to a bow and arrows to throwing stars. They detailed how Mr. George resisted arrest, fled downriver through chest-high water, and only stopped when a police helicopter swooped down to hover approximately 15 feet over his head. The State also played two videotapes showing the area where Mr. George had been living, which the third "rebuttal" witness narrated in detail. The trial court admitted a variety of items found in Mr. George's campsite, including several firearms, banana clips, and a listening device, among other things.

When Giddens did finally object, the State represented that the witnesses' testimony and Mr. George's various weapons and devices were relevant to show his "mental condition" (presumably at the time of the offense) and his conduct six years after the offense. Additionally, the witnesses' testimony would rebut Dr. Ronan's future testimony. The State did not elaborate on these points, perhaps because Dr. Ronan's report—which had been provided to the State before trial—said nothing about Mr. George's conduct six years after the offense. As to his mental state at the time of the offense, Dr. Ronan opined that Mr. George did not have any "major psychiatric disorder which would render him to be out of touch with reality" and had not been "experiencing major mental illness."

During closing arguments, Giddens did not ask for mercy or for a recommendation of life without parole. Instead, he told the jurors "nobody can be mad" if they recommended death. According to Giddens, "We won't have a problem with [your recommendation] either way."

By the time the court finished instructing the jury, it was 8:35 p.m. The trial court evidently determined that this was not too late for the jury to begin deciding whether to recommend that Mr. George be put to death, and sent the jury to deliberate. By 9:30 p.m., the jury was exhausted and sent a note to the judge asking to retire for the night. The prosecutor commented, "Don't see any way you can deny that. They want to rest tonight." Yet the trial court disagreed and, without objection from Giddens, sent a note to the jury stating that the court would "appreciate [the jury] deliberating for further

reasonable time" because they had "only been deliberating for 50 minutes." Perhaps to avoid spending all night deliberating, the jury returned its recommendation less than 30 minutes later: 10-2 in favor of execution. The judge followed the jury's recommendation and imposed a death sentence.

Now, after pursuing post-conviction relief in the state courts, Mr. George seeks a writ of habeas corpus from his unconstitutionally obtained convictions and sentences.

## JURISDICTION AND VENUE

This court has jurisdiction to hear Mr. George's habeas corpus petition pursuant to 28 U.S.C. § 2254(a). Venue is proper in the Northern District of Alabama because Mr. George was convicted and sentenced in Talladega County, Alabama, which is within this district. 28 U.S.C. § 2241(d).

## PROCEDURAL HISTORY[1]

Mr. George was originally charged with one count of capital murder for intentionally causing the death of two or more people pursuant to one scheme or course of conduct, in violation of Alabama Code § 13A-5-40(a)(10). (Tr. C. at 13-14). He was indicted separately for one count of attempted murder, in violation of Alabama Code §

---

[1] Mr. George's petition uses the following record abbreviations: "(Tr. C.)" refers to the clerk's record on direct appeal; "(Supp. Tr. C.)" refers to the supplement to record on direct appeal; "(Tr. R.)" refers to the trial transcript; "(C.)" refers to the Record on Appeal in Rule 32 proceedings (including deposition transcripts); "(R.)" refers to the consolidated transcript of all Rule 32 hearings; and "(Supp. C.1)," "(Supp. C.2)," and "(Supp. C.3)" refer to the first, second, and third supplements to the Rule 32 Record respectively.

13A-6-2. (*Id.* at 59). A grand jury later returned a substituted indictment, charging Mr. George with one count of capital murder under § 13A-5-40(a)(10) and two counts of capital murder during the course of a burglary, in violation of Alabama Code § 13A-5-40(a)(4). (*Id.* at 11). Approximately two weeks before trial, the court consolidated the capital and attempted murder cases. (Tr. R. at 7).

Mr. George's trial lasted two days, beginning November 15, 1994. (Tr. C. at 3). On November 29, the trial court sentenced him to death on the capital charges and to life in prison for the attempted murder conviction. (Tr. R. at 643-44, 664-65). The trial court found only one aggravating circumstance: that the offense was committed while Mr. George "was engaged in the commission of, or an attempt to commit, or flight after committing, or attempting to commit a burglary" (Tr. C. at 104) and one statutory mitigation circumstance: that Mr. George had "no significant history of prior criminal activity" (Tr. C. at 105). The court found no other mitigating circumstances and found "there is only one logical conclusion" for punishment—death. (Tr. C. at 107). Giddens and Fannin filed a timely notice of appeal the same day. (Tr. C. at 89).

On appeal, trial counsel raised 20 claims. (George Brief, *George I*).[2] In relevant part, they asserted that: (1) the trial court erred by allowing the State to present irrelevant

---

[2] *George I* refers to Mr. George's first appeal to the Alabama Court of Criminal Appeals ("ACCA"). *George II*, *George III*, and *George IV* refer to the State's appeal to the Alabama Supreme Court ("ASC"), the case on remand before the ACCA, and Mr. George's subsequent appeal to the ASC, respectively. Finally, *George V* refers to Mr. George's appeal to the ACCA from the denial of his Rule 32 petition, and *George VI* refers to his subsequent appeal to the ASC.

"flight" evidence during the penalty phase; (2) the State violated *Batson v. Kentucky*, 476 U.S. 79 (1986), and *J.E.B. v. Alabama*, 511 U.S. 127 (1994), by using peremptory strikes to remove the majority of black men from the jury; and (3) the trial court coerced the jury during the penalty phase deliberations by instructing the jurors to keep deliberating after they asked to retire. (*Id.* at 1-24).

The Alabama Court of Criminal Appeals ("ACCA") affirmed Mr. George's convictions, but vacated his death sentence and ordered a new penalty phase. *George v. State*, No. CR-94-387, 1996 WL 17876 (Ala. Crim. App. Jan. 19, 1996). On rehearing *ex mero motu*, the ACCA withdrew its initial opinion and issued a substituted opinion that again affirmed Mr. George's convictions, but vacated Mr. George's death sentence and remanded the case for a new penalty hearing. *George I*, 717 So. 2d 827, 843 (Ala. Crim. App. 1996). The State appealed to the Alabama Supreme Court ("ASC"), which reversed the ACCA and remanded with instructions to reinstate Mr. George's death sentence. *George II*, 717 So. 2d 844, 849 (Ala. 1996). The ASC denied Mr. George's subsequent motion for rehearing. (C. at 1019).

On remand, the ACCA affirmed Mr. George's convictions and death sentence, then denied his motion for rehearing. *George III*, 717 So. 2d 849, 858 (Ala. Crim. App. 1997); (C. at 1019). Mr. George filed a petition for certiorari in the ASC, raising the same claims he previously argued in *George I*. (George Brief, *George IV*). The ASC granted the petition, but affirmed the ACCA's decision. *George IV*, 717 So. 2d 858, 859

(Ala. 1998). The U.S. Supreme Court denied Mr. George's subsequent petition for certiorari. *George v. Alabama*, 525 U.S. 1024 (1998).

Mr. George timely filed a *pro se* petition pursuant to Alabama Rule of Criminal Procedure 32 on November 19, 1999.[3] (Supp. C.1 at 9-199). Approximately five years later, John Poti, Esq. entered a notice of appearance on Mr. George's behalf. (Supp. C.1 at 394-95). Poti filed an Amended Petition on July 7, 2005. (*Id.* at 426-580). Judge Fielding—the judge who had presided over Mr. George's original trial—summarily dismissed some of Mr. George's claims and sub claims pursuant to Alabama Rules of Criminal Procedure 32.2(a), 32.6(b), and 32.7(d). (*Id.* at 843-60). Judge Virginia A. Vinson from the Jefferson County Circuit Court later took over the case and conducted an evidentiary hearing on July 25 and 26, 2011. (R. at 1).

On October 23, 2015, the Rule 32 court issued an order adopting Judge Fielding's summary dismissal orders and denying relief on all grounds. (C. at 20). Mr. George filed a motion to reconsider on November 20, 2015, which the court denied ten days later. (*Id.* at 1216, 1270).

Mr. George timely appealed to the ACCA on December 3, 2015. (*Id.* at 45-47). Following oral argument, the ACCA affirmed the trial court's order. *George V*, No. CR-

---

[3] Mr. George signed the certificate of service on November 18, but the certificate stated that he mailed his petition on November 19. (Supp. C.1 at 199). The state court received Mr. George's petition on November 19, which suggests that he probably mailed it November 18. (*Id.* at 9). Because it is immaterial in this proceeding whether Mr. George filed his Rule 32 petition on November 18 or 19, this petition assumes *arguendo* that he filed it on November 19.

15-0257, 2019 WL 180146, at *30 (Ala. Crim. App. Jan. 11, 2019). Mr. George filed an application for rehearing, which the court denied on March 29, 2019. (George Brief, *George VI*, at App'x B).

Mr. George subsequently filed a petition for writ of certiorari with the ASC on April 12, 2019. (George Brief, *George VI*.) The ASC denied certiorari on February 19, 2021. Mr. George now timely files the instant § 2254 petition.[4]

## STATEMENT OF FACTS

On February 12, 1988, Geraldine George ("Geraldine") and two of her neighbors—Ralph Swain and Janice Morris—were shot in the neighbors' apartment in Talladega, Alabama. Geraldine survived, but her neighbors did not. In 1994, Mr. George was arrested in Delaware and extradited to Alabama. During the period that Mr. George had been charged but not yet arrested, *America's Most Wanted* and *Unsolved Mysteries* ran several episodes on the case featuring sensational, factually inaccurate dramatizations. Further, the print media published many news articles regarding the crime and Mr. George's indictment. The exposure to prejudicial information by potential jurors was great.

### A. Pre-trial

---

[4] Mr. George's convictions and sentences became final on November 30, 1998, when the U.S. Supreme Court denied certiorari. *George v. Alabama*, 525 U.S. 1024 (1998); *see Gonzalez v. Thaler*, 565 U.S. 134, 150 (2012) (holding that a state prisoner's conviction becomes final when the Supreme Court denies his petition for certiorari). Mr. George filed his *pro se* Rule 32 petition 354 days later, on November 19, 1999—11 days before the expiration of the one-year statute of limitations.

Steven Giddens was appointed as lead counsel for Mr. George on May 3, 1994. (C. at 1305). The day he was appointed, Giddens met with Mr. George for two hours. (*Id.*). Over the next five weeks, he met with Mr. George three more times for a total of three hours. (*Id.*). He did not see Mr. George again until September 16, less than two months before trial. (*Id.*). During the interim, Giddens reviewed the file once a month for approximately 18 minutes each time. (*Id.*). There is no record of any investigation, such as contact with witnesses or collection of records, or contact with any experts during this period.

Giddens did not file a request for production by the State until September 16— one week after the trial court appointed Fannin as co-counsel. (Tr. C. at 23-24). That same day, Giddens and Fannin filed a motion for a change of venue based on the overwhelming amount of pretrial publicity, but did not explain what publicity the case had received (several hours of coverage on national television). (*Id.* at 64-65). The trial court deferred ruling on the motion. (*Id.* at 3).

On September 26 and 28, with less than a month left before trial was scheduled to begin, Giddens filed two motions requesting a mental examination based on "[his] own observations." (*Id.* at 28-31; R. at 93). Whatever his observations, he did not ask the court to appoint a defense expert; instead, he requested that the court provide "a competent psychiatrist or psychologist" from Cheaha Mental Health Center ("Cheaha") and that the report be provided to the defense, the court, and the State. (Tr. C. at 30). The court granted the motion for a psychological evaluation. (*Id.* at 3).

Giddens contacted Gary Garner, a therapist at Cheaha. (C. at 1306). Garner evaluated Mr. George and filed a one-page report recommending that he be further evaluated at Taylor Hardin Secure Medical Facility ("Taylor Hardin") due to his reports of possible psychotic symptoms. (Tr. C. at 32). In his interview notes, Garner wrote that Mr. George reported hearing "voices talking," seeing "ghost images" and "dead people" in the "past and present," and feeling like someone was "in the bed" with him. (C. at 1320).

On October 7, the day after Garner's report was filed, the trial judge issued an order directing that Mr. George be evaluated at Taylor Hardin. (*See* Tr. C. at 33-35). The judge also ordered defense counsel to "provide such information as may be in his possession as may assist the examining psychologist/psychiatrist in the completion of the examination of [Mr. George's] competency to stand trial and mental state at the time of the offense." (*Id.* at 33-34). Fannin filled out a "Defense Attorney Information" form, writing only that Mr. George had "stated to his attorneys that at the time of the alleged offense, he heard voices saying 'shoot her.'" (Supp. C.2 at 125-26). Fannin indicated that he had no information from third parties that would substantiate Mr. George's mental condition. (*Id.* at 126).

Dr. Kathleen Ronan, a forensic examiner at Taylor Hardin, evaluated Mr. George on November 1, 1994. (Supp. C.1 at 1184). Unsurprisingly, the State provided significantly more data than defense counsel did for use in Dr. Ronan's subsequent report, including witness statements regarding Mr. George's behavior before, around,

and after the date of the shootings. (*See id.* at 1185; Supp. C.2 at 125-26). Dr. Ronan was unable to obtain Mr. George's military records or speak with his family members before writing the report. (Supp. C.1 at 1185-86).

According to Dr. Ronan, Mr. George's responses to the Millon Clinical Multiaxial Inventory-II were consistent with those of individuals who are highly sensitive toward others, demonstrating "constant ambivalence" in relationships and sometimes "vacillat[ing] to periods of anguish and anger which may be demonstrated in behavioral acting out." (*Id.* at 1190-91). Such individuals also might experience "periodic episodes of deterioration into more maladaptive thought processes or perceptual disturbances." (*Id.* at 1191).

Dr. Ronan reported that she "found no evidence that Mr. George ha[d] ever suffered from a major psychiatric disorder which would render him to be out of touch with reality or unable to understand right from wrong." (*Id.* at 1193). Although Mr. George had a personality disorder that could result in perceptual disturbances during times of stress, she also saw "no evidence that he was in a psychotic state or unable to understand right from wrong during the time in question." (*Id.*). She did not comment on whether Mr. George was or might have been in extreme distress the night of the shootings.

On November 8, the day that Dr. Ronan's report was provided to the trial court, the State, and the defense, Giddens contacted Dr. Ronan "regarding [her] evaluation" and spoke with her for approximately 18 minutes. (C. at 1306). His fee declaration

indicates that he did not speak with her again prior to trial, and Fannin never contacted her regarding her report. (*Id.* at 1306-07, 1310).

In investigating the facts of the case, Giddens and Fannin each spent three hours on "[c]ase preparation, visit[ing] [the] scene, [and] talk[ing] to witnesses." (*Id.* at 1306, 1309). For the penalty phase investigation—the alleged focus of defense counsel's trial strategy—Giddens spent a total of approximately 84 minutes calling a few of Mr. George's family members in the four days before the beginning of voir dire. (*Id.* at 1306).

## B. Trial

### 1. Voir Dire

On the morning of November 14, the court initially addressed all of the venire members together and asked if anyone believed they were disqualified. (Tr. R. at 20). Juror D.S. replied that he could not serve on the jury because he was involved in the "manhunt" for Mr. George. (*Id.*). Another juror, F.H., informed the court that he "participated in the acquisition of prop material for [*America's Most Wanted*] and participated somewhat in the production of it." (*Id.* at 21). After Giddens moved to strike D.S. for cause, the court asked, "What about [F.H.]?" (*Id.* at 27-28). Giddens replied, "We don't make a challenge on him," then reiterated his decision when the court asked a second time. (*Id.* at 28). The court later struck D.S. for cause. (*Id.* at 120).

The trial court divided the venire members into four panels. (*See id.* at 2, 29). Giddens examined the first and third panels, while Fannin questioned the second and

fourth panels. (*Id.* at 41, 75, 99, 137). In total, 33 of the 51 jurors admitted they had heard about the case or seen something about it on television. (*Id.* at 35-36, 70, 93-94, 130). Jurors C.G. and D.H. also indicated that they knew Geraldine and her daughter, Synobia George. (*Id.* at 77-78). Fannin did not move to strike either juror for cause, and both ultimately served on the jury. (*Id.* at 86; *see* Supp. Tr. C. at 12).[5] Another juror, M.D., stated, "[Mr. George] wouldn't be here if he hadn't done something."[6] (Tr. R. at 55.) The prosecutor subsequently asked M.D., "regardless of any thoughts that you have that [Mr. George] must have done something or he wouldn't be here, could you put any thoughts like that aside and just render a fair and impartial verdict based strictly on what comes to you from the witness stand?" (*Id.* at 57-58). M.D. indicated that he could do so. (*Id.* at 58). Giddens moved to strike M.D. for cause, but the trial court denied the challenge on the basis of M.D.'s response to the prosecutor. (*Id.* at 60-61).

After venire members were excused or removed for cause, six black men remained. *George I*, 717 So. 2d at 837. The State used four of its 15 peremptory strikes to remove black men, resulting in a jury containing two black men[7]. *Id.* Giddens raised

---

[5] The jury strike list is the eleventh page of the supplement to the record on direct appeal, but is labeled "12" in the upper right corner. This petition refers to pages in the supplement on direct appeal by the handwritten number on each page.

[6] In his amended Rule 32 petition, Mr. George referred to M.D. as "Juror Davidson." (Supp. C.1 at 477-78.) Mr. George here calls this juror "M.D." for consistency with his references to other jurors.

[7] There was an African-American male who served as an alternate but did not deliberate, reach a verdict, or recommend a sentence. (Tr. R. at 496). The State of Alabama sometimes employs a jury selection process where each parties' final peremptory *strike* results in that juror becoming an alternate. *See generally, Martin v. State*, 62 So. 3d 1050 (Ala. Crim. App. 2010).

a *Batson* claim, which the court denied because the percentage of African-Americans on the jury exceeded that of the population of Talladega County. (Tr. R. at 171-74).

## 2. Guilt Phase

Giddens gave a very brief opening statement, less than two pages of trial transcript, only asking the jury to treat the case seriously and hold the State to its burden of proof. (*Id.* at 206-07) ("I just ask you give it the attention and the seriousness which it deserves in all phases of this trial."). Counsel conducted minimal cross-examination, which was sometimes more harmful than helpful.[8] The defense rested without calling any witnesses, and did not give any closing argument. (*Id.* at 439, 469-70). At 2:20 p.m., the jury convicted Mr. George of attempted murder for the shooting of Geraldine George and of two counts of capital murder. (Tr. C. at 6-7, 57; Supp. Tr. C. at 12).

## 3. Penalty Phase

The case proceeded to the penalty phase the same day. In its opening argument, the State indicated that it would "not present evidence initially after the opening statement, and [it] may have some in rebuttal depending on what evidence [Mr. George] presents." (Tr. R. at 507.) As during the guilt phase, Giddens gave a very brief opening statement. (*Id.* at 514-15.) He explained that the defense would present criminal history

---

[8] For example, Stanley Russell testified that, on or around February 22, 1988, he drove Mr. George to Brewton, but he did not tell police about the encounter due to "fear and really just trying to protect [his] family." (Tr. R. at 406-15.) On re-cross, Giddens asked if it was "[f]ear of Larry George," and Russell responded, "That's right." (Tr. R. at 415.) Giddens continued, "Or fear of getting arrested for helping" to which Russell said, "Well, it wasn't fear of getting arrested." (*Id.*)

evidence, character evidence, and evidence of his mental state at the time of the offense, though he did not explain any of the details of the expected evidence. (*Id.*).

The defense called two of Mr. George's sisters—Gayle Joyce Bailey and Linda Faye Wright—as character witnesses.[9] When asked whether her brother was a "[g]ood boy" or "[b]ad boy" as a child, Bailey described him as a "normal boy" who "[g]ot along with everybody," but "kept mostly to [himself]" and "didn't talk about his problems too much." (*Id.* at 518). She confirmed that Mr. George did not have a criminal history and gave a short, skeletal overview of his life—he graduated high school, joined the Army, and got married. (*Id.* at 518-19). She described Mr. George's relationship with Geraldine as "[l]ike the normal marriage," but admitted that she had not spoken with him since he left the Army around 1986. (*Id.* at 520, 578). On cross-examination, Bailey testified that she did not know of any abuse he might have suffered from family members. (*Id.* at 521-22, 524).

Wright's testimony was even briefer. The only anecdotal evidence she offered was that, when she and Mr. George were children, they "used to enjoy late nights together . . . watching TV . . . comedy movies, and . . . eat[ing] corn flakes." (*Id.* at 526). Otherwise she essentially reiterated Bailey's testimony regarding his character (Mr. George kept to himself and did not confide in others) and general history (he graduated high school, joined the Army, and had not gotten into any legal trouble). (*Id.* at 526-27).

---

[9] The trial transcript incorrectly spelled Bailey's first name as "Gail."

Like Bailey, Wright had not seen Mr. George in "some years." (*Id.* at 526). Both Bailey and Wright asked the jury to impose a life sentence. (*Id.* at 521, 529).

After Wright was excused, Giddens noted that his next witness was Dr. Ronan, who was not yet present. (*Id.* at 529). The State suggested that it could "put on what little rebuttal" it had if the defense rested, subject to being allowed to call Dr. Ronan later. (*Id.* at 529-30). Without argument, Giddens agreed to rest. (*Id.* at 530).

Following a brief recess, the State called three witnesses—Investigator K.K. Parker, Detective Quinton Watson, and Detective Bruce Pinkett. (*Id.* at 532, 540, 550). Parker described the area in Delaware which Mr. George had been living prior to his arrest, as well as items found in the area. (*Id.* at 533-37). Through Parker, the State was able to offer several prejudicial exhibits as evidence, including, inter alia, a rifle, a banana clip loaded with ammunition, "bionic ears" (a listening device), and a newspaper clipping titled, "Murder Suspect Eludes Officers During Manhunt." (*Id.* at 539). The trial court admitted the exhibits over Giddens' objection. (*Id.* at 538-39).

Watson next testified to the circumstances of Mr. George's arrest, explaining how Mr. George attempted to break free from the two arresting officers; how one of the officers "ran up from behind and tackled him to the ground," resulting in a "wrestling match"; and how Mr. George fled downriver through chest-high water, only surrendering when a state police helicopter lowered down to about 15 feet above his head. (*Id.* at 545-47). He also described the campsite, adding more details regarding weapons that were found there (guns, throwing stars, and shotgun shells) and Mr.

George's hidden living area, which contained a television, VCR, car batteries, food, homemade stove, and a generator. (*Id.* at 548-50).

Finally, through Pinkett, the State was able to play for the jury two videotapes made of the area, with Pinkett narrating what was happening throughout. (*Id.* at 552-57). Pinkett also added to the list of weapons found at the site, including a spear gun, a night stick, bows and arrows, a BB gun, a loaded sawed-off shotgun, and a loaded handgun. (*Id.* at 556-59).

The trial court recessed until 6:30 p.m. (*Id.* at 561). Giddens then called Dr. Ronan, who explained the evaluation she had done prior to trial and what information is generally used for such evaluations. (*Id.* at 564-66). When asked about her opinion of Mr. George's mental state at the time of the offense, Dr. Ronan said, "I think he has a personality disorder. . . . The diagnosis that I gave was a mixed personality disorder that had dependent, avoidant, passive-aggressive, paranoid, and perhaps schizotypal features." (*Id.* at 567-68). She described Mr. George as "unstable when it comes to relationships," "very unstable," "too dependent on [people he is close to] to where he might be very smothering or very possessive, very – maybe at times very jealous, want to control them," "very mistrustful of others," and a person who "might explode, become aggressive, either verbally or physically." (*Id.* at 569-70). She repeatedly stated, however, that he did not have any "major mental illness." (*Id.* at 569-70, 574, 585). Giddens did not ask Dr. Ronan on direct whether she thought Mr. George was under

extreme emotional distress or experiencing an extreme mental disturbance at the time of the offense.

Near the close of cross-examination, the State emphasized the findings Dr. Ronan had written in her report, asking questions such as, "[Y]ou said that you do not find that he was experiencing major mental illness during the time in question nor would the reported symptoms have impaired his understanding of right from wrong?" and "[Y]ou found no evidence that Mr. George has ever suffered from a major psychiatric disorder that would render him to be out of touch with reality or . . . unable to understand right from wrong?" (*Id.* at 589). Dr. Ronan confirmed that her report accurately reflected her opinion. (*Id.*).

The State made a closing statement, spanning approximately ten pages of transcript. (*Id.* at 595-605). The State reiterated the evidence in detail as it related to the extreme emotional disturbance mitigating factor, highlighting portions of Dr. Ronan's testimony and arguing that "[n]othing you heard [Bailey or Wright] say about [Mr. George's] upbringing provides you with any reason to think that he is somehow not culpable or not as culpable or provide you with some mitigating circumstance." (*Id.* at 599-600, 602-03).

By contrast, Giddens' closing argument spanned about five pages of transcript and referred only vaguely to the evidence: "I submit to you that his sisters testified he had not been in trouble with the law, and he has no criminal history," and "[Y]ou consider the mental state at the time of the offense, and Dr. Ronan testified to that, and

[I] ask you to consider what she said." (*Id.* at 605-10). Giddens closed by saying that, if the jurors thought that Mr. George should be executed and recommended the death sentence, "*nobody can be mad at you about that or say you didn't do your duty.*" (*Id.* at 609). He assured the jury that, whatever sentence they recommended, "*[w]e won't have a problem with that either way.*" (*Id.* at 610) (emphasis added). Giddens did not ask at any point that the jury recommend life without parole. (*Id.* at 605-10).

Following rebuttal argument from the State, the judge instructed the jury on mitigation and aggravation and told them that "the State has proved beyond a reasonable doubt the aggravating circumstance of burglary in the first degree." (Tr. R. at 625.) The jury retired for deliberations at 8:35 p.m. (Supp. Tr. C. at 12). By 9:30 p.m., the jurors had not reached a decision and sent a note to the court asking if they could retire for the night. (*See* Tr. R. at 634-35). After reading the note, the State said, "Don't see any way you can deny that." (*Id.* at 635). The trial court, however, commented that it was "just 9:30" and "not too late." (*Id.*). Accordingly, the judge suggested that he could write a note to the jurors stating, "I would appreciate you deliberating for further reasonable time before we recess for tonight. You have only been deliberating for 50 minutes at this time. Consider this request, and if this is okay, continue deliberating." (*Id.*). Giddens did not object. (*Id.*). At 10:00 p.m., the jury returned a 10-2 recommendation for the death sentence. (*Id.* at 636; Supp. Tr. C. at 12).

4.   <u>Sentencing Hearing</u>

At the judicial sentencing, the trial court sentenced Mr. George to life imprisonment on the attempted murder charge. (Tr. R. at 643). As to the capital charges, the State asked the court to adopt by reference a note in Mr. George's presentence investigation report regarding a threatening letter Mr. George allegedly wrote while imprisoned. (*Id.* at 646-47). Despite the fact that Giddens had not yet presented any evidence in the hearing—and indeed, did not do so at all during the hearing—the State claimed that it was offering the letter "in *rebuttal* to the mitigating evidence which [Mr. George] is offering." (*Id.* at 651) (emphasis added). Over Giddens' objection, the trial court admitted the letter into evidence. (*Id.* at 647-48, 651, 659). Rather than present any additional evidence or argue that Mr. George had shown any particular mitigating factor, Giddens simply asked the court to "take judicial knowledge" of Bailey's, Wright's, and Dr. Ronan's testimony and Dr. Ronan's report, and "consider that as a mitigating factor." (*Id.* at 660-61). The court sentenced Mr. George to death by electrocution. (*Id.* at 665).

The trial court subsequently published its "Findings of Fact" regarding the penalty phase and sentencing hearing. (Tr. C. at 100-07). The court found that only one aggravating factor applied—the offense was committed while Mr. George "was engaged in the commission or, or an attempt to commit, or flight after committing, or attempting to commit a burglary." (*Id.* at 103-04). It also concluded that Mr. George had proved one statutory mitigating factor—he had "no significant history of prior criminal activity"—and no non-statutory mitigation. (*Id.* at 105-06).

### C. Rule 32 Proceedings

#### 1. Proceedings Prior to the Evidentiary Hearing

Mr. George initiated state post-conviction proceedings *pro se* in 1999. (Supp. C.1 at 9-199). Eventually, attorney John Poti filed the amended Rule 32 petition in July 2005. (Supp. C.1 at 426-580). After dismissing some of Mr. George's claims and sub claims, the circuit court ordered that both parties be allowed to have Mr. George evaluated by a psychologist. (C. at 86, 88). In May 2010, Dr. Bryan Hudson—an expert retained by Mr. George—prepared a "Neuropsychological Evaluation" of Mr. George based on three interviews/evaluations with him, several tests, a review of the record, and interviews with Mr. George's friends and family. (*Id.* at 1321-46). Mr. George showed "evidence of underlying paranoia . . . [and] unusual beliefs and bizarre thoughts" during each interview. (*Id.* at 1333). At the third interview, Mr. George's "affect was odd, as he typically oscillated between a blunted affect and smiling, with neither being particularly relevant to the situation." (*Id.* at 1334). The findings from each interview "were consistent with underlying personality disturbances related to a highly idiosyncratic/odd world view, increased self-doubt . . . , and a belief system characterized by magical thinking. (*Id.* at 1335). He also showed "neurotic tendencies," increased levels of anxiety and fear about others' motives, irrational beliefs, "delusions of persecution, and poor reality testing." (*Id.* at 1335, 1339).

Dr. Hudson diagnosed Mr. George with Schizotypal Personality Disorder ("SPD"), a Schizophrenic Spectrum Disorder characterized by a "reduced capacity for[

] close relationships as well as by cognitive and/or perceptual distortions and eccentricities of behavior." (*Id.* at 1336). Mr. George's abnormal behaviors and beliefs were "consistent with frontal-temporal disturbance"—*i.e.*, an impairment of the area of the brain responsible for inhibition and modulating emotion-based impulses. (*Id.* at 1339). Based on interviews with others, Dr. Hudson found a "great deal of anecdotal evidence" that Mr. George "experienced significant psychopathology during adolescence through early adulthood, which would include the time period before and during his commission of the current offenses." (*Id.* at 1338). Finally, Dr. Hudson concluded that Mr. George's "functional capacity was greatly diminished during the time period leading up to and following his commission of the current offense." (*Id.* at 1336).

Dr. Glen King, the state's expert, also prepared a Psychological Report regarding Mr. George following an interview with him on February 23, 2011. (*Id.* at 1179-84). During the interview, Mr. George stated that he had "not really" ever had any psychiatric problems, and he had not sustained any injuries as a result of car accidents, though he had been "called crazy all [his] life because [he had] done some crazy-ass [expletive] sometimes", such as "play[ing] chicken with a train" or "stand[ing] in front of gun, pistol, or knife." (*Id.* at 1180-81, 1184). Mr. George described his mother as "loving, caring" and "like any other regular mom." (*Id.* at 1181). His father was "hardworking, dedicated, loved his kids, and tried to do what he could do." (*Id.* at 1182).

Dr. King stated that he found no evidence that Mr. George had ever suffered from a serious mental illness or defect. (*Id.* at 1184).

Almost a year before the evidentiary hearing, Poti filed a motion requesting the court to accept affidavits from Calvin George ("Calvin," Mr. George's older brother), who died in 2008, and Clarence Brown (Mr. George's cousin), who died in 2009. (C. at 232-36.) Calvin attested that he and the other children were beaten every day by both parents for irrational reasons such as not "automatically know[ing] how to do something." (C. at 242-43.) Their dad "drank so much" that he caused the family to "go days without a good meal." (*Id.*)

Calvin stated that Mr. George suffered several serious head injuries as a child. When Mr. George was an infant, he was in a car accident and was thrown out of the car, rolling "down into [a] drainage pipe." (C. at 243.) Calvin was unsure whether Mr. George was taken to a doctor because his family "didn't believe in doctors too much," and being thrown from a car as an infant might not amount to being "really down and out" such that he could see a doctor. (*Id.* at 244.) From then on, Mr. George would do and say "crazy things," such as seeing apparitions, but he never received treatment. (*Id.*) Additionally, their mother once "threw a plank with a nail" at Mr. George, hitting him in the head with the nail. (*Id.* at 243.) Mr. George was not given any medical treatment, even though the nail "[b]usted his head" and caused "[a] lot of blood." (*Id.*)

Calvin explained that growing up poor "affected the children real bad." (*Id.*) His own upbringing "prepared [him] to respond with violence" such that Calvin had to

leave his girlfriend so he would stop abusing her. (*Id.*) As to Mr. George, the Army exacerbated the problems caused by his upbringing; it "messed [him] up," making him "more aggressive" and "a different person" than when he joined. (*Id.* at 247.) Shortly before the incident, Mr. George told Calvin that Geraldine wanted to get a divorce, which Mr. George did not want. (*Id.* at 248.) Mr. George caught Geraldine cheating on him, causing "all of the things in his life"—his childhood, upbringing, and the military—"fell on him all at once." (*Id.*) Had defense counsel contacted him, he would have testified to this information. (*Id.*)

Brown attested that Mr. George was "a mental health person who fell through the cracks." (*Id.* at 252.) "Every time [Mr. George] went somewhere, people would eventually dump him," and although he was "good at getting ladies, . . . he couldn't hold them." (*Id.* at 250-51.) When he became angry, he "stayed mad for a long time" and "took a long time to drop it." (*Id.* at 251.) Mr. George also had a history of treating dreams as if they really happened, once beating a woman because he "had a dream she was cheating on [him]" and had "to go take care of it." (*Id.*) Defense counsel never contacted him, but he would have testified had he been given the opportunity. (*Id.* at 252.) The circuit court denied Mr. George's motion to accept affidavits in lieu of deposition. (*Id.* at 268-69.)

About two weeks before the hearing, Poti filed a motion to take testimony at the hearing via videoconferencing, telephonically, by deposition, or by affidavit. (*Id.* at 438-44.) He indicated that he intended to present testimony from eight out-of-state

witnesses—Bailey and Wright, who testified during the penalty phase; two of Mr. George's cousins; and four of Mr. George's friends. (*Id.* at 439-40.) The circuit court denied the motion. (R. at 181-82.)

### 2. Rule 32 Evidentiary Hearing

The circuit court held the evidentiary hearing on July 25 and 26, 2011. (R. at 1). Both of Mr. George's trial attorneys testified at the Rule 32 hearing. Fannin admitted that, prior to being appointed to Mr. George's case, he had no capital defense experience or capital-specific training. (*Id.* at 57). Judge Fielding appointed him because he thought Giddens, who had been on the case for several months, "might need some assistance." (*Id.*). At the time, Fannin had been practicing law for only four years. (*Id.* at 56-57).

Fannin explained that his responsibilities consisted of "[j]ust really, I guess you would say, tot[ing] Mr. Giddens' bag for him more or less and just help[ing] him get ready for trial," and conceded that he did not remember whether he and Giddens divided tasks. (*Id.* at 58). He also did not recall conducting any investigation; rather, he believed that Giddens had investigated the case earlier. (*Id.*) Fannin did not travel to meet any of Mr. George's family members or childhood neighbors prior to trial. (*Id.* at 59-60). In fact, aside from a few family members who he met "briefly before trial started," Fannin testified that he did not recall meeting or interviewing any witnesses. (*Id.* at 59). He also did not remember collecting records of any kind. (*Id.* at 60).

Poti produced a copy of a September 30, 1994, fee declaration, in which Fannin had claimed that he spent three hours on "case preparation, visit[ing] [the] scene, and talk[ing] to witnesses." (*Id.* at 62). After reviewing the document, Fannin stated that he remembered going to the scene of the crime and "talk[ing] to some folks," who he believed were probably "people that lived in the complex there." (*Id.* at 62-63). He attempted once to talk to Geraldine, but she did declined to speak with him. (*Id.* at 63).

Fannin testified that he reviewed discovery with Giddens, and he identified several exhibits—including statements taken from witnesses—as files he had seen. (*Id.* at 63-66). Although the district attorney had an "open file policy" and made the State's complete case file available to the defense, Fannin could not remember getting the names of any potential witnesses who he thought he should interview. (*Id.* at 64). He did not specifically recall discussing a mental health defense with Giddens, though he remembered receiving a report from Dr. Ronan. (*Id.* at 68). He also did not recall whether he met Dr. Ronan or prepared her to testify. (*Id.* at 69). He believed they had employed a mitigation specialist for the case. (*Id.* at 70). Finally, Fannin could not remember how he and Giddens decided who to call during the penalty phase or who prepared the penalty phase witnesses to testify. (*Id.* at 71).

Giddens testified that he did not recall handling any capital cases prior to his appointment or whether he had any capital-specific training. (*Id.* at 78, 83). He and Fannin did not have "any specific way to divide" case duties between themselves; instead, they "were just on the case together." (*Id.* at 79). No legal assistants, paralegals,

or investigators assisted with the case. (*Id.* at 80). Giddens agreed that he had access to the State's files, but could not remember whether he had seen some documents from the file, such as Talladega Police Department records. (*Id.* at 85).

According to Giddens, his trial strategy was "really to plan for the penalty phase," given that Mr. George allegedly made a statement to police that rendered his case "a difficult prospect."[10] (*Id.* at 88, 91). Giddens recommended to Mr. George that they "get family members to testify on his behalf . . . [a]ny mitigation or any nonstatutory mitigation." (*Id.* at 92). He explained that he called Dr. Ronan for this purpose. (*Id.*). Giddens did not remember what information he gave Dr. Ronan, and based on her assessment, he concluded that there was no need to further explore any mental health issues. (*Id.* at 97-98). He did not remember why he had asked Mr. George to be evaluated at Cheaha, a state-run facility, and when asked whether he sought a defense expert to evaluate him, Giddens replied "[t]hat's what I filed for to Taylor-Hardin," even though Taylor-Hardin is a state-run facility. (*Id.* at 95-96). Giddens claimed that he and Fannin "would have attempted to talk to witnesses," though he only remembered speaking with Mr. George's mother and sisters prior to trial. (*Id.* at 98-99). He admitted that he did not provide Mr. George's file to Poti because he had been unable to find it. (*Id.* at 104-05).

---

[10] Nothing in the record suggests that Mr. George did, in fact, make a statement to police.

Next, Dr. Hudson testified. He first discussed general techniques used in preparing a comprehensive psychological evaluation. (*Id.* at 194-200). He stated that "[a]lmost always you would want to include collateral sources of data"; thus, it is "important" to interview the client's family, friends, coworkers. (*Id.* at 197-98). Dr. Hudson also typically "require[d]" the client's medical records, developmental records, birth records, records relating to medication use or hospitalization, academic records, military records (if applicable), and family medical records. (*Id.* at 199-200).

As to Dr. Ronan's report, Dr. Hudson found her conclusion "interesting" because she had indicated that Mr. George was displaying some symptoms due to the situation he was in (*i.e.*, charged with capital crimes), but also that the symptoms "appeared to be schizotypal," and "schizotypal is by nature a personality disorder meaning it's innate," not caused by one's surroundings. (*Id.* at 210.) According to Dr. Hudson, "she was saying both and didn't really say which one she most firmly believed, which [Dr. Hudson] found a little unusual." (*Id.*).

Dr. Hudson then described the procedures he used to prepare his own evaluation and the findings contained in his report. (*Id.* at 214-20, 239.) He explained that people with SPD have: (1) "distortions in [their] perception[,] [m]eaning how [they] view the world"; (2) "distortions in [their] basic believe [sic] system or [their] world view"; and (3) distortions . . . or deviance in [their] behavior that's consistent with [their] perceptual and cognitive distortions." (*Id.* at 258-59.) They view the world as "something that needs to be avoided, something that is out to hurt [them]"; thus, if someone did

anything that a person with SPD perceived as harming him, the person with SPD could "easily turn on that individual at that time and turn in a very vicious way." (*Id.* at 259-60.) When a person with SPD feels cornered, he might engage in impulsive, unthinking aggressiveness that emerged as "kind of a barrage of actions." (*Id.* at 260-61.) When in extreme distress, a person with SPD "will lapse into a full psychotic break"—a "break in the reality testing"—where his "break with reality is final . . . and [he] start[s] to hear, see, and perceive the world through those delusional sets, through those perceptions that have reached a reality, and [he] become[s] truly psychotic." (*Id.* at 264, 267.) Dr. Hudson concluded that, at the time of the offense, Mr. George "had all the makings for a psychotic break," such that his "comprehension [was] no longer there." (*Id.* at 270.)

The State called Dr. Glen King, a clinical and forensic psychologist, to rebut Dr. Hudson's testimony and opinion. Dr. King conducted an evaluation of Mr. George consisting of the following: (1) a single clinical interview of Mr. George, lasting no more than an hour and a half (C. at 1141-42, 1186); and (2) record review[11] (*Id.* at 1179-80).

Dr. King conducted no psychological testing himself, because, he said, he observed nothing from his record review or during the interview with Mr. George that

_____

[11] This included: a) review of prior mental health evaluation reports by Dr. Hudson, Mr. Garner and Dr. Ronan; b) review of materials related to the criminal prosecution of Mr. George, such as the trial testimony of Dr. Ronan, a pre-sentence report, and the sentencing order; c) personal records of Mr. George, such as school records, military records, and prison health records; and d) review of affidavits of family members and relatives of Mr. George.

suggested a need for testing. (*Id.* at 1119, 1132.) He testified that "I didn't find in any of the records any regular references to odd beliefs or odd behaviors." (*Id.* at 1136.) Dr. King stated that Mr. George "categorically denied" any belief in voodoo. (*Id.*) He testified that when asked whether he practices voodoo, "Mr. George told me that some people had – he knew that some people had said that about him …."[12] (*Id.*)

Dr. King also reported as a reason for conducting no testing that Mr. George's demeanor during his clinical interview was "forthright … pleasant and cooperative." (*Id.* at 1132-33.) However, when asked on direct whether he had attempted to interview Mr. George on an occasion earlier than the reported evaluation, Dr. King acknowledged that Mr. George refused to speak to him at that time.[13] (*Id.* at 1153-54.) Dr. King said nothing about Mr. George's interpersonal relationships generally or his relationship with his wife in particular as related to assessing his mental health.

On cross-examination, Dr. King admitted that he is not trained to administer or interpret the Luria Nebraska test battery. (*Id.* at 1146-47.) He also admitted that he had not reviewed the files from the Police Department or the DA's Office.[14] (*Id.* at 1141.)

---

[12] Besides ignoring the circumlocution in Mr. George's answer, Dr. King did not indicate any awareness that "voodoo" is not the term Mr. George applies to his own beliefs and practices. (C. at 660) (testimony of Dr. Hudson).

[13] *See also* the State's Motion *in limine* to Exclude Mental Health Expert's Testimony, in which the grounds stated are that Mr. George refused to speak with Dr. King on his first visit. (C. at 261.) The State sent Dr. King to evaluate Mr. George without giving Mr. George's counsel advance notice in defiance of a court order. (R. at 44-45.)

[14] These included the "Profile" described above, the very first page of which states "George developed an interest in voodooism and ritualistic acts." (C. at 819.) Numerous other references to odd practices are also included in both of these files, as described above.

He did not recall reviewing Dr. Ronan's report (*Id.* at 1146), though it is listed in his "Data Sources". (*Id.* at 1180). He acknowledged that he had not conducted any interviews with collateral witnesses (*Id.* at 1148), but had reviewed affidavits from some. (*id.*). When pressed as to whether he relied on the affidavits as truthful, Dr. King stated only that "I just reviewed the affidavits to see what information they might provide for me."[15] (*Id.* at 1149-50.) He disagreed with the suggestion that, if he had doubts about their veracity, he should have interviewed the affiants in person (*Id.*. at 1150), because "[m]y basic assessment here was of Mr. George to see if he had any presence of symptoms of serious mental illness or defect which he does not" (*id.*). Ultimately, he gave no reason for disbelieving their content or explanation as to how they fit into his contrary diagnosis.

At a rebuttal deposition, Dr. Hudson described a number of problems with Dr. King's report and opinion. First, Dr. Hudson stated that, while Dr. King may have the training to interpret some neuropsychological tests, he is not a neuropsychologist and is not trained to interpret the full test battery administered by Dr. Hudson, who is a neuropsychologist. (C. at 645-48, 652.) Second, Dr. Hudson found Dr. King's omitting to review certain materials inexplicable. (*Id.* at 645-46.) And finally, Dr. Hudson

---

[15] The State sought to rehabilitate Dr. King's opinion at Dr. Hudson's deposition by pointing out that the affidavits of Gayle Bailey, Linda Wright and Kendell Storey all post-date Dr. King's deposition. (C. at 839-41.) However, Dr. King did have the affidavits of Calvin George, Clarence Brown, Rosanna Simmons, and Darlene Jackson, yet he ignored them.

critiqued Dr. King's taking Mr. George's self-report at face value, with no attempt at "external validation." (*Id.* at 646.)

Dr. Hudson explained his own methodology in some detail. Before interviewing Mr. George, he reviewed numerous records. (*Id.* at 671.) This, combined with testing, allowed him to form a preliminary hypothesis. (*Id.* at 670-71.) Neuropsychological testing was of particular importance in this case to rule out brain injury, rather than personality disorder, as the cause of Mr. George's mental health issues. (*Id.* at 672.) Dr. Hudson then engaged in multiple interviews with Mr. George, because repeated contact increases the validity of a diagnosis. (*Id.* at 657-61.) This is so because disclosure of valid information by the subject involves establishing trust. (*Id.* at 660-61.) Finally, because Dr. Hudson's diagnosis was a personality disorder, interviews with multiple collateral witnesses who had interacted with Mr. George throughout his life and in various capacities was critical because a personality disorder affects the subject in all of his relationships and activities. (*Id.* at 668-70.) Based on these repeated efforts to "disvalidate" his hypothesis without success, Dr. Hudson arrived at the conclusion that his assessment of Mr. George as having SPD was accurate. (*Id.* at 671-74.)

Dr. Hudson critiqued Dr. King's opposite conclusion, that Mr. George does not have any serious mental illness, as lacking in many areas. With respect to the first deficiency in Dr. King's evaluation, Dr. Hudson explained that Dr. King could not even use Dr. Hudson's evaluation, because he lacks the expertise to interpret it (*Id.* at 647, 666), yet he conducted no testing using instruments he does have experience with (*Id.*

at 666-68). So, for example, Dr. Hudson testified that a diagnosis of learning disability, which Dr. King suggested was the only mental health problem manifested in Mr. George's test results and records, must rest on a "discrepancy between IQ and achievement," which does not exist in Mr. George's case, based both on the results of the Luria Nebraska battery which he administered and review of Mr. George's school records. (*Id.* at 753-55.) Furthermore, Dr. Hudson testified that, if Dr. King believed Mr. George has a learning disability, he should have conducted additional testing, i.e., achievement testing, to either prove or disprove his hypothesis. (*Id.* at 779, 799.) Dr. Hudson also explained that Dr. King's description of the Luria Nebraska test battery as not "popular" was inexplicable and that the battery is generally accepted as a valid instrument for neuropsychological testing. (*Id.* at 761-66.). Dr. Hudson also questioned Dr. King's assertion that nothing in the records he reviewed indicated mental illness. (*Id.* at 785-87.) Those records included Dr. Hudson's report, as well as the reports of Mr. Garner and Dr. Ronan. (*Id.* at 786.) All of these indicated mental illness. (*Id.* at 785-87.)

As Dr. Hudson described it, the third deficiency, taking what Mr. George said at face value, without validating it, actually has two parts. First, Dr. King spent such a short period of time with Mr. George that he could not establish the necessary relationship or understanding of his language to extract reliable information from Mr. George. (*Id.* at 657-60.) This led to the misunderstanding about Mr. George's unusual beliefs and practices. Because Mr. George does not use the term "voodoo," he honestly

responded to Dr. King that he does not practice it. But he does (or did) practice "magic" and believe in "hexing." (*Id.* at 660-61.) Second, Dr. King did not employ any method of validating or disvalidating Mr. George's self-report. As Dr. Hudson explained:

> [W]hether or not a behavior is eccentric or odd is kind of in the eye of the beholder, which is why this is reported by other people.
>
> The patient is not going to report the behavior as eccentric or odd. It's their behavior. It's normal to them. Part of the issue of schizotypal is that their normal is deviant, is different than everyone else's, so – but still they are normal [in their own view].
>
> So if you ask them, they are going to tell you, you know, I'm fine, I'm okay. But if you ask anyone else, what they will tell you is they are abnormal, they have problems. So no, you can't rely on self-report.

(*Id.* at 688-89.) Dr. Hudson testified that Dr. King's apparent rejection of the information provided by collateral witnesses in affidavits, yet failure to interview them or any other persons acquainted with Mr. George, contradicted standard practice and provided inadequate grounds to refute Dr. Hudson's diagnosis. (*Id.* at 690-94.)

3. <u>Testimony of other mitigation witnesses</u>

As well as the above mental health evidence, relevant both to culpability and mitigation, Mr. George presented additional evidence to demonstrate prejudice from trial counsel's failure to conduct a mitigation investigation and effectively present the results to the jury.

Contrary to the picture painted at trial, the evidence admitted during the Rule 32 proceedings demonstrated that Mr. George grew up in a household full of violence and chaos. Mr. George's father, Ransom, was an alcoholic, by all accounts. According to all

of Mr. George's siblings, Ransom worked hard at his job during the week, but blew his pay on alcohol as soon as he got the cash. (Supp. C.2 at 909) (George aff.); (Supp. C.2 at 2298-99) (Bailey aff.); (Supp. C.2 at 2304) (Wright aff.). The family often went hungry because Ransom had burned through the grocery budget. (Supp. C.2 at 909) (George aff.); (Supp. C.2 at 2299) (Bailey aff.). His daughter Gayle had to learn to drive a stick-shift so she could go pick her father up out of the street when he got falling-down drunk. (*Id.*) (Bailey aff.). Ultimately, he even lost the house he had built, gambling it away. (*Id.*) (Bailey aff.).

The effects of this long-term addiction finally caught up with Ransom, as his medical records show. At Ransom's last hospitalization in 1982, his treating physician noted, "On arrival at the emergency room, he had apparently been drinking considerable amounts of alcoholic beverages which he has done for a long period of time." (Supp. C.2 at 864.) The doctor also recorded that Ransom "has had multiple altercations, fighting, in jail several times due to his drinking problem." (*Id.*)

Whether it was the alcohol or something else, Ransom took his frustrations out on his wife, beating her mercilessly. (Supp. C.2 at 910) (George aff.); (Supp. C.2 at 2299) (Bailey aff.); (Supp. C.2 at 2304) (Wright aff.). On one of these occasions, Ransom bashed his wife in the head with a frying pan, blinding her in one eye. This incident was witnessed by one of Mr. George's cousins, Darlene, on a rare visit to her Alabama relatives. (Supp. C.2 at 916.) Everyone in the family heard about it. (Supp. C.2 at 2299)

(Bailey aff.); (Supp. C.2 at 2304) (Wright aff.). They even recounted it to the police years later, when detectives came looking for Mr. George. (Supp. C.2 at 819.)

Towards their children, Mr. George's parents were both violent and neglectful. Family members described Ransom to the police as "a very cruel and abusive person," who beat his children as well as his wife. (*Id.*) Daughter Amanda suffered severe burns as a child huddling close to the fire one evening when her parents left the children home alone. (Supp. C.2 at 909) (George aff.); (Supp. C.2 at 2299) (Bailey aff.); (Supp. C.2 at 2304) (Wright aff.); (Supp. C.2 at 848) (medical records of Amanda Addison George).[16] To teach Calvin a lesson about staying out late at night, Ransom nailed shut all the windows but one, then threw hot water on Calvin when he tried to climb back in the house. (Supp. C.2 at 910.)

Mother, Amanda, as a disciplinarian, was equally as cruel and out-of-control as Ransom. When in a disciplinary mood, she would grab whatever came to hand – "extension cords, broom" (C. at 1182) (response of Larry George to Dr. King), or "belts, boards, switches" (Supp. C.2 at 2299-2300) (Bailey aff.). On one occasion, when Larry was slow in answering her summons, she threw a board with a nail sticking out of it at him and hit him in the head. (Supp. C.2 at 910) (George aff.); (Supp. C.2 at 2300) (Bailey aff.). He bled profusely, but no medical attention was sought. (*Id.*) A neighbor

---

[16] Medical records for Amanda George, Mr. George's mother, and Amanda Addison George, his sister, are intermixed.

and friend of the Georges, Eddie Jones, reported seeing regular whippings and bruises on Larry. (R. at 134.)

Mr. George's brother, Calvin, explained how all of this violence became normative, even without the handicap of mental illness. (Supp. C.2 at 910.) He treated his girlfriends the same way his father had treated his mother until he recognized the dysfunction in this mode of relationship. (*Id.*)

Prior to his marriage, Mr. George enlisted in the United States Army, where he served nine years. (Tr. C. at 43.) He then served in the Army Reserve for two years. (*Id.*) While in the Army, he was stationed in Germany for a number of years, while his wife and children remained in the U.S. (Supp. C.2 at 2301.) While enlisted, Mr. George engaged in odd behaviors such as taking M.R.E., medical supplies, and military survival kits without authorization. (Supp. C.2 at 664.) He faced a few criminal charges while enlisted for possessing marijuana and leaving the scene of an accident with bodily injury. (*Id.*) He was disciplined for dereliction of duty because he was found sleeping while on guard duty. (*Id.*) Because of his disciplinary issues, he was demoted from tank commander to the supply room (Supp. C.2 at 2295), where the confrontation with a superior officer recalled by Kendell Storey and recounted above occurred. Ultimately, Mr. George received an honorable discharge from the Army, but was banned from reenlisting. (Supp. C.2 at 821.) Although discharged from active duty, he continued to dress in complete or partial fatigues and eat M.R.E. rations. (*Id.*)

All of this information would have been available to counsel, if they had conducted a mitigation investigation. Such investigation was common practice in Alabama at the time of Mr. George's trial, yet counsel failed either to undertake the investigation themselves or to employ a specialist's services. Lucia Penland, a mitigation specialist active in Alabama at the time of Mr. George's trial, testified that her agency, the Alabama Prison Project, routinely contacted all counsel appointed to capital cases in the state to offer assistance with mitigation investigation. (R. at 32-34.) She made contact with Mr. George's defense counsel, but her office was not retained to work on the case. (R. at 33.) She also testified on cross-examination that her agency would not take a case if they would not have sufficient time to prepare it thoroughly. (R. at 35.) She stated that she did not believe time had been an issue in Mr. George's case. (R. at 36.) All of the information above points to a reasonable likelihood of a different outcome had this information been presented at trial.

## CIRCUMSTANCES RELATED TO COVID-19

In January 2020, the United States Health and Human Services Secretary declared a public health emergency because of the novel corona virus (COVID-19).[17] On March 11, 2020, COVID-19 was designated as a pandemic by the World Health

---

[17] Secretary Azar Declares Public Health Emergency for United States for 2019 Novel Coronavirus (Jan. 31, 2020), *available at* https://www.hhs.gov/about/news/2020/01/31/secretary-azar-declares-public-health-emergency-us-2019-novel-coronavirus.html (last visited on Mar. 1, 2021).

Organization (WHO).[18] Two days later, on March 13, the President of the United States declared a national emergency.[19] In step with the national response, Alabama's Governor also declared a state public health emergency on March 13, 2020.[20] As of this filing, the public health crisis remains.

On March 18, 2020, the Alabama Department of Corrections issued a public announcement suspending all visitation for thirty days.[21] Since that time, ADOC has continued to suspend all visitation as the public-health emergency has not been lifted. As a result, counsel have been unable to meet in person with Mr. George.

On March 16, 2020, the Executive Director of the Federal Defenders for the Middle District of Alabama issued a directive closing the office, directing nearly all staff to work from home, and limiting fieldwork, effective March 17, 2020. On April 30, 2020, the Alabama Department of Public Health issued an order mandating that all individuals minimize all travel outside the home, and advising employers to minimize

---

[18]WHO Director-General's opening remarks at the media briefing on COVID-19, Mar. 11, 2020 *available at* https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020 (last visited on Mar. 1, 2021).

[19] President Donald J. Trump's Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak (March 13, 2020), *available at* https://www.govinfo.gov/app/details/DCPD-202000156 (last visited on Mar. 1, 2021).

[20] State of Alabama Proclamation by the Governor, Mar. 13, 2020, *available at* https://governor.alabama.gov/assets/2020/03/2020-03-13-Initial-COVID-19-SOE.pdf

[21] Alabama Dep't of Corr., ADOC Public Announcement: COVID-19 (Mar. 18, 2020), *available at* http://www.doc.state.al.us/NewsRelease?article=ADOC+PUBLIC+ANNOUNCEMENT%3A+C OVID-19 (last accessed Mar. 1, 2021).

employee travel.[22] The Federal Defender has continued that directive, which remains in effect as of this filing.

Courts have recognized the problem that this pandemic has created for criminal defense attorneys. In a recent federal capital case, a court explained that "contacting potential witnesses solely though telephone would prove devastating to the defense team in trying to obtain any mitigating evidence from them." *United States v. Crusius*, 2020 WL 4340550, at *3 (W.D. Texas, July 28, 2020). The court explained that "attempting to conduct in-person interviews during these times would not only go against all ensuing federal and state orders and the advice of the national public health authorities, but also risk damaging any possible relationship between his defense team and potential mitigation witnesses." *Id.* Courts have been willing to extend deadlines, recognizing "the situation presents a rare and exceptional event that has impacted counsel's ability to investigate" and prepare a habeas petition. *Hutto v. Cain*, No. 3:20-CV-98-DPJ, Order Granting Mot. for Equitable Tolling (S.D. Miss. June 26, 2020), Doc. 11 at 1.

Counsel for Mr. George are filing this petition to comply with the statute of limitations imposed by 28 U.S.C. § 2244(d), which runs on March 3, 2021. In light of the current limitation on visits with their client and the general restrictions on travel, it

---

[22] Ala. Public Health, Order of the State Health Officer Suspending Certain Public Gatherings Due to the Risk of Infection by COVID-19, Amended Sept. 30, 2020 *available at* https://www.alabamapublichealth.gov/legal/assets/order-adph-cov-gatherings-093020.pdf (last visited Mar. 1, 2021).

may be necessary to later seek the Court's permission to amend the petition, which Mr. George respectfully requests be liberally granted.

## AEDPA & EXHAUSTION OF CLAIMS

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides, in relevant part:

> (d)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

### A.  The Anti-Terrorism and Effective Death Penalty Act ("AEDPA") is unconstitutional.

As an initial matter, Mr. George argues that a key section of AEDPA is unconstitutional. The present application of 28 U.S.C. § 2254(d)(1) violates Articles III and VI of the United States Constitution because it dictates what precedent a federal court may use to decide a case and allows state courts to be the final arbiter of federal constitutional law even when the state court decision is incorrect. Section 2254(d)(1) violates Article III of the Constitution because it invades the judicial power. Section

2254(d)(1) also violates Article VI of the Constitution because it deprives the federal courts of the ability to order the release of a prisoner even if the federal court concludes that the prisoner is being held in violation of the Constitution.

### B. Exhaustion of Claims under 28 U.S.C. § 2254(b)

Because of principles of comity and federalism, "a state prisoner must normally exhaust available state judicial remedies before a federal court will entertain his petition for habeas corpus."[23] If the prisoner has not presented a claim to the state courts, AEDPA allows federal courts to grant a prisoner's petition for writ of habeas corpus where there is no available state corrective process or "circumstances exist that render such process ineffective to protect the [prisoner's] rights."[24] Indeed, "Alabama's postconviction process is governed by exceptionally complex procedural rules, unyielding deadlines, demanding pleading requirements, and very short time periods during which to navigate the maze. . . . The postconviction process is so complex that even attorneys and judges often struggle to understand its nuances."[25]

Despite the complexity of the state post-conviction process, Alabama did not guarantee the appointment of counsel to indigent death-sentenced prisoners.[26] Instead, the State relied "on the efforts of . . . volunteers."[27] Alabama's capital legal system put

---

[23] *Picard v. Connor*, 404 U.S. 270, 275 (1971) (citation omitted).
[24] 28 U.S.C. § 2254(b)(1).
[25] *Maples v. Thomas*, Br. of Amici Curiae Alabama Appellate Ct. Justices and Bar Presidents in Support of Pet'r, 2011 WL 2132709 at *29-30 (2011).
[26] *Maples v. Thomas*, 565 U.S. 266, 272 (2012).
[27] *Id.* at 273.

the burden and onus on prisoners and outside sources to preserve and present any extra-record constitutional violations that occurred during trial. The circumstances that existed in Alabama rendered the process ineffective to protect Mr. George's rights.

## GROUNDS FOR RELIEF[28]

### I. Larry George was denied his Sixth Amendment right to counsel when he was tried, convicted, and sentenced to death under Alabama's system that capped defense counsel's out-of-court fees at $1000.

In the American "adversary system of criminal justice, any person haled into court, who is too poor to hire a lawyer, cannot be assured a fair trial unless counsel is provided for him."[29] For that reason, *Gideon v. Wainwright* clearly established that the Sixth Amendment guarantees the right to counsel to those charged with a crime—a right "deemed fundamental and essential to fair trials."[30] Here, Alabama's state system constructively denied Mr. George his Sixth Amendment right, resulting in a fundamentally unfair trial devoid of necessary adversarial testing.

In 1994, Alabama's criminal system only provided indigent capital defendants up to $1000 in attorney's fees for *all* out-of-court work.[31] That meant that Alabama paid Mr. George's counsel a rate of $20/hour and capped their work at 50 hours. In representing a capital defendant, attorneys are expected to: review the state's evidence against their client; investigate the witnesses involved in the case; meet with their client;

---

[28] As to each claim asserted, Mr. George incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.
[29] *Gideon v. Wainwright*, 372 U.S. 335, 344 (1963).
[30] *Id.*
[31] *See* Ala. Code. § 15-12-21(d) (1994).

draft and file all relevant pre-trial motions; consult with experts; and otherwise prepare for trial.[32] Any attorney would admit that such requirement would be a nearly impossible task in *any* double-homicide case, but especially so in a capital case where defense counsel had to prepare not only for the defense against the conviction but also for the penalty phase.

In this case, the system limited Mr. George's attorneys from having the resources necessary to provide zealous representation. Neither of Mr. George's counsel were paid for out-of-court work that exceeded 50 hours.[33] Lacking the resources to spend adequate time to investigate and prepare the capital case for trial, counsel was unable to submit the prosecution's case to meaningful adversarial testing in direct violation of *Gideon*. As a result, the state constructively denied Mr. George his Sixth Amendment right to counsel.

Mr. George raised this claim in his state post-conviction petition. (Supp. C.1 at 17-20.)[34] The court dismissed the claim under Rule 32.2(a)(3) and (a)(5). The State of

---

[32] *See generally Strickland v. Washington*, 466 U.S. 668, 691 (1984) ("counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary"); *Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (focusing on "whether the investigation supporting counsel's decision not to introduce mitigating evidence of Wiggins' background *was itself reasonable*").

[33] *See* Attorney's Fee Decl., Steven D. Giddens, Nov. 30, 1994 (C. at 1304-07) (reporting 57.3 hours of out-of-court work but only getting paid for 50); *see also* R. 32 Hearing, R. Tr. 81 (Giddens testifying that the fees were capped at $1,000); Attorney's Fee Decl., Jeb Fannin, Dec. 7, 1994, (C. at 1308-11) (recording 50.4 hours of out-of-court work but only getting paid for 50).

[34] Mr. George did not appeal this decision. He asserts that there is an absence of available State corrective process, and even if there were, circumstances exist that render such process ineffective to protect his rights. 28 U.S.C. § 2254(b)(1)(B)(i)-(ii).

Alabama should not be entitled to procedural default because of inadequate state process, and because the rule is not adequate or independent. This claim could not have been raised on trial or direct appeal because counsel cannot raise their own ineffectiveness. Therefore, this Court should review this claim *de novo* and grant him habeas relief.

## II. Larry George was prejudiced when he was tried in a county where thirty-three jurors were familiar with his case and had watched the highly inflammatory crime shows portraying him as guilty.

"Prejudice is presumed from pretrial publicity when (1) pretrial publicity is sufficiently prejudicial and inflammatory, and (2) the prejudicial pretrial publicity saturated the community where the trials were held." *Coleman v. Zant,* 708 F.2d 541, 544 (11th Cir. 1983). The test is "where a petitioner adduces evidence of inflammatory, prejudicial pretrial publicity that so pervades or saturates the community as to render virtually impossible a fair trial by an impartial jury drawn from that community, '[jury] prejudice is presumed and there is no further duty to establish bias.'" *Id.* at 544-45 (alteration in original; citations omitted).

For six years, Larry George was the subject of pre-trial publicity. Extensive pretrial publicity made it impossible for Mr. George to receive a fair trial in Talladega County. Major area media outlets, including the *FOX* network, extensively featured Mr. George's capture and arrest. The search for Mr. George spanned six years, and was profiled on the television show *America's Most Wanted* seven times. It was also profiled on the television show *Unsolved Mysteries* 15 times. Mr. George's story was front-page

news in the county's local newspaper *The Daily Home* for several weeks surrounding the crime, as was Mr. George's arrest in Delaware, his extradition to Alabama, and his arraignment.

The news accounts of the crime were sensational and prejudicial, particularly the national programs mentioned above. *America's Most Wanted* depicted a scene where the actor portraying Mr. George physically abused his wife. No evidence of abuse was presented at trial. However, at least three of the jurors on Mr. George's case had seen the inflammatory re-enactment. Moreover, this news show included an interview with one victim's mother Jessie Morris, arguing that Mr. George deserved the death penalty. Many of the media reports contained equally prejudicial, inflammatory, and inadmissable facts.

Of the 52 Talladega County residents called for jury service 33 had some knowledge of the case. At least one veniremember was involved in the production of the *America's Most Wanted* television program that featured Mr. George (Tr. R. at 21); another participated in the manhunt (*Id.* at 20). In addition, several jurors admitted that because they had been exposed to so many facts about the case, they already had a fixed opinion about what the outcome should be. (*Id.* at 24, 130, 148). Still other veniremembers knew the victims and their families. (*Id.* at 22, 78, 142). These circumstances made it virtually impossible for Mr. George to select a fair and impartial jury in Talladega County. Although the exposure of the venire to this prejudicial pre-trial publicity plainly prevented Mr. George from obtaining a jury of impartial and

unbiased jurors, trial counsel rendered ineffective assistance by failing to pursue a motion for a change of venue.

When trial counsel argued for a change of venue (*Id.* at 10), the court set the motion for hearing (*Id.* at 11). However, at the hearing, the court declined to rule and instead stated that "[l]et's try to do that the week before the trial week if at all possible." (*Id.*). Thereafter, the record is silent.

It was not until direct appeal that this issue surfaced again. In Mr. George's appellate brief, filed by trial counsel, it is alleged that the motion for change of venue was denied. (*George I*, Appellant's Br. at 30.)[35] The ACCA denied this claim finding "[t]he record does not contain the evidence offered by the appellant in support of his motion for a change of venue. In fact, other than a few brief references, the record is devoid of evidence indicating that the appellant's motion was heard and ruled on." *George I,* 717 So. 2d. at 833. So, while trial counsel asserted that the motion for change of venue was denied, there is no record of such proceedings. Appellate counsel (also trial counsel) failed to ensure a complete record on appeal. Without such record available for review by the appellate court, Mr. George could not obtain relief.

In state post-conviction, Mr. George argued that his trial counsel was ineffective for failing to pursue the meritorious motion for change of venue. Trial counsel were

---

[35] In their appellate brief, counsel cite the trial record (Tr. R. at 64) to support the statement that the trial court denied the motion. However, that record citation is to the motion itself, *not* a ruling from the court.

ineffective for failing to pursue a change of venue motion especially in light of the pervasive publicity leading up to Mr. George's trial. Counsel's failure resulted in prejudice to Mr. George under *Strickland*, as the extensive publicity rendered it nearly impossible for Mr. George to receive a fair trial in Talladega County, in violation of his rights.

This *Strickland* claim was raised in state post-conviction but was summarily denied pursuant to Rule 32.7(d) of the Alabama Rules of Criminal Procedure, because it failed to state a valid claim for relief or present a material issue of fact or law. As Mr. George was wrongly denied the opportunity to present facts in support of this claim at his state post-conviction evidentiary hearing, the Court should review this claim *de novo*.

### III. Mr. George established a prima facie case of racial discrimination under *Batson v. Kentucky*, 476 U.S. 79 (1986) and *J.E.B. v. Alabama ex. rel. T.B.*, 511 U.S. 127 (1994).

"In the eyes of the Constitution, one racially discriminatory peremptory strike is one too many." *Flowers v. Mississippi*, 139 S. Ct. 2228, 2241 (2019) (Kavanaugh, J.) (analyzing "a basic equal protection point" of *Batson*). Here, Larry George was tried, convicted, and sentenced to death by an Alabama jury selected in an unconstitutionally discriminatory process.

The Equal Protection Clause prohibits the use of peremptory strikes to exclude jurors on the basis of race. *Batson v. Kentucky*, 476 U.S. 79, 97-98 (1986). This prohibition "makes race neutrality in jury selection a visible, and inevitable, measure of the judicial system's own commitment to the commands of the Constitution," and "courts are

under an affirmative duty to enforce" the constitutional principles exemplified in that prohibition. *Powers v. Ohio*, 499 U.S. 400, 416 (1991). Nowhere is this affirmative duty more significant than in a capital case where the death penalty has been imposed. *See Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (plurality) ("Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case."). Racially discriminatory jury selection "destroys the appearance of justice and thereby casts doubt on the integrity of the judicial process." *Rose v. Mitchell*, 443 U.S. 545, 555-56 (1979); *see also Smith v. Texas*, 311 U.S. 128, 130 (1940) ("For racial discrimination to result in the exclusion from jury service of otherwise qualified groups not only violates our Constitution and the laws enacted under it but is at war with our basic concepts of a democratic society and a representative government.") (footnote omitted). Such discrimination harms not only the accused, but extends to the "excluded jurors and the community at large." *Powers*, 499 U.S. at 406.

Prior to empaneling the jury, Mr. George raised a *Batson* challenge and asserted prima facie racial discrimination during jury selection. The trial court conflated two related constitutional protections (substituting the Sixth Amendment's fair-cross section of the community requirement for the Fourteenth Amendment's Equal Protection Clause) and applied an erroneous legal standard. On direct appeal, the

intermediate appellate court, and the Alabama Supreme Court sustained this error. As a result, Mr. George is entitled to an evidentiary hearing to correct this error and complete the final two steps of his *Batson* proceedings. *See Madison v. Comm., Ala. Dep't of Corr.*, 677 F.3d 1333, 1339 (11th Cir. 2012) ("Accordingly, we reverse the district court's order and remand the case for the district court to complete the final two steps of the *Batson* proceedings.").

Mr. George must be given the opportunity to prove that the State of Alabama engaged in purposeful discrimination such that he is entitled to federal habeas relief. At trial, Mr. George established a prima facie inference of discriminatory purpose. It is not until the State provides an adequate race or gender neutral explanation for its peremptory strikes that Mr. George should shoulder the burden to prove purposeful discrimination. Until now, Mr. George has not been afforded the opportunity to develop the factual basis for his *Batson* claim nor has the State had the opportunity to challenge the inference in an adversarial hearing.

## A.    Jury Selection

Following initial jury selection and cause challenges, the trial court adjourned the proceedings so the parties could conduct their peremptory challenges. (*See* Tr. R. at 168-69). In accordance with Alabama law, these challenges were done off the record and without the benefit of transcription. *See Shanklin v. State*, 187 So. 3d 734, 755 (Ala. Crim. App. 2014) (holding that Alabama rules of procedure do not require transcription of

the jury-striking process). No record exists that would show the content of any discussions among counsel or the court regarding race- or gender-based discrimination.

Trial counsel moved to supplement the record on direct appeal. A hearing was held. (Supp. C.2. at 6). Although, this too was held off the record and without the benefit of transcription. It is presumed[36] that trial counsel stipulated that no "pre-trial hearings, sidebar conferences and conferences in chambers that were not made part of the record" existed.[37]

The record shows otherwise. It shows, during jury selection, the court adjourned so that the parties could conference to designate their peremptory challenges. (Tr. R. at 168-69). Absent a transcript, Mr. George was unable, on direct appeal, to provide support for his *Batson* claim as to any individual juror and could only rely on the collective establishment of a prima facie case of discrimination.

This failure, one entirely out of his control, was used to wrongfully deny his claim. *See George I*, 717 So. 2d at 835. ("[t]he only evidence presented that a *Batson* violation occurred was that the state used 5 of its 14 strikes to remove blacks"). Nonetheless, Mr. George maintains, even without this critical information, he established a prima facie case of discrimination. The "Constitution forbids striking even

---

[36] The court references such a stipulation is its order granting the motion to supplement. (Supp. C.2. at, 6-7.) ("[I]t was agreed". . .").

[37] The ACCA used this stipulation as the basis for the denial of Mr. George's motion to change venue but the absence of the hearing transcript from the proceedings where counsel stipulated applies equally to his *Batson* claim. *See George I*, 717 So. 2d at 833.

a single prospective juror for a discriminatory purpose." *Foster v. Chatman*, 136 S. Ct. 1737, 1747 (2016) (citation omitted).

The Supreme Court has established a framework for evaluating *Batson* challenges. "[I]f the State demonstrates a prima facie case of racial discrimination by the defendants, the defendants must articulate a racially neutral explanation for peremptory challenges." *Georgia v. McCollum*, 505 U.S. 42, 59 (1992). Once the *Batson* challenger demonstrates a prima facie case of discrimination and the opposing party offers an explanation for the challenged strikes, "the trial judge determines, in light of all the facts and circumstances, whether the [*Batson* challenger] has established the existence of purposeful discrimination." *United States v. Jimenez*, 983 F.2d 1020, 1023 (11th Cir. 1993). Under the *Batson* framework, the trial court first determines whether the party challenging the peremptory strikes has established a prima facie case of discrimination. If so, the court requires the striking party to explain its reasons for the strikes in question, and then proceeds to determine whether those strikes were based upon the venire members' race or instead upon race-neutral reasons. The Supreme Court has enumerated a three-step process for determining whether a *Batson* violation has occurred:

> First, the defendant must make out a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose. Second, once the defendant has made out a prima facie case, the burden shifts to the State to explain adequately the racial exclusion by offering permissible race-neutral justifications for the strikes. Third, if a race-neutral explanation is tendered, the trial court must then decide ... whether the opponent of the strike has proved purposeful racial discrimination.

*Johnson v. California*, 545 U.S. 162, 168 (2005) (internal quotation marks, citations, and footnotes omitted). Moreover, *Batson* teaches that a prima facie case determination should include an examination of "all relevant circumstances." *Id.* at 170.

### B.    The Jury Selected

The original jury venire consisted of 175 potential jurors. (Supp. R. at 8-11). Of those potential jurors, 40 were African-American. (*Id.*).  In other words, the prospective jury pool was initially 22.8% African-American. At the time of voir dire, there were 54 potential jurors available for questioning. (Supp. R. at 11). Of those potential jurors, 12 were African-American; six female and six male. (*Id.*). These 12 potential jurors represented 22.2% of the remaining 54 person jury pool.  These 54 persons were divided into smaller panels for group questioning. (Tr. R. at 31).  Each panel was collectively death-qualified, questioned on potential conflicts, and analyzed for any disqualifiers. (Tr. R. at 165-204). This questioning was initially conducted by the trial court.  The court also granted each side an opportunity to question the panels.

After completion of voir dire and excusals for cause, 42 potential jurors remained. (Supp. R. at 11). Of those potential jurors, 12 African-Americans remained. (*Id.*). These 12 jurors represented 28.5% of the remaining 42 person jury pool.  The remaining African-American jurors were divided equally along gender lines; six female and six male. (*Id.*). Of those 12 remaining African-American jurors, the State of Alabama struck five (one female and four males) from the jury venire pool. (*Id.*). These

five stricken African-American jurors represented 41.6% of the total available African-American jurors and, more specifically, the four male African-American jurors that were struck represented 66.6% of the total available African-American male jurors. Therefore, although African-Americans represented only 28.5% of the entire jury pool, the State struck 41.6% of those African-American jurors (66.6% of the males). A substantial disparity between the percentage of their representation on the venire and the percentage of African-American jurors struck was obvious.

The record also shows instances of disparate treatment of members of the jury venire with the same characteristics and who answered the voir dire questions in a similar manner. For example, white juror, Larry Barnett, raised his hand and indicated that he had heard of the case in the television or newsprint media but indicated that he could put the information he had seen out of his mind and render a verdict based on the evidence and the law. (Tr. R. at 35). Mr. Barnett was not stricken and served on Mr. George's jury. (Tr. R. at 169). Freddie Morris, an African-American had identical responses during voir dire but was stricken by the State and did not serve. (Supp. R. at 11).

Likewise, Ronnie Browning and George Smelley, both white jurors, testified that they had heard of the case but could put it out of their minds. (Tr. R. at 35, 94). They were not stricken and both served. Barry Smith, an African-American juror, testified similarly, but was stricken. (Tr. R. at 94). In both instances, the record is completely silent as to why the African-American jurors were excluded when a similarly situated

white juror served. Further, the record reflects that the State failed to ask any meaningful questions to the stricken African-American jurors. (Tr. R. at 98-117). Indeed, the record is silent on why these jurors would have been excluded at all. *See Flowers*, 139 S. Ct. at 2248. ("Comparing prospective jurors who were struck and not struck can be an important step in determining whether a *Batson* violation occurred.").

Following jury selection, counsel made "a motion under *Batson*" and argued that the State had engaged in race-based discrimination when using their peremptory strikes. (Tr. R. at 171).

> *GIDDENS: Judge, I guess at this time the defense would make a motion under Batson. The State has used their peremptory strikes in a racially discriminatory manner in that there were, by my calculations, twelve black members of the panel which were struck. They struck five, the last one being an alternate. The makeup of the jury was 28.5 percent black. That's my calculation. I may be wrong. We would make that motion at this time - - a prima facie case made by the State's strikes.*

(*Id.*).

Rather than providing race neutral explanations, the State asked "if we could have just a few minutes to argue against the prime facia [sic] case." (Tr. R. at 172). Ultimately, the State responded. A close reading of the following excerpt shows that the State clearly argues that a prima facie case had not been made because Mr. George's jury was made up of a fair-cross section of the community.

> *MR. RUMSEY: In answer to their motion and evidence in their argument for a prima facie case, the State would show unto the*

Court in opposition of their being a prima case. That number one, I think the Court can take judicial knowledge that Talladega County is approximately 27.5 percent black or right at 28 percent. That 29 percent of this jury panel is black. That the State made four strikes if you exclude the alternate, which would be 29 percent of the State's strikes we used to exclude African American and 71 percent—

THE COURT: Wait just a minute. Please close the door back there. What did you say after you said the State made four strikes of blacks if you exclude the alternate? Pick up right there.

MR. RUMSEY: That the panel was 29 percent. That if you do not consider the alternate strikes, which there was one a piece, 29 percent were used by the State in striking -- 29 percent of the State's strikes were used on African American.
That 71 percent were used on Caucasian. That even if you consider the alternate as a strike, which he's still available for jury service, one-third of the State's strikes were black people. As I said, 29 percent makeup of the panel was black and about 28 percent of the population of Talladega County and 58 percent of the jury is black as it sits now serving, not counting the alternate.

THE COURT: Of the twelve.

MR. RUMSEY: Of the twelve, and 50 percent of the alternates would be black. The makeup of the jury is a little more than twice the makeup of the population of Talladega County. So the participation is over twice what it is in Talladega County. We think that does not make it -- what the argument that they have produced does not make a prima facie case.

MR. KING: If we put the numbers in, Robert, as to how many whites and how many blacks are on the actual jury --

THE COURT: Put that in.

MR. GIBBS: The jury was-- that we struck from had 42 members. Of those 42, 30 venire members were white and 12 were black.

*MR. KING: And the composition of the jury?*

*MR. GIBBS: The jury is currently made up of--*

*MR. RUMSEY: Eight and six, eight blacks and six whites and if you exclude the alternates, it would be seven blacks and five whites.*

*THE COURT: Anything else from the defendant?*

*GIDDENS: No, sir.*

*THE COURT: The Court finds failure to make a prima facie case based on the information presented to the Court today and also the Court having judicial knowledge of some of the statistics which have been set forth. All right. Are you gentlemen ready to proceed with your opening statements?*

(*Id.* at 172-74). (emphasis added). As the transcript shows, the State and the trial court applied the wrong legal standard to Mr. George's *Batson* claim. Not an incorrect standard - but an entirely wrong standard. It is unquestionably clear that the State and the trial court focused on the overall composition of the jury and whether the jury, as chosen, represented a fair-cross section of Talladega County, Alabama. This conflates the fair-cross section of the community standard of the Sixth Amendment with the Equal Protection Clause standard of the Fourteenth Amendment.

Indeed, the fair cross section of the community requirement is based in the Sixth Amendment's mandate that a person be tried by a fair and impartial jury which was *not* implicated in *Batson*. *Batson* is based in the Equal Protection Clause. *See Holland v. Illinois*, 493 U.S. 474, 477 (1990) ("To the contrary, our cases hold that the Sixth Amendment entitles every defendant to object to a venire that is not designed to represent a fair

cross section of the community, whether or not the systematically excluded groups are groups to which he himself belongs."). *Holland* made explicit, however, racial exclusion of prospective jurors violates the overriding command of the Equal Protection Clause, and "race-based exclusion is no more permissible at the individual petit jury stage than at the venire stage." *Id.* at 479.

### C.    State Court Opinions

Mr. George's *Batson* claim was preserved at trial (Tr. R. at 171) and properly raised on direct appeal. *See* (Appellant's Br., *George I* at 16). Mr. George did not raise a gender based *J.E.B.* claim at trial but did raise it on appeal to the ACCA. *Id.* at 18. Pursuant to Rule 45A of the Alabama Rules of Appellate Procedure, the ACCA must apply the plain error doctrine to all claims raised for the first time on appeal in death penalty cases. *See George I*, 717 So. 2d at 831.

### 1.   Racial discrimination

In denying relief, the ACCA applied *Mines v. State*, 671 So. 2d 121 (Ala. Crim. App. 1995)[38] to Mr. George's facts. The court found "[t]he party alleging a *Batson* violation has the burden of establishing a prima facie case of discrimination." *George I*, 717 So. 2d at 837. Applying a clearly erroneous standard, the court determined that

---

[38] *Mines* was decided *after* the trial court's denial of Mr. George's *Batson* challenge in 1994.  The trial court could not have applied *Mines* when it denied Mr. George's *Batson* motion.

"no prima facie case had been established." *Id.*[39] The court cited nine "types of evidence that could be used to raise [an] inference" of a prima facie case. *Id.* The court found that Mr. George "did not meet th[e] burden" of establishing a prima facie case of discrimination. *Id.*

## 2. Gender discrimination

Mr. George also asserted that the State engaged in gender-based discrimination against men (specifically African-American men) during jury selection. (Appellant Br., *George I* at 16). Citing almost exclusively state law, the ACCA found no record of gender discrimination because while the State struck four of the six African-American men, it also used its strikes against women. *Id.* As another basis for denial of relief, the ACCA also found that "the voir dire examination in this case was extensive." *George I*, 717 So. 2d at 837. The court did not expound on the direct relevance of an extensive voir dire to a *J.E.B.* based claim of gender discrimination in jury selection. Mr. George is unaware of any.

## D. Prima Facie inference

To establish a prima facie inference of discrimination, "the defendant first must show that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's

---

[39] To the extent that the ACCA denied this claim on a procedural ground or sufficiency of argument, as opposed to the underlying substance, Mr. George would argue that this constituted deficient performance on the part of trial counsel for which he was prejudiced.

race." *Batson*, 476 U.S. at 96 (citation omitted). "Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.'" *Id.* (quoting *Avery v. Georgia*, 345 U.S. 559, 562 (1953)). "Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race. This combination of factors in the empaneling of the petit jury, as in the selection of the venire, raises the necessary inference of purposeful discrimination." *Batson*, 476 U.S. at 96.

Mr. George is an African-American male. The State exercised certain peremptory challenges to remove African-Americans. The State removed 41% of *all* the potential African-American jurors and, of those jurors, the State struck 66% of the African-American males in a jury pool comprised of only 28.5% African-American jurors. This alone establishes a prima facie inference of racial discrimination and satisfies the first step of *Batson* and *J.E.B.* The record clearly shows the disparate treatment of African-Americans from similarly situated white jurors. The State should have been required to provide race and gender neutral explanations *as to each juror*.

In determining whether one has made a prima facie case supporting a *Batson* challenge, a court must consider all relevant circumstances, including inter alia: "(1) a prosecutor's pattern of strikes against black jurors included in the venire; (2) the prosecutor's questions and statements during voir dire examination; (3) the failure of a

prosecutor to ask meaningful questions to the struck jurors; (4) the subject matter of the case . . . if it is racially or ethnically sensitive." *Madison*, 677 F.3d at 1337 (citations and internal quotation marks omitted; alteration in original).

Here, the State of Alabama engaged in the systematic exclusion of African-American men from Mr. George's jury. Perhaps, there was a race-neutral basis for the exclusion of those specific jurors, but the record does not reflect one. The State was not required to provide one. Thus, Mr. George maintains that an evidentiary hearing is required where the State must provide a reasoned race and gender neutral explanation for its peremptory strikes. Habeas relief must be granted.

## IV. The introduction of evidence of Mr. George's living conditions at the time of his arrest six years after the crime, during the penalty phase of his trial violated Mr. George's Fourteenth Amendment rights to due process and fundamental fairness.

"Evidence such as that offered by the state depicting the lifestyle of the accused *had no probative value in this case.*" *George I*, 717 So. 2d at 841. (emphasis added). This unequivocal statement by the ACCA was correct. The court properly granted Mr. George the relief he deserved in the form of a new sentencing hearing. It was the second time that the ACCA found that this evidence's sole purpose was to inflame the minds of jurors. *See George I*, 1996 WL 17876 (Ala. Crim. App. Jan. 19, 1996), *withdrawn overruled on reh'g*, 717 So. 2d 827 (Ala. Crim. App. 1996). Nonetheless, the Alabama Supreme Court reversed and remanded for reinstatement of the death sentence.

## A.    Penalty Phase

During the recess between the guilt and penalty phases, the trial court noted that Dr. Kathleen Ronan, one of the defense's planned witnesses, would not arrive until 6:30 or 7:00 p.m.—several hours after the penalty phase had been scheduled to start. (Tr. R. at 501-02). The court stated that, after any other defense witnesses testified, the court would "stop off" until Dr. Ronan arrived. (*Id.* at 502).

The State began its penalty phase opening argument by stating,

> *Ladies and gentlemen, as the Judge has told you, the law provides for a guilt stage and a sentencing stage, and I think probably the sentencing stage will be short. We will not present evidence initially after the opening statement, and we may have some in rebuttal <u>depending on what evidence that the Defendant presents.</u>*

(*Id.* at 507) (emphasis added). Giddens indicated that he would offer evidence that Mr. George did not have a significant criminal history, evidence of his character, and testimony from Dr. Ronan regarding his "mental state, condition, *at the time of the offense.*" (*Id.* at 514-15) (emphasis added). He urged the jury to take the case seriously, but did not ask for mercy or a recommendation of life without parole. (*Id.*).

After the State indicated it would not present any evidence at that time, Giddens called Mr. George's sisters, Bailey and Wright, who described Mr. George's childhood habits (building things) and temperament ("normal"), his lack of criminal history, his reluctance to confide in others, and the lack of stated problems in his marriage. (*Id.* at 518-29). Bailey further explained that she had not been in contact with Mr. George since he left the Army, a few years before the incident. (*Id.* at 520). Including cross-

examination, Bailey's testimony spanned only nine pages of transcript. (*Id.* at 516-24). Wright's testimony was even briefer, spanning less than five pages. (*Id.* at 525-29).

As anticipated, Dr. Ronan had not yet arrived by the time Wright finished testifying. (*Id.* at 529). Rather than "stop off," as the trial court had said it would, the State offered to call its "rebuttal" witnesses, who would allegedly rebut testimony and evidence that did not yet exist in the record:

> *State:*     *If [Dr. Ronan's] going to be his last witness, if he goes ahead and rests just subject to that one, I could probably – give me a few minutes to get started, I could probably put on some of my witnesses.*
>
> *Giddens:*     *I can subject to being allowed to call her.*
>
> *Court:*     *You are resting subjecting to calling [Dr. Ronan]?*
>
> *Giddens:*     *Yes, sir.*
>
> *State:*     *Instead of just sitting here and waiting, I could – if you give me about ten minutes to get started, I can put on what little rebuttal I have got.*

(*Id.* at 529-30 (emphasis added)).

During the "little rebuttal" it had, the State called an investigator and two detectives to testify as to the circumstances of Mr. George's arrest. An arrest that occurred six years *after* the crime. Through these witnesses, it was able to portray Mr. George as a "rogue male" armed with every weapon reasonably available (and some that likely were not so reasonably available).[40] In particular, Investigator K.K. Parker

---

[40] *George I*, 717 So. 2d at 842.

testified that he found Mr. George's campsite and collected a duffel bag that had been stuffed with a rifle, loaded banana clips, and "bionic ears" (a type of listening device). (*Id.* at 533-35). He also found several of Mr. George's identifying documents, as well as a newspaper clipping entitled "Murder Suspect Eludes Officers During Manhunt." (*Id.* at 535-37). Through Parker, the State was able to not only show the jury each of these items, but also admit each one as an exhibit. (*Id.* at 537-39).

The State represented that Parker's testimony and the seized items were "relevant to show Mr. George's conduct after the murders" and to "rebut those portions of the witnesses' testimony presented at the sentencing hearing." (*Id.* at 539). The State further claimed that it "put the testimony on at this time in addition to keep from having to sit here and wait for" Dr. Ronan, and the evidence "certainly goes as to flight and what was done after the crime and just [the] total scenario goes in explanation in rebuttal of her testimony also." (*Id.*).

Detective Quinton Watson, one of the arresting officers, alleged that Mr. George struggled with him and his partner, Detective Bruce Pinkett. (*Id.* at 545). Pinkett had to "[run] up from behind and tackle[ ] [Mr. George] to the ground," at which point Mr. George began wrestling with the officers. (*Id.* at 545-46). As Mr. George got away and started wading downriver, Pinkett called in a police helicopter, which flew down until it was hovering only 15 feet above Mr. George. (*Id.* at 546-47). Mr. George stopped, then "took his pants off, raised them up over his head, and began to walk ashore." (*Id.* at 547). According to Watson, Mr. George's campsite contained more unusual or

dangerous things, including several guns, shotgun shells, throwing stars, a radio, and a camouflaged bunker-type area complete with "an elaborate system of a TV, VCR, some more car batteries, a lot of food, [and] a homemade stove." (*Id.* at 548-49).

Finally, the State called Pinkett and presented two videotapes that were made of the scene. (*Id.* at 551-52). Giddens objected to the videotapes "as being irrelevant to aggravating circumstances or to any rebuttal [he had] offered." (*Id.* at 552). The State countered that the evidence "[went] to [Mr. George's] mental condition" and "to many other things that [the State] would like to put into the record." (*Id.* at 552-53). The trial court overruled Giddens' objection and allowed the State to play both tapes for the jury. (*Id.* at 553). At the State's direction, Pinkett narrated what the tapes showed, referring to Mr. George's living area as a "fortress," "actual fortress," or "actual bunker" seven times. (*Id.* at 553-57). The camera focused on items police found inside Mr. George's living area: throwing stars, a spear gun, a night stick, shotgun shells, radios, a cell phone, bows and arrows, car batteries, camping equipment, binoculars, a BB gun, and a police scanner, among other things. (*Id.* at 556-57). Pinkett subsequently identified additional weapons found at the campsite, including a sawed-off shotgun, and a handgun. (*Id.* at 558).

## B.    Due process and fair and reliable sentencing determination

The Supreme Court has long established "the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson*, 428 U.S. at 305. Consistent with principles of reliability, the Eighth and Fourteenth

Amendments to the United States Constitution require that "any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." *Gardner v. Florida*, 430 U.S. 349, 358 (1977); *see also Gregg v. Georgia*, 428 U.S. 153, 189 (1976) (noting that "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action"). When "evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." *Payne v. Tennessee*, 501 U.S. 808, 825 (1991).

The State's evidence of Mr. George's living conditions unquestionably infected the penalty phase such that the sentencing proceeding was fundamentally unfair and amounted to a denial of due process. There can be no reasonable debate as to the effect of testimony, physical evidence, and two videotapes demonstrating that a defendant convicted of murder: (1) eluded law enforcement for six years; (2) established a camouflaged compound—or, as one witness repeated, an "actual fortress"—in the woods; (3) gathered weapons ranging from a sawed-off shotgun to a spear gun to throwing stars; (4) kept the guns and extra banana clips loaded with ammunition; (5) physically resisted arrest; (6) fled downriver from police; and (7) surrendered only after a state police helicopter swooped down to hover immediately overhead. This

evidence clearly painted Mr. George as a dangerous, unpredictable figure who was both willing and able to escape and live on the run, armed to the teeth all the while.

The ACCA recognized that:

> [e]vidence such as that offered by the [S]tate depicting the lifestyle of [Mr. George] had no probative value in this case. It appears that the sole purpose of presenting this evidence was to inflame the minds of the jurors and to 'dehumanize' [him] so that the jurors would feel less reluctance in taking his life. . . . The overall impact was to give the impression that [Mr. George] was a 'rogue male,' alienated from the mainstream of society. It might very well have been be less difficult for a juror to impose the death penalty on a person who pursued such an alternative lifestyle.

*George I*, 717 So. 2d at 841-42. The evidence introduced unduly prejudiced Mr. George and resulted in a fundamentally unfair and unreliable penalty proceeding in violation of his Eighth and Fourteenth Amendment rights. He is entitled to a new penalty phase hearing.

## V. The trial court improperly coerced the jury to return a death verdict violating Mr. George's right to a fair trial.

"Any criminal defendant, and especially a capital defendant, being tried by a jury is entitled to the uncoerced verdict of that body." *Lowenfield v. Phelps*, 484 U.S. 231, 241 (1988); *see also Witherspoon v. Illinois*, 391 U.S. 510, 521 n.20 (1968) ("[T]he decision whether a man deserves to live or die must be made on the scales that are not deliberately tipped toward death").

Mr. George's trial began at 9:00 a.m. After a long day of hearing testimony during both the guilt and penalty phases of Mr. George's capital trial, the trial court sent the

jury to make its final deliberations at 8:35 p.m. (*See* Tr. R. at 633.) After almost an hour of deliberations, at 9:30 p.m., the jurors sent a note requesting to retire for the night and to continue the deliberations the following day. (*See id.* at 634-35.) This was an unequivocal request to suspend deliberations and to resume the next day. (*Id.* at 635.) In response to the request, the State of Alabama stated: "Don't see any way you can deny that. They want to rest tonight." (*Id.*) But the court replied:

> *What I thought I would do is write back in there and ask them if they felt like they could go a reasonable length of time longer. If they say they can, that will probably take care of that. If they say they don't want to, we will do what they request.*

(*Id.*)

Instead of heeding the jurors' request and allowing them to retire for the night, the trial court asserted that it was "still early" and "not too late." (*Id.*) The court said that it would "write" the following to the jury:

> *I would appreciate you deliberating for further reasonable time before we recess for tonight. You have only been deliberating for 50 minutes at this time. Consider this request, and if this is okay, continue deliberating.*

(*Id.*) At the judge's request, the jury continued to deliberate.

Not only did the court ignore the jurors' inability to properly deliberate, it also sent a clear signal to the jury, that its deliberations were unimportant, and Mr. George's life was not deserving of a thoughtful deliberative process. It also suggested that the decision to decide life or death was minor and could be completed in a short amount of time. Not surprisingly, 30 minutes later, at 10:00 p.m., the jury returned a 10-2 verdict

for death. (Tr. R. at 636.) Given the facts surrounding the deliberations, the verdict was unquestionably coerced. Pressuring the jury to reach a verdict violated Mr. George's due process rights as guaranteed under the Eighth and Fourteenth Amendments to the United States Constitution.

Mr. George first raised this claim on direct appeal. As the ACCA granted penalty phase relief based on a different constitutional violation, this claim was not resolved until after remand from the Alabama Supreme Court reversing the grant of a new sentencing proceeding. *See George II*, 717 So. 2d 844. When the ACCA finally considered this claim, it was denied because "[t]he trial court did not suggest to the jury which way its verdict should be returned." *George III*, 717 So. 2d at 851. Mr. George sought certiorari review from the Alabama Supreme Court which was granted and the court denied the claim on the merits, making it the last reasoned opinion of the state courts.[41] *See George IV*, 717 So. 2d at 859 ("We find no error, plain or otherwise, in either the guilt phase or the sentencing phase of George's trial that would warrant a reversal of his conviction or his sentence.").

Forcing a jury to decide whether a man should live or die after such a long day of jury service fatally infected Mr. George's trial and jury. In *Jenkins v. United States*, 380

---

[41] "If the last state court to be presented with a particular federal claim reaches the merits, it removes any bar to federal-court review that might otherwise have been available." *Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991) (citations omitted).

U.S. 445 (1965), the United States Supreme Court granted the petitioner a new trial because it found the trial court improperly coerced the jury:

> Slightly more than two hours after the jury retired to deliberate, the jury sent a note to the trial judge advising that it had been unable to agree upon a verdict "on both counts because of insufficient evidence." The judge thereupon recalled the jury to the courtroom and in the course of his response stated that "You have got to reach a decision in this case." [The Court] granted certiorari to consider whether in its context and under all the circumstances of this case the statement was coercive.

*Id.* at 446. The Court found, "in its context and under all the circumstances the judge's statement had the coercive effect attributed to it." *Id.*

This is akin to what happened in Mr. George's trial. Assuming what the court stated on the record is what it relayed to the jury, it implied that a verdict should be reached, and could be reached, in the same night. Not allowing the jurors to retire for the night when it was already 9:30 p.m., strongly suggested that a decision *should be reached*, and there was no need to return the following day. Given the timing and circumstances of the jury's note, the court's encouragement to consider deliberations indirectly coerced the jurors to reach a sentence of death

The United States Supreme Court has repeatedly emphasized that extraordinary measures are required to ensure the reliability of decisions regarding both guilt and punishment in a capital trial. "[D]eath is qualitatively different from a sentence of imprisonment, however long." *Woodson*, 428 U.S. at 305; s*ee also Caldwell v. Mississippi*, 472 U.S. 320, 329 (1985) ("[M]any of the limits that this Court has placed on the imposition of capital punishment are rooted in a concern that the sentencing process

should facilitate the responsible and reliable exercise of sentencing discretion."). At the penalty phase in particular, it is essential that jurors recognize "the truly awesome responsibility of decreeing death for a fellow human [so that they] will act with due regard for the consequences of their decision." *McGautha v. California*, 402 U.S. 183, 208 (1971), *reh'g granted, judgment vacated sub nom. Crampton v. Ohio*, 408 U.S. 941(1972). By indirectly asserting itself in the deliberative process and urging the jurors to reach a verdict after they requested to go home for the night, the trial court improperly infected the reliability of a capital sentence. Because Mr. George was denied his Eighth and Fourteenth Amendments rights to a fair and reliable sentence, he is entitled to relief.

## VI. Mr. George received ineffective assistance of counsel in violation of the Sixth Amendment during the guilt and penalty phases of his trial.

Mr. George was denied effective counsel during both his guilt and penalty phases of trial. In the guilt phase, trial counsel failed to remove a biased juror, investigate and pursue a mental health defense, and request an independent mental health expert. At the penalty phase, trial counsel failed to conduct a reasonable investigation into Mr. George's background and to hire an independent mental health expert. Trial counsel's deficient performance undermines confidence in the outcome of Mr. George's trial and sentencing. He was therefore denied his Sixth Amendment right to counsel.

### A. Legal Standard

The Sixth Amendment guarantees a defendant the effective assistance of counsel at all "critical stages of a criminal proceeding." *Lee v. United States*, 137 S. Ct. 1958, 1964

(2017). To demonstrate ineffective assistance of counsel, in violation of the Sixth Amendment, a habeas petitioner must show that (1) counsel's performance was deficient, and (2) counsel's deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687. Counsel's performance is deficient if it "fell below an objective standard of reasonableness," as measured by "prevailing professional norms" such as American Bar Association ("ABA") standards or state bar guidelines in the state of conviction. *Id.* at 688; *Wiggins v. Smith*, 539 U.S. 510, 522-24 (2003). The court must assess "whether counsel's assistance was reasonable considering all the circumstances." *Hinton v. Alabama*, 571 U.S. 263, 273 (2014) (citing *Strickland*, 466 U.S. at 688). "[C]ounsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case." *Strickland*, 466 U.S. at 690.

An attorney's strategic choice "made after less than complete investigation [is] reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690-91. In other words, a "cursory investigation" does not "automatically justif[y] a tactical decision with respect to sentencing strategy." *Wiggins*, 539 U.S. at 527. Counsel's awareness of a fact may, in some case, obligate counsel to pursue leads in order to "mak[e] an informed choice among possible defenses" or mitigation strategies. *See id.* at 525. "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Strickland*, 466 U.S. at 691.

"The duty to investigate exists regardless of the expressed desires of a client," and counsel cannot "sit idly by, thinking that investigation would be futile." *See* Commentary for Guideline 10.7 (A)(2), ABA Guideline for the Appointment and Performance of Defense Counsel in Death Penalty Cases, 31 Hofstra L. Rev. 913, 1021 (2003). (quotation marks and footnote omitted). When there are "red flags" in the record, counsel has a duty to investigate when those flags point to the need for further examination. *Rompilla v. Beard*, 545 U.S. 374, 376 (2005). It is unreasonable for counsel to counsel "abandon[ ] their investigation" if they have "acquired only rudimentary knowledge of his history from a narrow set of sources." *Wiggins*, 539 U.S. at 524. Ultimately, if counsel failed to investigate because of "neglect or oversight, no presumption of reasonableness attaches, and [a Court is] far more likely to find deficient performance." *Jefferson v. GDCP Warden*, 941 F.3d 452, 478 (11th Cir. 2019).

To establish prejudice, a petitioner must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* In determining whether a defendant was prejudiced by counsel's failure to introduce evidence at the penalty phase, courts examine whether, in light of the totality of the evidence adduced at trial and during the Rule 32 proceeding, the jury might have returned a different recommendation if confronted with the additional or alternative mitigating evidence. *Wiggins*, 539 U.S. at 536. Stated otherwise, the habeas court looks to whether "the

available mitigating evidence, taken as a whole, might well have influenced the jury's appraisal of [the defendant's] moral culpability." *Id.* at 538 (citation and internal quotation marks omitted).

### B. Guilt Phase

1. <u>Counsel's failure to remove a biased juror, who knew the surviving victim and attended the funeral of the deceased victims.</u>

Mr. George was denied his right to a fair and impartial jury guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution. "It is well settled that the Sixth and Fourteenth Amendments guarantee a defendant on trial for his life the right to an impartial jury." *Ross v. Oklahoma*, 487 U.S. 81, 85 (1988) (citations omitted). To help protect that right, a defendant is entitled to "an adequate *voir dire* to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992). A juror will be unqualified if they are "actually biased or incompetent" because they are "not capable and willing to decide the case solely on the facts before (him)." *Rogers v. McMullen*, 673 F.2d 1185, 1190 (11th Cir. 1982). A juror may properly be excluded for cause if "the juror in question exhibited 'actual bias' by showing either an 'express admission of bias *or facts demonstrating such a close connection to the present case that bias must be presumed.*'" *Teasley v. Warden, Macon State Prison*, 978 F.3d 1349, 1356 (11th Cir. 2020) (citations omitted; emphasis added). In other words, the "the juror [could not] lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.* (citing *Irvin v. Dowd*, 366 U.S. 717, 723 (1961)) (alteration in original).

During voir dire, the State asked the following venire members to stand: "people who have either read something in the newspaper, talked about it on the street, heard it on the radio or seen anything on TV relative to the case which happened back on February 12, 1998." (Tr. R. at 70.) Juror D.H. raised her hand. (*Id.*) Later, asked "does anyone know Geraldine S. George . . . anybody know Synobia George?" (Tr. R. at 71.) Juror D.H. raised her hand in response to both questions. (*Id.*) Fannin acknowledged Juror D.H.'s raised hand but failed to follow up on her relationship with the surviving victim and her daughter. At the end of the second panel of 12 jurors, the court asked if there were any challenges, and trial counsel declined. (Tr. R. at 86-87.) At no point did trial counsel ask follow up questions to assess the extent of Juror D.H.'s relationship with the victims. (Tr. R. at 70.) This deficiency proved prejudicial.

At the state post-conviction hearing, Juror D.H. testified that she went to church with Geraldine and her daughter. (R. at 42.) She also revealed that *she attended the deceased victims' funeral* out of remorse for the victims and recalled the funeral as "very sad." (R. at 45.) (emphasis added). She testified that she thought she would have been eliminated from Mr. George's jury. (*Id.*)

However, Rule 32 counsel was not permitted to ask Juror D.H., as trial counsel should have during voir dire[42], if knowing the victims could affect her verdict. (R. at

_____

[42] During voir dire, trial counsel would have been able to ask questions exploring the relationship. But because Juror D.H. sat on the jury that convicted Mr. George, Rule 32 counsel was significantly limited in his questioning of D.H. and could not establish actual bias due to the protection of the deliberative process. (R. at 47.). It is questionable if this objection was properly sustained. *Cf. Remmer v. United*

47.) The State objected at the Rule 32 hearing on the basis that her answer would reveal her deliberative process. (*Id.*) The court sustained the objection. As a result, the state court prevented Mr. George from establishing a direct correlation between her knowing the victims and her verdict.

Counsel had a duty to ask questions on voir dire to ensure jurors were not biased. *See, e.g., Aldridge v. United States*, 283 U.S. 308, 313 (1931) (recognizing the "right to examine jurors on the voir dire as to the existence of a disqualifying state of mind"). If a biased juror "sat on the jury that ultimately sentenced petitioner to death, . . . the sentence would have to be overturned." *Ross*, 487 U.S. at 85; *see also United States v. Martinez-Salazar*, 528 U.S. 304, 316 (2000) (reaffirming that *Ross* held that "the seating of any juror who should have been dismissed for cause . . .would require reversal."). For that reason, "the decision whether to seat a biased juror cannot be a discretionary or strategic decision." *Miller v. Webb*, 385 F.3d 666, 675 (6th Cir. 2004) (citing *Martinez-Salazar*, 528 U.S. at 316).

Given Juror D.H.'s emotional connection with all three victims, there is a reasonable probability she was biased, and prejudice should be presumed. Actual bias,

---

*States*, 347 U.S. 227 (1954) (remanding case for hearing to determine how an incident with a juror may have impacted the outcome of proceedings); *Smith v. Phillips*, 455 U.S. 209, 215-17 (1981) ("This Court has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias."); *Chandler v. Florida*, 449 U.S. 560, 101 S. Ct. 802, 66 L.Ed.2d 740 (1981) (holding that where a defendant raises a claim of juror prejudice, "the appropriate safeguard against such prejudice is the defendant's right to demonstrate that the [circumstance underlying the allegation of prejudice] compromised the ability of the particular jury that heard the case to adjudicate fairly.")

also known as bias in fact, is "'the existence of a state of mind that leads to an inference that the person will not act with entire impartiality.'" *United States v. Torres*, 128 F.3d 38, 43 (2d Cir. 1997) (citing *United States v. Wood*, 299 U.S. 123, 133 (1936)). Implied bias, by contrast, is "bias conclusively presumed as a matter of law," or, put another way, it is "bias attributed to a prospective juror regardless of actual partiality." *Id.*

Here, Juror D.H. was far more knowing and involved with the victims than her simple initial acknowledgment that she "knew" them. Juror D.H. attended church with Geraldine and her daughter. She attended the deceased victims' funeral, *even though she did not know them.* A funeral surrounded by the victims' loved ones, who were burdened with grief; she felt and witnessed their pain; and personally experienced their trauma. According to Juror D.H., she attended the funeral because she was remorseful and sympathetic. She even recalled more than 20 years later that the funeral was "sad." If those feelings resurfaced at the post-conviction hearing in 2011, naturally those emotions would have influenced this juror during trial and jury deliberations. If trial counsel had not performed deficiently, all of this evidence of bias would have been elicited. Juror D.H. should never have been empaneled. Having a biased juror serve on the jury caused Mr. George to have been convicted by a jury where not all members were "capable and willing to decide the case solely on the evidence before it." *Smith*, 455 U.S. at 217. Habeas relief should be granted.

2. Counsel's failure to investigate and present a mental health defense at the guilt phase

Counsel failed to adequately investigate the circumstances surrounding Mr. George's mental health issues, and failed to obtain a mental-health expert who was independent from the prosecution to aid in Mr. George's defense. Mr. George was denied his Sixth Amendment right to counsel.

Giddens was Mr. George's attorney for four months, and he failed to interview friends, family members, and request records. In fact, Fannin testified that by the time he was appointed in late September, he assumed Giddens had done all of the investigation. It is clear from the record and trial counsel's testimony at the evidentiary hearing that they were not communicating and thought little of conducting an investigation. After Fannin's appointment, counsel met with Mr. George four times prior to trial: September 14th for one hour; September 16th for two hours; September 28th for two hours; and October 20th for two hours. (C. at 1304-06). Even more striking is that trial counsel received discovery on September 15, 1994, reviewed it on September 16, 1994, and not again until October 10, 1995. (*Id.* at 1305, 1309).

On the "Defense Attorney Information" form Fannin wrote, the reason for the referral, was that Mr. George had "stated to his attorneys that at the time of the alleged offense, he heard voices saying 'shoot her.'" (Supp. C.2 at 125-26). The ACCA concluded that the record supported the Rule 32 trial court's determination that counsel was not ineffective for failing to investigate a mental health defense, given Fannin's testimony at the Rule 32 hearing that he did not remember Mr. George complaining about hearing voices. *George V*, 2019 WL 180146 at *9. Yet, prior to trial, Fannin noted

that Mr. George had heard voices at the time of the offense. (Supp. C.2 at 125-26). The ACCA did not address this discrepancy or explain why Fannin's memory regarding a case he worked on 17 years earlier would be more accurate than his contemporaneous written statement. Crediting Fannin's equivocal testimony at the evidentiary hearing that he did not *remember* Mr. George reporting that he heard voices over Fannin's pretrial statement that Mr. George in fact stated that he heard voices was unconvincing in light of the record before the state court.

To support his decision not to present a guilt phase defense, Giddens testified at the Rule 32 hearing that he chose to focus on mitigation (effectively conceding guilt) because Mr. George confessed to the police. (R. at 88-89). However, there is *no record* of a confession, and the State presented no evidence of a confession at trial. Assuming Giddens' testimony at the evidentiary hearing was true, defense counsel made the decision not to conduct a meaningful guilt phase investigation based solely on Mr. George's statement that he made a confession to police and without even investigating the circumstances and voluntariness of the alleged confession. Using a client's unsupported statement that he confessed to justify a failure to investigate constitutes ineffective assistance in a case when a client may not be intellectually capable of appreciating the consequences of his actions . . . or of formulating the intent necessary to violate the law. Giddens made such a representation in the motion for a psychological examination. (Tr. C. at 69-72). Giddens' "strategy" was clearly inconsistent with prevailing professional norms, which impose a "duty to investigate . .

. regardless of the accused's admissions or statements to the lawyer of facts constituting guilt." *Rompilla*, 545 U.S. at 387 (quoting the 1982 ABA Standards for Criminal Justice); *see also Porter v. McCollum*, 558 U.S. 30, 39 (2009) (concluding counsel performed deficiently by failing to "even take the first step of interviewing witnesses or requesting records").

"'[S]trategic choices made after less than complete investigations are reasonable' only to the extent that 'reasonable professional judgments support the limitations on investigation.'" *Wiggins*, 539 U.S. at 533 (citing *Strickland*, 466 U.S. at 690-91). Before Mr. George's trial, Giddens and Fannin each spent *three hours* on "[c]ase preparation, visit[ing] [the] scene, [and] talk[ing] to witnesses." (C. at 1306, 1309). This was the beginning and end of their guilt phase investigation. Giddens spent *less than an hour and a half* talking to a few of Mr. George's immediate family members in the four days before the beginning of voir dire. (*Id.* at 1306). This was the beginning and end of the penalty phase investigation.

Investigating and presenting a mental health defense during the guilt phase would not have been incompatible with a different defense strategy. During the guilt phase, Giddens gave a one-page opening argument generally asking the jury to hold the State to its burden of proof and perform the unremarkable task of taking a capital murder case seriously. (Tr. R. at 206-07). He rested without calling any defense witnesses, and he did not give a closing argument. (*Id.* at 439, 469-70). Defense counsel cannot reasonably decline to, at least, investigate a mental health defense when a defendant said

he heard voices at the time of the offense, and the alternative is presenting no defense whatsoever.

An adequate investigation would have included compiling and requesting a medical history to assess trauma and physical/mental illness; an education history to gauge academic performance and disciplinary issues; a military history to determine the type and length of service; a family and social history to determine if any abuse was present; and investigating any religious and cultural influences. *See* Commentary for Guideline 11.4.1 (D)(2)(C), ABA Guideline for the Appointment and Performance of Counsel in Death Penalty Cases (1989). None of the above was requested or consulted. Counsel's "decision not to investigate did not reflect reasonable professional judgment. *Porter*, 558 U.S. at 40.

If trial counsel had interviewed witnesses, gathered records, and retained a defense expert, then they would been able to develop a defense to capital murder because "at the time of the commission of the acts constituting the offense, the defendant, as a result of severe mental disease or defect, was unable to appreciate the nature and quality or wrongfulness of his acts." Ala. Code § 13A-3-1(a) (1977).

During his state post-conviction proceedings, Mr. George's counsel retained *defense* expert Dr. Bryan Hudson who prepared a neuropsychological evaluation based on the following:

- **clinical interviews of Mr. George**;
- **neuropsychological testing, including the following**:

- the Luria Nebraska Neuropsychological Battery II (LNNB-II);
- the Wechsler Adult Intelligence Scale-Third Revision (WAIS-III);
- the Minnesota Multiphasic Personality Inventory-2 (MMPI-2);
- the Test of Memory and Malingering (TOMM);
- **record review including**
  - review of prior mental health evaluation reports by Mr. Garner, and Dr. Ronan and Dr. Ronan's trial testimony;
  - review of various materials related to the criminal investigation of Mr. George, such as the Talladega Police Department file and the Talladega District Attorney's file;
  - review of various materials related to the criminal prosecution of Mr. George, such as the trial testimony of Dr. Kathleen Ronan;
  - personal records of Mr. George, such as birth records, school records, military records, marriage and divorce records, and prison health records;
  - personal records of family members, including medical records of father Ransom George and sister Amanda George; and
  - review of affidavits of family members, relatives, and friends of Mr. George; and
- **personal interviews with family members, relatives, and friends of Mr. George.**[43]

The interviews of Mr. George lasted approximately 4 to 5 hours each time, on at least three different occasions, *id.*; (C. at 667). Dr. Hudson explained the importance of having multiple sources of information and the significance of each of the above types of data sources. (C. at 667-670.) He reported no indication that Mr. George was malingering. (C. at 673.)

Mr. George was prejudiced by counsel's failure to investigate and present a mental health defense. A reasonable investigation would have revealed that Mr. George

---

[43] Pet'r's Hrg Exhs. 14 and 27; Depo. Dr. Hudson, Exhs. 15-17, 21-22, 24-25, 28, 41, and 46-47; and (Tr. R. at 562-94) (testimony of Dr. Kathleen Ronan).

experienced head injuries throughout his childhood: as an infant, he was the thrown from a moving vehicle into the gutter; his mother hit him on the head with a board that had an exposed nail; and he was physically abused by both parents. (R. at 312; C. at 243-44; Supp. C.2 at 662, 819, 2300). Had counsel requested a defense expert to perform a thorough evaluation using collateral data, counsel could have presented evidence such as that offered by Dr. Hudson in the Rule 32 proceedings: substantial anecdotal evidence suggested that Mr. George experienced significant psychopathology from adolescence through adulthood; and Mr. George "had all the makings for a psychotic break," such that his "comprehension [was] no longer there" at the time of the offense and he could not form the requisite intent to commit murder. (R. at 270; C. at 404).

At a minimum, trial counsel had a duty to make an informed decision why an investigation was unnecessary. *See Wiggins*, 539 U.S. at 523. "[A] particular decision not to investigate . . . be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* at 521-22 (quoting *Strickland*, 466 U.S. at 690-91). Here, trial counsel unreasonably determined an investigation was unnecessary.

Mr. George was never evaluated by an independent mental health expert prior to trial. This was a clear constitutional violation. However, the ACCA affirmed the Rule 32 court's findings. Specifically, the court determined that Mr. George was not entitled to an independent mental health evaluation because (1) there was no evidence of strong mental health problems; (2) that family and friends stated that Mr. George appeared

normal in the weeks preceding the crimes; and (3) that Dr. Ronan's report did not indicate additional psychological testing was needed. *George V,* 2019 WL 180146 at *11. Those findings are unsupported by the record and contrary to clearly established federal law. In denying relief, the Rule 32 court relied on *Holladay v. Haley,* 209 F.3d 1243 (11th Cir. 2000). However, controlling Supreme Court precedent on this issue is *Ake v. Oklahoma*, 470 U.S. 68, 83 (1985).

The Supreme Court has held that "when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." *Ake*, 470 U.S. at 83. In fact,

> without the assistance of a psychiatrist to conduct a professional examination on issues relevant to the defense, to help determine whether the insanity defense is viable, to present testimony, and to assist in preparing the cross-examination of a State's psychiatric witnesses, the risk of an inaccurate resolution of sanity issues is extremely high. With such assistance, the defendant is fairly able to present at least enough information to the jury, in a meaningful manner, as to permit it to make a sensible determination.

*Id.* at 82.

The exact opposite occurred here. Mr. George was given no such assistance. Counsel's ineffectiveness violated Mr. George's right to a fair trial consistent with the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. At Mr. George's trial, counsel presented only a neutral mental health expert, who did

not assist with the preparation or presentation of the defense. In *McWilliams v. Dunn,* 137 S. Ct. 1790 (2017), the United States Supreme Court reinforced and elaborated on *Ake* principles:

> *Ake v. Oklahoma* [ ] clearly established that, when certain threshold criteria are met, the State must provide an indigent defendant with access to a mental health expert who is sufficiently available to the defense and independent from the prosecution to effectively "assist in evaluation, preparation, and presentation of the defense.

*Id.* at 1793 (quoting *Ake*, 470 U.S. at 83).

Here, trial counsel filed two motions for a mental health examination: a motion for psychological examination and a motion for psychiatric evaluation. The court granted the motions at the September 28, 1994 motion hearing. (Tr. R. at 7-9.) The court even took the liberty to contact, *ex parte*, Mr. Gary Garner, a mental health therapist at the Cheaha Mental Health Center who was not qualified to conduct the psychological evaluation. (*Id.*)

On October 3, 1994, Mr. Garner furnished a report describing the mental health examination he performed on Mr. George at the Talladega County Jail on September 30, 1994. (Tr. C. at 32.) Although Mr. Garner determined that Mr. George could assist in his defense, he recommended Mr. George for referral to Taylor Hardin Secure Medical Facility for psychiatric testing because of Mr. George's hallucinations. (*Id.*) There is no indication trial counsel conducted any investigation following the receipt of Mr. Garner's report. The report clearly referenced the hallucinations. Moreover, trial

counsel made no contact with Mr. George following Mr. Garner's recommendation. (Tr. R. at 32, C. at 1306, 1309.)

On October 7, 1994, the judge issued an order, later amended on October 25, 1994, for Mr. George to submit to an examination at Taylor Hardin Secure Medical Facility. (Tr. C. at 33, 73.) Ms. Beverly Strong, Community/Court Liaison, followed up with a letter to counsel requesting input of "personal observations," "any history of psychiatric or substance abuse treatment," or "any other information pertinent to the evaluation." (Supp. C.2 at 123.) Ms. Strong stressed the importance of the information prior to the evaluation, and she requested that the attorneys complete the "Defense Attorney Information" form. (*Id.*) Trial counsel never attempted to locate or to provide any records to assist in the evaluation. Likewise, trial counsel did not provide any "information pertinent to the evaluation" because they did not conduct an investigation.

In the Defense Attorney Information form that Mr. George's counsel sent to Taylor Hardin, either Giddens or Fannin[44] (neither remembers) stated that Mr. George had expressed to counsel that Mr. George heard voices saying "shoot her" at the time of the offense. (Supp. C.2 at 125.) In fact, trial counsel spoke with Mr. George for two hours on October 20, 1994, the day the form was sent to Taylor Hardin.[45] (C. at 1306,

---

[44] In the records counsel received from the Department of Health, Fannin's business card appears to have been attached to the form when it was faxed. (Supp. C.2 at 125.)
[45] It is unclear when sequentially this conversation with Mr. George occurred.

1309.)  Trial counsel's testimony that he had no reason to believe Mr. George had

mental health issues was false.  (Tr. C. at 32.)  Although Mr. George has several siblings,

trial counsel only listed Mr. George's mother as a collateral source.  (Supp. C.2 at 126.)

In truth, a number of Mr. George's friends and family members had knowledge of Mr.

George's mental state in relation to his seeing and hearing things, paranoia, and strange

interpersonal behaviors.  Trial counsel made no attempt to investigate any mitigating

mental health evidence that would have assisted in the guilt phase of Mr. George's trial.

The relevant ABA Guideline 11.4.1(D)(7)(D) (1989), at the time, provided that

"[e]xperts assisting in investigation and other preparation of the defense should be

independent and their work product should be confidential to the extent allowed by

law." Here, Dr. Ronan's role in Mr. George's trial falls short of this standard. Dr. Ronan

was a neutral mental health expert—she reported her findings to the court, the State,

and the defendant.  She neither assisted in the preparation nor presentation of a defense.

She also performed a very limited evaluation, focusing on competency and criminal

responsibility at the time of the crime.  (Tr. R. at 565-66.)  Her role was simply that of

a neutral mental health expert, primarily hired to assist the court.  Given Mr. George's

paranoia and delusions, instead of trial counsel requesting funds for an independent

mental health expert to examine Mr. George for mental health issues, including possible

brain damage, trial counsel wholly relied on Dr. Ronan's incomplete evaluation.  Dr.

Ronan even testified that she did not have time to complete an evaluation because she

was unable to locate family members and received no records to assist in her evaluation. (Tr. R. at 577-78, 587-88.)

Dr. Kathleen Ronan was not an independent psychologist. The mental health expert in *McWilliams* was retained to conduct an evaluation for the court. In fact, noting that the mental health expert retained in *McWilliams* was not independent, the United States Supreme Court pointed out that the court order required "'the Department of Corrections' to 'complete neurological and neuropsychological testing on the Defendant . . . and send all test materials, results and evaluations to the Clerk of the Court." *McWilliams*, 137 S. Ct. at 1801 (alterations in original). This is precisely what happened in Mr. George's case. The two orders the court entered required all materials to be sent to the prosecution, the defendant, and the court: "the examining psychiatrist or psychologist [shall] submit to the Court a written report as to the defendant's mental state at the time of the offense and his present mental condition as related to his ability to under the nature and object of the proceedings against him." (Supp. C.1 at 1181.) *McWilliams* states that the "simplest way for a State to meet [*Ake*'s requirement] may be to provide a qualified expert retained *specifically* for the defense team." *McWilliams,* 137 S. Ct. at 1800 (emphasis added). Dr. Ronan was not retained specifically for the defense team.

*McWilliams* also explained that "*Ake* does not require just an examination. Rather, it requires the State to provide the defendant with 'access to a competent psychologist who will conduct an appropriate (1) *examination* and assist in (2) *evaluation*,

(3) *preparation*, and (4) *presentation* of the defense."' *Id.* at 1800 (citing *Ake*, 470 U.S. at 83). Dr. Ronan did not meet any of the requirements: she did not complete an examination; she did not assist in an evaluation because hers was limited; and she did not assist in the preparation and presentation of a defense on behalf of Mr. George. The court simply relied on Dr. Ronan's uninformed opinion that Mr. George did not suffer from a mental illness at the time of the crime. A contrary finding to what Dr. Hudson concluded—a finding the ACCA overlooked, finding no error in Dr. Ronan's report and evaluation being incomplete. Dr. Hudson painted the following picture for Mr. George's crimes:

> *During times of decreased structure, behavior tends to be highly impulsive and emotionally, instead of rationally, driven, which often leads to increased aggression or irrational avoidance. While SPD is known to be accompanied by periods of rage, these episodes are fairly rare, unless the person with SPD is under a fair degree of sustained distress. During periods of sustained distress the already disturbed reality testing ability of these patients is accentuated. It is during these times that episodes of what are commonly referred to as "positive symptoms" emerge including episodes of hallucinations, ideas of reference and other symptoms characteristically viewed as being associated with Schizophrenia.*

(C. at 1341.)

The ACCA noted that "[t]he mere fact that George found a psychiatric expert who gave favorable testimony years after the fact did not render trial counsel's performance in this case deficient." *George V,* 2019 WL 180146 at *12. That is not what occurred. Dr. Ronan was hired for a very specific purpose and that purpose was not to assist or prepare the defense. (Supp. C.1 at 1181.) To the contrary, Dr. Hudson's

role complied with *Ake*, providing a full and complete evaluation—beyond the scope of mental state at the time of the crime—for the defense, not the court.

Unlike Dr. Ronan, Dr. Hudson's role in Mr. George's case meets the standard established by *Ake*. Dr. Hudson was an independent defense mental health expert; he examined Mr. George, including performing a neuropsychological exam; and he assisted in the full and complete evaluation, preparation, and presentation of a defense. In summary, Dr. Hudson concluded:

> *When consideration is given to the circumstances under which Mr. George was functioning at the time of the current offenses, it would seem reasonable to conclude that he not only lacked the structure of the environment provided by his wife and children, a steady job, and consistent domicile, he also experienced extreme distress associated with the perception that he was "hexed by his mother-in law and his belief that his wife was involved in an extramarital relationship. I suspect, that the combination of these circumstances did indeed push him into more psychotic realm of SPD during the time of his crime, giving additional credence to his report of hearing voices commanding him to "shoot." I also suspect that his vulnerability to engage in violent impulsive behavior would have been extreme.*

> *＊ ＊ ＊ ＊*

> *Given the great likelihood that [Mr. George] experienced an acute exacerbation of his underlying schizotypal disorder resulting in psychoticism during the time of the commission of the crimes in question, he would have been incapable of rational thought or socially responsible actions. As such, it is my opinion that Mr. George was mentally incapacitated during the commission of these crimes and thus, would not have been responsible for his actions at that time.*

> (C. at 1341-42.)

An independent defense mental health expert would have been able to adequately assist and support the defense, as well as provide a complete evaluation and portrayed an accurate account of Mr. George's mental health issues. Mr. George was entitled to such an expert under the law. Indeed, it was constitutionally required. Trial counsel seeks to protect their failures by highlighting that after the evaluation they did not believe Mr. George's mental health was at issue. Yet, they still chose to present Dr. Ronan, a court-appointed mental health expert, who testified that Mr. George did not suffer from a mental disease or defect.

### C. Penalty Phase

1. <u>Counsel's failure to investigate and present mitigation evidence at the penalty phase</u>

After being assigned to Mr. George's case, trial counsel conducted no investigation into Mr. George's life. Client contact was minimal and unrevealing. Trial counsel did not interview any of Mr. George's family and friends to discover any information about Mr. George's background or his behavior around the time of the crimes. Had trial counsel spoken with family members, they would have discovered that Mr. George's family members noticed that his behavior had changed days before and leading up to the day of the crimes. Instead, trial counsel argued to the jury:

> *Time to do the duty to which you swore you would. And if that recommendation is death, if you believe in your hearts and you believe in your heads and you believe what came from this witness stand, you base it on that, <u>then nobody can be mad at you</u> about that or say you didn't do your duty.*

(Tr. R. at 609, Defense Closing Argument) (emphasis added).

During the penalty phase, Mr. George's trial counsel put on three witnesses—Bailey, Wright, and Dr. Ronan. Trial counsel did not prepare either of Mr. George's sisters for trial. Neither attorney spoke with the family about the purpose of the penalty phase testimony and what information the jury needed to hear to spare Mr. George's life. In fact, Fannin testified that he "met some of [Mr. George's] family briefly before trial started"; that was his only contact with them, and it occurred four days before trial. (R. at 119). Inexplicably, the ACCA credited trial counsel's testimony that they interviewed family members, despite a record and witnesses contradicting the same. The fee declarations reflect that trial counsel were unaware of a significant portion of Mr. George's life, including his family dynamic, which supports the conclusion that trial counsel failed to conduct a constitutionally adequate investigation.

Although Giddens represented at the Rule 32 hearing that the defense focused on mitigation, counsel's 84-minute investigation into mitigation (four phone calls) does not reflect that. There was no meaningful investigation, and trial counsel prematurely decided not to explore any avenues that would have humanized Mr. George before the jury. "Counsel's failure to discover and present significant mitigating evidence was 'below the range expected of reasonable professional competent assistance of counsel.'" *Williams v. Taylor*, 529 U.S. 362, 371 (2000) (citation omitted). Giddens was appointed for almost six months before he attempted to contact Mr. George's family. Given that trial counsel testified that the entire defense strategy focused on the penalty phase, a

reasonable attorney immediately would have consulted with family and friends to develop a mitigation theory that would have supported a life sentence. *See Porter*, 558 U.S. at 39 ("Counsel did not even take the first step of interviewing witnesses or requesting records."). Trial counsel knew that they needed mitigating evidence, and they failed to uncover any because they did not attempt to investigate. As in *Williams*, all of Mr. George's penalty phase testimony consisted of him being a "nice boy." *Williams*, 529 U.S. at 369 (holding that trial counsel, whose sentencing presentation consisted of testimony from the mother and two neighbors of the petitioner that he was a "nice boy," performed an ineffective background investigation, as post-conviction investigation revealed evidence that petitioner had suffered childhood neglect and abuse).

Trial counsel never exposed the jury to Mr. George's childhood of poverty, domestic violence, alcoholism and physical abuse. According to Dr. Hudson, physical abuse, domestic violence, and trauma significantly affect development:

> [R]esearch clearly points to the detrimental effect that physical and emotional abuse has on the developing brain, particularly those aspects of the brain that manage regulatory functions related to emotion and behavior (i.e., the prefrontal regions). Based on the environment in which he was reared, it is also quite likely that he suffered some degree of physical trauma to the brain, as he reported that his father and brother often struck him on the head. The chronicity of brain disturbances incurred from factors such as a traumatic living environment and/or injury would depend on the extent of the abuse and whether or not he was given the opportunity to function in a restorative environment during the developmental period during which the damage could be at least partially corrected. . . . [I]t is clear that he did not move to a less tumultuous

*environment until he was relocated to Delaware, which would have likely been too late to sufficiently address any previous brain damage due to either an abusive living environment or physical trauma.*

(Supp. C.1 at 1340).

Properly portraying Mr. George's home life was necessary for the penalty phase. The jury was misled to believe that Mr. George was a "nice boy," who was raised in a normal and functional environment, absent any physical abuse or violence. To the contrary, Mr. George's tumultuous home life largely contributed to his SPD and the offense that occurred on February 1988. Had the jury been properly presented with the realities of Mr. George's background and how it informed his choices, it is reasonably probable the jury would have recommended a life sentence.

At the time of the offense, Mr. George was experiencing a breakdown in his marriage and separation from his children. At the time, Mr. George and his ex-wife were living in separate homes, and the children were residing with Mr. George's ex-wife. (C. at 1329.) Family members reported that Mr. George believed that his ex-wife was dating a co-worker, and Mr. George was agitated or depressed due to his separation from his children. (R. at 195-96; Supp. C.2 at 820.) Yet, trial counsel did not investigate the nature of Mr. George's relationship with Geraldine to determine how it impacted his mental health and led to the crimes. Given that the status of Mr. George's intimate relationship contributed to his downward spiral, had the jury been aware of this

mounting pressure, one more juror may have voted for life in prison without parole instead of death.

Moreover, counsel failed to adequately investigate mitigating evidence regarding Mr. George's state of mind at the time of the offense, instead choosing to rely on a limited evaluation completed by an examiner who had little to no collateral data available. Because mental state at the time of the crime was years prior to trial, Dr. Ronan had to reconstruct and "rely heavily on third party information, information about the person's past, and past psychiatric treatment." (Tr. R. at 565.) According to Dr. Ronan, the ultimate goal was to develop a "body of outside information." (*Id.*) Yet, Dr. Ronan neither developed a body of outside or third-party information nor received any third party outside information. Everything Dr. Ronan considered was based on Mr. George's self-report, a practice mental health professionals reject. *See* (Supp. C.1 at 1530-31.)

The ACCA found no constitutional violation and affirmed the Rule 32 court's findings that "two of George's sisters who testified at trial gave no indication that George had anything other than a normal childhood and that he has shown no signs of mental illness" and "no evidence presented at the evidentiary hearing indic[ated] that trial counsel had rendered ineffective assistance by not hiring a mitigation investigator." *George V,* 2019 WL 180146 at *21.

As Mr. George's death verdict was 10-2, it is reasonably probable that at least one more juror would have voted for a life sentence had more compelling mitigation

been presented.  *See Rompilla*, 545 U.S. at 393 ("[T]he likelihood of a different result if the evidence had gone in is 'sufficient to undermine confidence in the outcome' actually reached at sentencing.").  Trial counsel had every opportunity to explore Mr. George's past, yet they chose to forgo any opportunity to discover any mitigating evidence, including reviewing the State's file.  The trial court and jury heard nothing to humanize Mr. George or to provide context to the crimes so to accurately gauge his moral culpability.  *See Porter*, 558 U.S. at 41 ("[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable.") (citing *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989)) (alterations in original).

"[W]here, as here, a petitioner challenges a death sentence, 'the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'"  *Ferrell v. Hall*, 640 F.3d 1199, 1234 (11th Cir. 2011) (quoting *Strickland*, 466 U.S. at 695) (ellipses in original).  Courts have repeatedly held that the failure to investigate and present available mitigating evidence of severe poverty, domestic violence, abandonment, and alcoholism during the penalty phase of a capital trial is both deficient and prejudicial.  *See Rompilla*, 545 U.S. at 391-93 (holding that a habeas petitioner was prejudiced by trial counsel's failure to investigate and present mitigating evidence of parents' alcoholism, domestic violence, physical abuse, poverty, ragged clothing, and inadequate living conditions); *Wiggins*, 539 U.S. at  535 (holding that a

habeas petitioner was prejudiced by trial counsel's failure to investigate and present mitigating evidence of mother's chronic alcoholism, abandonment, poverty, sexual abuse, and neglect); *Johnson v, Sec'y, DOC*, 643 F.3d 907, 936-37 (11th Cir. 2011) (holding that a habeas petitioner was prejudiced by trial counsel's failure to investigate and present mitigating evidence of poverty, neglect, crowded childhood living conditions, parents' alcoholism, childhood abandonment, and family history of drug use).

In assessing prejudice, "we consider 'the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding'—and 'reweig[h] it against the evidence in aggravation.'" *Porter*, 558 U.S. at 41. The State alleged and proved *only one* aggravating circumstance, that the murders were committed during the course of the commission of a burglary. As discussed, there was abundant mitigating evidence available, but trial counsel presented none. The trial court found only one statutory mitigating circumstance—that Mr. George had no criminal history—and found no nonstatutory mitigating circumstances. The evidence trial counsel presented before the jury was minimal and did nothing to support a life sentence. Trial counsel put on the testimony of Mr. George's two sisters, who provided no mitigating information about Mr. George. Had Mr. George's counsel conducted a reasonable investigation, the jury would have heard compelling, non-statutory mitigating factors. Specifically, the jury would have heard that:

- Mr. George lived in extreme poverty;

- Mr. George's life was shaped with violence as his father was an alcoholic and physically abused his mother, causing her permanent blindness in one eye;

- Mr. George's parents physically abused him and his siblings;

- Mr. George's marital strife and separation from his children exasperated his mental health issues and led to  a severe emotional breakdown;

- Mr. George experience visual and auditory hallucinations; he often saw things and heard voices saying "shoot her" around the time of the crimes; and

- Mr. George was paranoid and believed his mother-in-law was "rooting" or hexing him.

All of the above non-statutory mitigating circumstances are consistent with Mr. George's longstanding mental health issues that were present from his adolescence through the time of the crimes and well into his capture.  Had counsel presented this evidence, there is a reasonable probability that the jury would have reached a different verdict. Instead, trial counsel stated during closing argument that Mr. George would not have a problem with the verdict either way. At the outset, Mr. George was prejudiced because the jurors likely did not feel the ultimate verdict mattered, considering it appeared that it did not matter to Mr. George.  Because trial counsel's investigative failures were "sufficient to undermine confidence in the outcome" of his penalty phase, Mr. George was prejudiced.  *Rompilla,* 545 U.S. at 393 ("It goes without saying that the undiscovered mitigating evidence, taken as a whole, might well have

influenced the jury's appraisal of [petitioner's] culpability.") (citations and internal quotation marks omitted).

## 2. Counsel's failure to hire an independent defense mental health expert for the penalty phase

"[J]ustice cannot be equal where, simply as a result of his poverty, a defendant is denied the opportunity to participate meaningfully in a judicial proceeding in which his liberty is at stake." *Ake*, 470 U.S. at 76. Trial counsel stated in opening statements: "[w]e offer . . . through a Dr. Kathy Ronan, Taylor-Hardin Medical Facility, of his mental state, condition at the time of the offense, and that is also mitigating." (Tr. R. at 515.) By this reading, trial counsel intended for Dr. Ronan to testify as a mental health expert and to provide mitigating information about Mr. George.

Yet, trial counsel presented her testimony either with knowledge that she would undermine any attempt at mitigation during the penalty phase or neglected to appreciate that her testimony would be unfavorable. Either way, this is evidence of trial counsel's lack of attention to Mr. George's case and unsound reasonable judgment. Trial counsel testified that they did not believe insanity was a viable defense or helpful mitigation, yet they presented a "mental health expert," who told the jury that Mr. George knew what he was doing on February 12, 1988. The State, however, presented no expert at the penalty phase. It is no surprise that the State did not have a rebuttal mental health expert, because based on Dr. Ronan's testimony, there was nothing to rebut.

On cross-examination, the State questioned Dr. Ronan at length about her contact with witnesses to corroborate her testimony as it related to Mr. George's relationships and military service. (Tr. R. at 577.) Unfortunately, because trial counsel failed to provide Dr. Ronan with the necessary records, and because she was appointed to assist the court rather than the defense, no records, witnesses, or any other corroborating information was available. In fact, Dr. Ronan testified that she relied more on recent information about Mr. George rather than his childhood. (Tr. R. at 592.)

In contrast, Dr. Hudson found that there was significant anecdotal evidence that Mr. George experienced significant psychopathology from adolescence through adulthood. (C. at 404.) This was a fact Dr. Ronan could not appreciate because she her limited evaluation did not focus on Mr. George's childhood. (Tr. R. at 592.) Armed with a limited record and examination that focused almost exclusively on mental state at the time of the crime, Mr. George's life was left in the hands of a court-appointed neutral mental health expert. Even in closing, trial counsel did not attempt to connect Mr. George's living conditions with his mental health.

Dr. Ronan made no mention of Mr. George's life in isolation; whereas, Dr. Hudson found that Mr. George's mental health condition informed how he was able to survive on the run. Dr. Hudson explained that Mr. George possessed weapons and was able to live as he did those six years because he was paranoid and isolation was normal to him. (C. at 1339.) Dr. Hudson attributed Mr. George's functioning to an

underlying mental health issue, including paranoia, delusions of persecution, and poor reality testing. (*Id.*) Mr. George exhibited signs of paranoia long before he fled. Mr. George's longstanding mental health issues were not inconsistent with the State's rebuttal evidence. Mr. George's mental health background provided context for his flight and would have served to undermine the State's improper rebuttal.

The behaviors Mr. George engaged in over those six years were consistent with his SPD symptomology. His possession of weapons and paramilitary devices aligned with his paranoia; the books and reading materials found after his capture supported his eccentric religious and cultural influences; and living in isolation and in the woods directly correlates with his interpersonal deficits and desire to be a loner and withdrawn. As it relates to the State's flight evidence, what the jury saw as alarming, rational behavior, was actually behavior that conformed to Mr. George's mental health diagnosis.

Trial counsel claimed they filed the mental health motions to get mitigating evidence. However, counsel uncovered no information about Mr. George's background. Trial counsel had information available about Mr. George's mind, but they ignored it. They stressed the importance of focusing on the penalty phase, but did nothing. *See Gilmore v. Taylor*, 508 U.S. 333, 343 (1993) ("The Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'") (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)).

Worse, the ACCA gave little attention to this claim, choosing, instead, to rely on trial counsel's Rule 32 testimony, which contradicted the record, and Dr. Ronan's incomplete evaluation and report. *See generally George V*, 2019 WL 180146 at *21-24. The ACCA erroneously found that Mr. George did not prove that trial counsel failed to adequately prepare and present mitigating evidence. Dr. Ronan, the court appointed psychologist, was hired to look at issues specified *by the court*. (Tr. R. at 565.) In other words, Dr. Ronan's examination focused solely on competency and criminal responsibility at the time of the trial. Dr. Ronan's evaluation was limited and incomplete. This information would have directly undermined the State's "rebuttal evidence" presented as alarming, rational behavior, as a well-prepare defense expert could have explained that Mr. George's behavior conformed to his mental health diagnosis and was a symptom of his illness. Had Mr. George's counsel conducted the necessary investigation into Mr. George's life and retained a defense expert who was properly prepared, counsel could have presented a much different picture of their client—one that was presented in the post-conviction proceedings. Although "it is possible that a jury could have heard [all new mitigating information] and still have decided on the death penalty, *that is not the test*." *Rompilla*, 545 U.S. at 393 (emphasis added). Here, the mitigating evidence could have influenced "at least one juror" in a manner that could have "struck a different balance." *Wiggins*, 539 U.S. at 537. Mr. George is entitled to a new penalty-phase hearing.

## VII. The trial court violated Mr. George's constitutional rights by failing to excuse for cause a potential juror who repeatedly stated that Mr. George would not have been in court if he was not guilty.

*"He wouldn't be here if he hadn't done something."* These are the words of Veniremember M.D. during voir dire of potential jurors. (Tr. R. at 55). Following unsuccessful attempts, by both the defense and the court, to rehabilitate Juror M.D., who steadfastly maintained that he believed Mr. George must have done something if he had been arrested and was facing trial, the State inquired as follows:

> **Mr. Rumsey**: Particularly with regard to [M.D.]. The burden is on the State of Alabama to prove that the defendant is guilty beyond a reasonable doubt and to a moral certainty. We accepted that burden when we carne to court. Now regardless of any thoughts that you have that he must have done something or he wouldn't be here, could you put any thoughts like that aside and just render a fair and impartial verdict based strictly on what comes to you from the witness stand?
>
> **Juror [M.D.]**: Yes, sir.

(R. at 58). The defense, however, was unconvinced and moved to strike Juror M.D. for cause. (R. at 60-61). The trial court denied the request. (*Id.*). The court found "I heard his responses both times. I think it was cleared up the second time, so I deny the challenge at this time." (*Id.*). Mr. George asserts that this was error.

This claim was made on direct appeal of his conviction and sentence to the Alabama Court of Criminal Appeals. It was denied because the court found that:

> even though Juror D. initially expressed an opinion concerning the appellant's guilt, he unequivocally stated that he could put his opinion aside and render a verdict based on the evidence presented during the trial. The record does not support a finding that Juror D.'s opinion was

> so "fixed" that it would bias his verdict. The trial court did not err in
> refusing to strike this prospective juror for cause.

*George I*, 717 So. 2d at 834. The court cited a series of Alabama cases where the juror in

question was rehabilitated during further questioning in voir dire and will base his

decision on the evidence alone such that "a trial judge's refusal to grant a motion to

strike for cause is not error." *Id.* (citations omitted).

Mr. George exhausted this claim by arguing the intermediate appellate court

erred in concluding that the trial court did not err in his petition for writ of certiorari at

the Alabama Supreme Court.  (*George IV*, Br. of Appellant, pp. 28-32). The Alabama

Supreme Court denied relief summarily by finding that "[w]e find no error, plain or

otherwise, in either the guilt phase or the sentencing phase of George's trial that would

warrant a reversal of his conviction or his sentence."). *George IV*, 717 So. 2d at 859.

Given that the state's highest court failed to address this singular claim with any specific

reasoning, this Court must "look through" the Alabama Supreme Court's decision and

review the claim under a § 2254 lens applied to the reasoned decision of the Alabama

Court of Criminal Appeals. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018) ("We hold

that the federal court should "look through" the unexplained decision to the last related

state-court decision that does provide a relevant rationale."). Having done so, Mr.

George contends he is entitled to federal habeas relief.

**VIII.**     **The death penalty in Alabama is rooted in systemic racism violating the Eighth and Fourteenth Amendments.**

Mr. George was entitled to a capital trial and sentencing "free of racial discrimination."[46] The death penalty in Alabama, however, is rooted in racism, and the facts in this case demonstrate that Mr. George's death sentence is a product of systemic racism (whether conscious or not) rather than justice. When racism is part of the system, it "poisons public confidence in the judicial process . . . and injures not just the defendant, but the law as an institution, the community at large, and the democratic ideal reflected in the processes of our courts."[47] Mr. George's sentence, therefore, should be vacated.[48]

Executions have long been rooted in racism as they were an intentional and integral element of the slave economy. The penal codes of the late American colonial period included a "swelling number of capital statutes applicable only to blacks."[49] Under Alabama Law in 1852, enslaved persons convicted of rebellion or conspiracy to rebel, arson or the rape, burglary, assault, robbery, poisoning or attempted poisoning of any white person would be executed.[50]

Even after slavery was abolished, Black citizens were still treated as inferior through the Black codes, Jim Crow laws, and convict leasing; and Blacks faced executions—both by the courts and lynch mobs—at a higher rate than their white

---

[46] *Flowers v. Mississippi*, 139 S. Ct. 2228, 2242 (2019).

[47] *Buck v. Davis*, 137 S. Ct. 759, 778 (2017) (citations, quotations, and alterations removed).

[48] Mr. George has not exhausted this claim in the state courts, but he cannot do so because there is an absence of available State corrective process, and even if there were, circumstances exist that render such process ineffective to protect his rights. 28 U.S.C. § 2254(b)(1)(B)(i)-(ii).

[49] Stuart Banner, *The Death Penalty: An American History*, at 8 (Harvard Univ. Press 2003).

[50] Ala. Code (1852), pt. 4, Title 1, Ch. 2, Art. X, §§ 3306-13.

counterparts.[51] "The era of slavery was followed by decades of terrorism and racial subordination most dramatically evidenced by lynching."[52]

To justify lynchings, in the 1920s, "[s]outhern legislatures shifted to capital punishment so that legal and ostensibly unbiased court proceedings could serve the same purpose as vigilante violence: satisfying the lust for revenge."[53] Between 1927 and 1965, Alabama executed 153 people; of those individuals, 126 (or 82%) were Black.[54]

During the 1900s, Alabama's elected officials openly voiced their commitment to upholding racism and white supremacy. When Alabama rewrote its constitution in 1901, the president of the constitutional convention began with a statement of purpose: "Why it is within the limits imposed by the Federal Constitution, to establish white supremacy in this state."[55]

Over the past several hundred years, Alabama has established and maintained a system of white supremacy, as seen through the criminal legal system and specifically in

---

[51] *See, e.g.*, Death Penalty Information Center, Enduring Justice: The Persistence of Racial Discrimination in the U.S. Death Penalty (2020), *at* https://documents.deathpenaltyinfo.org/pdf/Enduring-Injustice-Race-and-the-Death-Penalty-2020.pdf, at 5 ("The Civil War and Emancipation altered the legal status of African Americans in the South but not the desire of white southerners to ensure the continuation of a strict racial caste system. To ensure the continued subjugation of the large African-American population in the South, white southerners created Black Codes, convict-leasing systems, and eventually Jim Crow laws"); EJI, Lynching in America Confronting the Legacy of Racial Terror (3d Ed.), *at* https://eji.org/wp-content/uploads/2020/09/lynching-in-america-3d-ed-091620.pdf (EJI, Lynching in America), at 4-5.

[52] EJI, Lynching in America, at 3.

[53] *Id.* at 62.

[54] Ala. Dep't of Corr., Executions, *available at* http://www.doc.state.al.us/Executions (last visited Feb. 22, 2021).

[55] EJI, Lynching in America, at 23.

imposing the death penalty. In this case, Mr. George was represented, prosecuted, and sentenced by white men. Because of the long history of racism within the criminal system, Mr. George as a Black man did not receive a sentencing free from bias. His death sentence violates the Eighth and Fourteenth Amendments, and he is entitled to relief.

## CONCLUSION

For all of the reasons detailed above, Mr. George was not convicted or sentenced as the result of a fair proceeding. Substantial constitutional rights were violated by the prosecution, by the court, and by Mr. George's own counsel. There can be no confidence in the outcome of such proceedings. Therefore, this Court, after a full evidentiary hearing of all the claims raised herein or in any supplements or amendments to this petition, should set aside Mr. George's convictions and sentences and grant him federal habeas relief.

## PRAYER FOR RELIEF

For the above reasons, Larry Donald George respectfully asks this Honorable Court to grant him the following relief:

(A)   Afford him an opportunity to reply to any responsive pleading;

(B)   Grant him discovery under Rule 6 of the Rules Governing Section 2254 Cases and a sufficient period of time to conduct discovery, and further grant him authority to obtain subpoenas to further document and prove the facts set forth in this petition;

(C) Grant him an evidentiary hearing at which proof may be offered supporting the allegations set forth in this petition;

(D) Establish a briefing schedule that allows him the opportunity to amend, after additional factual development, and the opportunity to brief and argue the issues presented in this petition, including issues related AEDPA's limitation on relief, state corrective process, and procedural default;

(E) Issue a writ of habeas corpus granting him relief from his unconstitutionally obtained conviction and sentence of death; and

(F) Grant such further and other relief as may be appropriate.


Respectfully Submitted,


/s/ Allyson R. duLac
ALLYSON R. DULAC
Assistant Federal Defender
FL Bar#0670944
Federal Defenders
Middle District of Alabama
817 S. Court Street
Montgomery, Alabama 36106
Phone: (334) 834-2099
Fax: (334) 834-0353
E-Mail: Allyson_duLac@fd.org


*Counsel for Larry Donald George*

**VERIFICATION**[56]

I declare under penalty of perjury that the foregoing is true and correct to the best of my ability. Executed by counsel for petitioner on March 1, 2021.

/s/ Allyson R. duLac
Counsel for Mr. George

---

[56] Under the Rule 2(c)(5) of the Rules Governing Section 2254 Cases in the United States District Courts, the petition must "be signed under penalty of perjury by the petitioner or by a person authorized to sign it for the petitioner under 28 U.S.C. § 2242." Undersigned counsel is authorized to sign for Mr. George. However, due to the current COVID restrictions at the prison, counsel has been unable to meet with Mr. George in person; instead, undersigned counsel had a limited conference with Mr. George telephonically. The information alleged in this Petition is accurate to the best of counsel's knowledge under the circumstances.