FILED
2025 Apr-24  PM 02:34
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

| | | |
|---|---|---|
| **LARRY DONALD GEORGE,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 1:21-cv-0325-LCB** |
| | ) | |
| **TERRY RAYBON, Warden of** | ) | |
| **William C. Holman Correctional** | ) | |
| **Facility,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## <u>MEMORANDUM OPINION</u>

Larry Donald George, a convicted Alabama state prisoner, petitions for a writ of habeas corpus under Title 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). (Doc. 52). Mr. George challenges the constitutionality of his capital murder convictions and death sentence in the Circuit Court of Talladega County, Alabama. (*Id.* at 6–7). After careful consideration, the Court concludes that Mr. George has not shown a right to habeas relief and **DENIES** his petition. Before turning to the § 2254 analysis, the Court provides background information and reviews some fundamental habeas principles.

## I.    BACKGROUND

### A.    Trial Court Proceedings

Following several Talladega County Grand Jury indictments (Doc. 11 at 12–14, 62–63; Doc. 11-3 at 201–03; Doc. 11-4 at 3), the state prosecuted Mr. George for capital and attempted murder. The double-murder shooting of "Janice Morris and her boyfriend, Ralph Swain" during a burglary formed the foundation for the two capital-eligible counts. *George v. State (George Direct I)*, 717 So. 2d 827, 830–31 (Ala. Crim. App.), *rev'd on other grounds by Ex parte George (George Direct II)*, 717 So. 2d 844 (Ala. 1996); *see also* Ala. Code § 13A–5–40(a)(4), (a)(10). The surviving, but paralyzed, gunfire victim was Geraldine George—Mr. George's wife. *George Direct I*, 717 So. 2d at 831; (Doc. 11 at 103). Attorneys Steve Giddens and Jeb Fannin were Mr. George's trial counsel. (Doc. 11-1 at 21). The jury convicted Mr. George of both capital counts and attempted murder. (Doc. 11 at 9–10, 61).

The Alabama Court of Criminal Appeals ("ACCA") summarized the state's evidence in its opinion on direct appeal:

> The state's evidence tended to show that on the evening of February 12, 1988, the appellant shot his wife Geraldine George. The injuries she sustained as a result of the shooting rendered her a paraplegic. He also shot and killed Janice Morris and her boyfriend, Ralph Swain. Dr. Joseph Embry, a medical examiner for the State of Alabama, testified that Morris died as a result of a gunshot wound to the right side of her chest. Swain died as a result of a gunshot wound to the left side of his head. The lower half of the appellant's wife's body was paralyzed as a result of the damage caused by a bullet that entered

her arm and passed through the mid-portion of her body.

Geraldine George testified that on the evening of February 12, 1988, she finished her shift at the Wal–Mart discount department store and went to her apartment complex. George had left her two children with her neighbor, Janice Morris, so she went to Morris's apartment to pick up her children. As she was leaving the apartment she saw the appellant talking to her son. The appellant approached her and pulled a pistol from his jacket pocket. She ran into Morris's apartment, yelling for Morris to telephone the police. She heard gunshots, turned, and saw the appellant pointing a gun at her before he fired. Janice Morris was shot while she was at the telephone, and Ralph Swain was shot as he ran up the stairs to the second floor.

Andrew Watkins was visiting a friend at the apartment complex on the night of the shootings. He testified that he heard gunshots and that he watched the appellant leave an apartment and drive away in his automobile. Watkins followed the appellant's automobile and wrote down his license tag number. He then went to police Captain Willard Hurst's house, where he reported the incident. The appellant was apprehended in Delaware six years after the murders as a result of an episode of the television show *America's Most Wanted* on which the case was featured.

*George Direct I*, 717 So. 2d at 831.

Mr. George's capital convictions triggered a two-part penalty phase under Alabama law—the first ending with a jury vote on punishment and the second with the court's sentence. *Id.* at 830. In the advisory stage, the jury heard evidence and argument on aggravating and mitigating circumstances, deliberated, and voted 10 to 2 for capital punishment. *Id.*; (Doc. 11 at 11). The numerical breakdown of this penalty-phase verdict met Alabama's minimal threshold for a recommended death sentence. *See* Ala. Code § 13A–5–46(f) ("The decision of the jury to recommend a

3

sentence of death must be based on a vote of at least 10 jurors.").

In the judicial stage, the trial court summarized the guilt-phase record. (Doc. 11 at 99–103). The court accepted the jury's recommendation of capital punishment as "fully justified . . . fact[ually]." (Doc. 11 at 105). Elaborating, the court described Mr. George's conduct as "a brutal, aggravated, merciless[,] and intentional killing of [two victims]." (*Id.*).

As for findings relevant to the court's weighing role, the guilty verdict on burglary-murder was the state's sole source of aggravating evidence. (Doc. 11 at 108 ¶ 4). Although killing at least two people in "one scheme or course of conduct" was a capital offense when the state prosecuted Mr. George, unlike burglary, that conduct was not (yet) an aggravator. *Compare* Ala. Code § 13A–5–40(10), *with* Ala. Code § 13A–5–49(1)–(8) (1994 replacement vol.); *see also* Ala. Act 99–403 § 1 (adding "intentionally caused the death of two or more persons . . . pursuant to one scheme or course of conduct" as an aggravating factor) (available on Westlaw); Ala. Code § 13A–5–49(9) (same). Consequently, the court credited the state for proving the conviction-based aggravator of burglary. (Doc. 11 at 108 ¶ 4); *George Direct II*, 717 So. 2d at 845.

Rejecting all but one of Mr. George's mitigating factors, the court credited him for proving his "[in]significant" criminal history. (Doc. 11 at 109–10); *George Direct II*, 717 So. 2d at 845. The court compared the two opposing factors to determine Mr.

4

George's appropriate punishment. Concluding that "the aggravating circumstance outweighed the mitigati[on]," the court sentenced Mr. George to death consistent with the jury's recommendation. (Doc. 11 at 105, 111); *George Direct I*, 717 So. 2d at 830. Additionally, Mr. George received a life sentence for the attempted murder of Ms. George. (Doc. 11 at 59); *George Direct I*, 717 So. 2d at 830.

### B.    Direct Appeal Proceedings

Under Alabama's capital punishment framework, the appeal of Mr. George's convictions and sentence was automatic. (Doc. 11 at 7). Mr. George's trial counsel represented him on appeal. *George Direct I*, 717 So. 2d at 830. The ACCA—in a substituted opinion entered on its own motion—rejected Mr. George's guilt-phase challenge but determined that his penalty-phase proceedings contained reversible evidentiary error. *Id.* at 830, 843. The ACCA remanded the case for a new hearing on punishment and denied the state's application for rehearing. *Id.* at 843; (Doc. 11-7 at 79–80 ¶ 7).

The Alabama Supreme Court granted the state's petition for certiorari review, reversed the penalty-phase portion of the ACCA's judgment, and "remand[ed] the case . . . with instructions to reinstate the sentence of death." *George Direct II*, 717 So. 2d at 848. The Alabama Supreme Court denied Mr. George's application for rehearing. (Doc. 11-7 at 135).

On remand, the ACCA considered "the remaining [penalty-phase] issues" and

affirmed the circuit court's death sentence. *George v. State (George Direct III)*, 717 So. 2d 849, 850 (Ala. Crim. App. 1997), *aff'd sub nom. Ex parte George (George Direct IV)*, 717 So. 2d 858 (Ala. 1998). The ACCA denied Mr. George's application for rehearing. (Doc. 11-7 at 165).

Mr. George petitioned for certiorari review in the Alabama and United States Supreme Courts. (Doc. 11-8 at 2; Doc. 11-10 at 17). The Alabama Supreme Court affirmed the ACCA's judgment upholding Mr. George's convictions and sentence and rejected his rehearing request. *George Direct IV*, 717 So. 2d at 859; (Doc. 11-9 at 163). The United States Supreme Court denied certiorari review. *George v. Alabama*, 525 U.S. 1024 (1998); (Doc. 11-10 at 112).

## C.    Collateral Proceedings

After losing on direct appeal, Mr. George petitioned the Circuit Court of Talladega County for collateral relief under Alabama Criminal Procedure Rule 32. (Doc. 11-11 at 3). Mr. George represented himself initially and followed that pro se period with various counsel. (*Id.* at 3, 7, 17–18). Mr. George amended his postconviction pleading once, and the state moved for a dismissal of that operative petition. (Doc. 11-11 at 22; Doc. 11-24 at 27–70; Doc. 11-25 at 1–70; Doc. 11-26 at 1–42). In a collection of orders, the Rule 32 court concluded that much of Mr. George's petition was inadequate to benefit from additional development and dismissed those allegations summarily. (*Id.*); *see also* Ala. R. Crim. P. 32.7(d)

(authorizing summary disposition of collateral allegations that lack "sufficient[]
specific[ity]," present "precluded" matters, state an incognizable claim, or contain
"no material issue of fact or law . . . entitl[ing] the petitioner to relief"). Mr. George
moved to clarify the surviving claims with additional language and supporting
exhibits. (Doc. 11-12 at 111–156; Doc. 11-13 at 1–46; Doc. 11-14 at 3–28). The court
held an evidentiary hearing and denied relief, including Mr. George's proposed
clarifications. (Doc. 11-11 at 22, 29, 34, 39, 43–44).

Mr. George appealed the Rule 32 court's denial of postconviction relief. (Doc.
11-90 at 2–163). The ACCA affirmed the postconviction judgment, *George v. State
(George Collateral)*, 333 So. 3d 1022 (Ala. Crim. App. 2019), and denied Mr.
George's application for a rehearing (doc. 11-93 at 255). Mr. George petitioned the
Alabama Supreme Court for a writ of certiorari. (Doc. 11-93 at 2–164). The Alabama
Supreme Court denied the writ without an opinion and issued a certificate of
judgment. (Doc. 11-93 at 256).

### D.    Federal Habeas Proceedings

After completion of the state collateral review process, Mr. George petitioned
this Court for habeas relief and requested discovery and an evidentiary hearing. (Doc.
1 at 109–10; Doc. 17 at 111). Mr. George amended his original pleading to comply
with the requirements of the Court's initial order. (Docs. 7, 17). He filed a second
amended petition on April 10, 2025, for the limited purpose of including record

citations from his supplemented habeas corpus checklist. (Doc. 52).

Warden Terry Raybon answered Mr. George's petition and filed an opposing brief. (Docs. 22, 23). Mr. George followed with his reply. (Doc. 28).[1]

The Court ordered supplemental briefing on the impact, if any, of *Shinn v. Ramirez*, 596 U.S. 366 (2022), on Mr. George's claims. (Doc. 31). Consistent with that order, Warden Raybon and Mr. George supplemented the habeas briefing. (Docs. 33, 34).[2]

The Court then conducted oral argument. (Docs. 36, 39, 42). In preparation for that hearing, each side submitted to chambers a list of issues that "best support[ed] their respective positions." (Doc. 38 at 1). Mr. George filed a notice of supplemental authority. (Doc. 43).

## II.    HABEAS CORPUS REVIEW OF STATE COURT CONVICTIONS

"[T]he writ of habeas corpus has historically been regarded as an extraordinary remedy." *Brecht v. Abrahamson*, 507 U.S. 619, 633 (1993). That is especially true for habeas review of a state court conviction pursuant to 28 U.S.C. § 2254 because "[t]he role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited." *Brecht*, 507 U.S. at 633

---

[1] Because Mr. George's final amendment was filed solely to add citations, it was unnecessary to order amended responses.

[2] The *Shinn* Court addressed the "stringent" limits which 28 U.S.C. § 2254(e)(2) places on certain evidentiary hearing requests. 596 U.S. at 384. Ultimately, *Shinn* plays no part in the Court's rejection of Mr. George's hearing contentions.

(internal quotation marks omitted) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983), *superseded by statute on other grounds as recognized in Slack v. McDaniel*, 529 U.S. 473 (2000)). "Those few who are ultimately successful [in obtaining federal habeas relief] are persons whom society has grievously wronged and for whom belated liberation is little enough compensation." *Fay v. Noia*, 372 U.S. 391, 440–41 (1963), *overruled on other grounds by Wainwright v. Sykes*, 433 U.S. 72 (1977), *abrogated on other grounds by Coleman v. Thompson*, 501 U.S. 722 (1991), *and Coleman holding modified on other grounds by Martinez v. Ryan*, 566 U.S. 1 (2012). "Accordingly, . . . an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment." *Brecht*, 507 U.S. at 634 (internal quotation marks omitted).

Consistent with these finality and comity principles, Congress amended § 2254 nearly thirty years ago, and AEDPA governs this Court's review of Mr. George's habeas claims. *See Guzman v. Sec'y, Fla. Dep't of Corr.*, 663 F.3d 1336, 1345 (11th Cir. 2011) (explaining that AEDPA applies to habeas petitions filed after April 24, 1996). When a petitioner has obtained a state-court adjudication of a constitutional claim on the merits and AEDPA applies, additional significant restrictions constrain the role of review in federal court. In particular, "AEDPA imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." *Guzman*, 663 F.3d at 1345 (internal

quotation marks omitted) (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010)). To grant habeas relief on a substantively-adjudicated claim under AEDPA, this Court must find not only that the petitioner relies on a meritorious constitutional violation but also that the state court's resolution falls within an exception to § 2254(d)'s limitation on the authority to award habeas relief. *See* 28 U.S.C. § 2254(d) (providing that habeas relief "shall not be granted with respect to any claim that was adjudicated on the merits in [s]tate court proceedings unless" certain conditions or exceptions codified within (d)(1) or (d)(2) apply).

Under (d)(1), a petitioner opens the door to habeas relief if he demonstrates that a state court rejected the merits of a constitutional claim in a manner "that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Under (d)(2), the petitioner must show that a denial of constitutional relief "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in . . . [s]tate court." 28 U.S.C. § 2254(d)(2); *see also Boyd v. Allen*, 592 F.3d 1274, 1292 (11th Cir. 2010) (quoting 28 U.S.C. § 2254(d)). Periodically in this opinion, the Court uses "clearly-established constitutional error," "clearly-established AEDPA error," or "AEDPA (d)(1) error" to describe § 2254(d)(1)'s clauses collectively.

The petitioner bears the burden of showing that an adjudicated issue on the merits falls within § 2254(d)(1) or (d)(2). *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [a constitutional holding] incorrectly." *Id.* at 24–25. Additionally, "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991); *see also Wilson v. Sellers*, 584 U.S. 122,125 (2018) (holding that habeas courts reviewing adjudicated claims under AEDPA "should 'look through' [an] unexplained decision to the last [developed] state-court decision . . . . [and] then presume that the unexplained decision adopted the same [merits-based] reasoning").

Delving deeper into the limited exceptions to § 2254(d)'s overriding habeas bar, "clearly established Federal law" under (d)(1) encompasses Supreme Court decisions that predate "the last adjudication of [a federal claim's] merits in state court." *Greene v. Fisher*, 565 U.S. 34, 36, 40 (2011) (internal quotation marks omitted). Stated differently, "§ 2254(d)(1) requires federal courts to focu[s] on what a state court knew and did, and to measure state-court decisions against th[e] Court's precedents *as of the time the state court renders its decision*." *Id.* at 38 (first alteration and emphasis in *Greene*) (last alteration added) (internal quotation marks omitted).

11

Additionally, the statutory term "refers to the holdings, as opposed to the dicta, of [Supreme Court] decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000) (O'Connor, J., majority opinion with respect to part II).

"[T]he 'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] are interpreted as independent statutory modes of analysis." *Alderman v. Terry*, 468 F.3d 775, 791 (11th Cir. 2006). "A state-court decision is contrary to . . . clearly established precedents [of the Supreme Court] if it applies a rule that contradicts the governing law set forth in [the Court's] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of th[e] Court but reaches a different result." *Brown v. Payton*, 544 U.S. 133, 141 (2005). But as the United States Court of Appeals for the Eleventh Circuit has noted, the Supreme Court has not limited the construction of AEDPA's "contrary to" clause to those two situations. Instead, the statutory language "simply implies that the state court's decision must be substantially different from the relevant precedent of [the Supreme] Court." *Alderman*, 468 F.3d at 791 (internal quotation marks omitted) (quoting *Williams*, 529 U.S. at 405).

As for (d)(1)'s second clause, "[t]he pivotal question is whether the state court's application of the [relevant constitutional] standard was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). AEDPA requires this Court to give

a state court "a deference and latitude that are not in operation when the case involves review under the [relevant constitutional] standard itself." *Id.* Consistent with § 2254(d)(1) deference, "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Richter*, 562 U.S. at 101 (emphasis in original) (internal quotation marks omitted) (quoting *Williams*, 529 U.S. at 410).

If a state court denies a federal claim as meritless and "'fairminded jurists could disagree' on the correctness of th[at] . . . decision," then habeas relief under AEDPA's unreasonable application clause is unavailable. *Richter*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has clarified that a "rule's specificity" must factor into evaluating whether an unreasonable application error occurred in state court. *Richter*, 562 U.S. at 101 (internal quotation marks omitted). "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Id.* (internal quotation marks omitted).

Section 2254(d)(2) governs federal court review of state court findings of fact underlying a conviction or sentence. "[W]hether a state court errs in determining the facts [under AEDPA] is a different question from whether it errs in applying the law." *Rice v. Collins*, 546 U.S. 333, 342 (2006). Section 2254(d)(2) limits the availability of federal habeas relief due to factual error unless a petitioner can show a state court relied on "an unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding" to deny the claim 28 U.S.C. § 2254(d)(2).

13

This means that a petitioner may overcome AEDPA's overriding bar against habeas relief by challenging the state court factual findings underlying an adjudicated constitutional claim as unreasonably in conflict with the evidentiary record. *Wood v. Allen*, 558 U.S. 290, 293 (2010). But "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood*, 558 U.S. at 301. Therefore, "even if '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's . . . determination.'" *Id.* (alteration in *Wood*) (quoting *Rice*, 546 U.S. at 341–42). Conversely, "when a state court's adjudication of a habeas claim result[s] in a decision that [i]s based on an unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding, [a federal] [c]ourt is not bound to defer to unreasonably-found facts or to the legal conclusions that flow from them." *Adkins v. Warden, Holman Corr. Facility*, 710 F.3d 1241, 1249 (11th Cir. 2013) (some alterations added) (internal quotation marks omitted) (quoting *Jones v. Walker*, 540 F.3d 1277, 1288 n.5 (11th Cir. 2008) (en banc)).

Additionally, "a determination of a factual issue made by a [s]tate court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). Only with "clear and convincing evidence" may a petitioner overcome a state court's presumptively correct factual findings. *Id.* "Clear and convincing evidence entails proof that a claim is highly

14

probable, a standard requiring more than a preponderance of the evidence but less than proof beyond a reasonable doubt." *Ward v. Hall*, 592 F.3d 1144, 1177 (11th Cir. 2010) (internal quotation marks omitted). The Supreme Court has not addressed the exact relationship between § 2254(e)(1) and § 2254(d)(2). *Wood*, 558 U.S. at 293; *see id.* at 304–05 ("[W]e leave for another day the questions of how and when § 2254(e)(1) applies in challenges to a state court's factual determinations under § 2254(d)(2).").

In the Eleventh Circuit, a petitioner who challenges a constitutional ruling factually must satisfy AEDPA's independent (e)(1) and (d)(2) standards. *Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1035 (11th Cir. 2022) (en banc). Accordingly, "[e]ven if [a petitioner shows that] the state court made a clearly erroneous factual determination," he may not prevail under (d)(2). 50 F.4th at 1035. Instead, a petitioner's ability to satisfy (d)(2) will depend on "the importance of the factual error to the state court's ultimate 'decision.'" 50 F.4th at 1035. Even with some (e)(1) erroneous factual findings, the decision may, nonetheless, be reasonable because, "taken as a whole," it neither is "an 'unreasonable determination of the facts'" nor "'based on' any such determination." 50 F.4th at 1035 (cleaned up).

Regarding a petitioner's overall ability to obtain merits-based habeas review, the Supreme Court has commented, "If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of

15

imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings." *Richter*, 562 U.S. at 102; *see also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold.").

Keeping the case's background and AEDPA's framework in mind, the Court is ready to evaluate the claims and defenses which the parties pursue. The Court divides its discussion loosely into three parts. The Court begins considering those claims in which Warden Raybon asserts a complete procedural defense and follows that part with a discussion of claims involving AEDPA deference, with or without a procedural aspect. The last group of issues which the Court covers are Mr. George's discovery and evidentiary hearing requests and a certificate of appealability analysis.

Procedurally, Warden Raybon challenges several of Mr. George's claims as unexhausted and, thus, barred from supporting habeas relief. Beginning with the exhaustion requirement, the Court discusses some common principles applicable to procedural default. The Court follows that legal framework with the parties' particularized arguments.

Consistent with § 2254(b)(1)(A), "prisoners must ordinarily exhaust state remedies before filing for federal habeas relief." *Pinholster*, 563 U.S. at 182. And "[a]n applicant shall not be deemed to have exhausted the remedies available [in state

court] . . . if he has the right under the law of the [s]tate to raise, by any available procedure, the question presented." 28 U.S.C. § 2254(c). Exhaustion requires that a petitioner "'give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the [s]tate's established appellate review process.'" *Pruitt v. Jones*, 348 F.3d 1355, 1358 (11th Cir. 2003) (alteration added) (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)). A full round "includ[es] review by the state's court of last resort, even if review in that court is discretionary." *Pruitt*, 348 F.3d at 1358–59. "Alabama's discretionary direct review procedures bring Alabama prisoner habeas petitions within the scope of the *Boerckel* rule." *Pruitt*, 348 F.3d at 1359 (internal quotation marks omitted) (quoting *Smith v. Jones*, 256 F.3d 1135, 1140 (11th Cir. 2001)). The exhaustion holding in *Boerckel* applies to Alabama's postconviction appellate review structure too. *See Pruitt*, 348 F.3d at 1359 ("Nothing in *Boerckel*'s reasoning suggests that a different rule should apply in state post-conviction appeals as opposed to direct appeals."); *id.* (concluding that the petitioner had "failed to exhaust his state remedies by not petitioning the Alabama Supreme Court for discretionary review of the denial of his state habeas petition").

The intent behind § 2254(b)'s exhaustion requirement is to afford the state-court system the first opportunity to correct federal questions concerning the validity of criminal convictions. This means that for habeas review "[t]o be appropriate," the petitioner "must have raised these claims in state court to allow the state courts the

opportunity to rule on the federal issues." *Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998). Additionally, this means that "[f]ederal courts are not forums in which to relitigate state trials." *Smith v. Newsome*, 876 F.2d 1461, 1463 (11th Cir. 1989) (alteration added) (internal quotation marks omitted) (quoting *Barefoot*, 463 U.S. at 887).

Moreover, "to exhaust state remedies fully the petitioner must make the state court aware that the claims asserted present federal constitutional issues. 'It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made.'" *Snowden*, 135 F.3d at 735 (citation omitted in *Snowden*) (quoting *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam)). Rather, "an issue is exhausted if 'the reasonable reader would understand [the] claim's particular legal basis and specific factual foundation' to be the same as it was presented in state court." *Pope v. Sec'y, Fla. Dep't of Corr.*, 680 F.3d 1271, 1286 (11th Cir. 2012) (alteration in *Pope*) (quoting *Kelley v. Sec'y, Fla. Dep't of Corr.*, 377 F.3d 1317, 1344–45 (11th Cir. 2004)). And "[a] failure to exhaust occurs . . . when a petitioner has not 'fairly present[ed]' every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review." *Pope*, 680 F.3d at 1284 (last alteration modified in *Pope*) (quoting *Mason v. Allen*, 605 F.3d 1114, 1119 (11th Cir. 2010) (per curiam)).

Linked to the doctrine of exhaustion is procedural default of an unexhausted habeas claim. For example, sometimes a petitioner seeks habeas relief based on a mixture of exhausted and unexhausted federal claims. If ongoing state review is the reason for the petitioner's unexhausted federal claim, then a district court may dismiss the petition without prejudice, *Rose v. Lundy*, 455 U.S. 509, 519 (1982), or stay the habeas action to allow the petitioner to first avail himself of his state remedies, *see Rhines v. Weber*, 544 U.S. 269, 277–78 (2005) (discussing "[s]tay and abeyance" option for mixed habeas petitions). But "if it is clear from state law that any future attempts at exhaustion would be futile" under the state's procedural framework, then a "federal court[] may treat [that] unexhausted claim[] as procedurally defaulted, even absent a state court determination to that effect." *Bailey v. Nagle*, 172 F.3d 1299, 1305 (11th Cir. 1999) (per curiam) (citing *Snowden*, 135 F.3d at 737). This habeas dismissal doctrine, which the court refers to as unexhausted procedural default, avoids a game of "needless 'judicial ping-pong'" when a state procedural rule "obvious[ly]" bars a state court from considering the merits of an unexhausted federal claim. *Snowden*, 135 F.3d at 736 (quoting *Harris v. Reed*, 489 U.S. 255, 270 (1989)) (O'Connor, J. concurring) (citing *Coleman*, 501 U.S. at 735 n.1). Unexhausted procedural default includes claims that a petitioner never raised or exhausted only partially in state court.

19

A second type of procedural default occurs when a petitioner presents a federal claim without following "'independent and adequate' state procedures." *Mason*, 605 F.3d at 1119 (quoting *Wainwright*, 433 U.S. at 87). If the state court relies upon that procedural mistake to dismiss the alleged constitutional violation, then the petitioner "will have 'procedurally defaulted his claim[]' in federal court." *Mason*, 605 F.3d at 1119 (alteration added) (quoting *Boerckel*, 526 U.S. at 848). The Court refers to this type of habeas defense as state-barred procedural default. Under this strain of procedural default, "[a] state court's rejection of a petitioner's constitutional claim on state procedural grounds will generally preclude any subsequent federal habeas review of that claim." *Ward*, 592 F.3d at 1156 (alteration in *Ward*) (internal quotation marks omitted) (quoting *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001)).

But not all procedural dismissals of a federal claim in state court will prohibit habeas review. Instead, "a state court's rejection of a federal constitutional claim on procedural grounds may only preclude federal review if the . . . procedural ruling rests upon 'adequate and independent' state grounds." *Ward*, 592 F.3d at 1156 (citing *Marek v. Singletary*, 62 F.3d 1295, 1301 (11th Cir. 1995)). The Eleventh Circuit uses "a three-part test . . . to determine when a state court's procedural ruling constitutes an independent and adequate state rule of decision." *Judd*, 250 F.3d at 1313 (citing *Card v. Dugger*, 911 F.2d 1494, 1516 (11th Cir. 1990)). "First, the last state court rendering a judgment in the case must clearly and expressly state that it is relying on

20

state procedural rules to resolve the federal claim without reaching the merits of that claim." *Judd*, 250 F.3d at 1313. "Second, the state court's decision must rest entirely on state law grounds and not be intertwined with an interpretation of federal law." *Ward*, 592 F.3d at 1156–57 (citing *Judd*, 250 F.3d at 1313). "Third, the state procedural rule must be adequate, i.e., firmly established and regularly followed and not applied 'in an arbitrary or unprecedented fashion.'" *Ward*, 592 F.3d at 1157 (quoting *Judd*, 250 F.3d at 1313).

Additionally, a petitioner may overcome procedural default. One approach requires a petitioner to "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law." *Coleman*, 501 U.S. at 750. To do so, because the standard is conjunctive, a petitioner must establish both components to obtain habeas review. *Coleman*, 501 U.S. at 750. To show cause, a petitioner must prove that "some objective factor external to the defense impeded counsel's efforts" to pursue the claim properly under state court procedures. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Appropriate grounds include demonstrating that "interference by officials . . . ma[de] compliance with the [s]tate's procedural rule impracticable[;] . . . showing that the factual or legal basis for a claim was not reasonably available to counsel[;] . . . . [or attributing that procedural noncompliance to] constitutionally [i]neffective assistance of counsel." *McCleskey v. Zant*, 499 U.S. 467, 494 (1991) (some alterations added) (internal quotation marks omitted) (quoting *Carrier*, 477

21

U.S. at 488), *superseded on other grounds by statute as stated in Banister v. Davis*, 590 U.S. 504 (2020).

As for the second component, a habeas petitioner must "show . . . actual prejudice resulting from the alleged constitutional violation." *Ward*, 592 F.3d at 1157. This standard means "not merely that the errors . . . created a *possibility* of prejudice, but that they worked to [a petitioner's] *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original).

Establishing a fundamental miscarriage of justice tied to a defaulted claim is another way to avoid a procedural bar on habeas review. *Schlup v. Delo*, 513 U.S. 298, 324 (1995). The *Schulp* Court examined a "claimed injustice . . . that constitutional error ha[d] resulted in the [petitioner's] conviction" despite his actual innocence. *Id.* at 324. The Court held that a capital petitioner satisfies the *Schlup* "gateway standard" on excusing procedural default if the new and old evidence make "it . . . more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt." *Id.* at 327. With this legal background in mind, the Court moves to those claims in which Warden Raybon argues procedural default forecloses merits-based habeas review completely. The Court refers to Mr. George's claims in the format that Warden Raybon uses in his brief.

## III.  ANALYSIS

### A.  Claim I—Capped Attorney Compensation

When Mr. George was on trial for capital murder, Alabama Code § 15–12–21(d) capped appointed counsel's compensation for "out-of[-]court work" at $1,000 per attorney. *See James v. Culliver*, No. CV-10-S-2929-S, 2014 WL 4926178, at *146 (N.D. Ala. Sept. 30, 2014), *aff'd sub nom. James v. Warden*, 957 F.3d 1184 (11th Cir. 2020); *see also* Ala. Act 99–427 (reflecting textual changes to preceding version of § 15-12-21(d)) (available on Westlaw). The corresponding hourly rate for counsel was $20. Ala. Act 99–427. Consequently, time spent preparing for a capital trial which exceeded 50 hours was not compensable under Alabama's prior framework.

Mr. George asserts in Claim I that Alabama's cap on the compensated hours available for non-court services violated his Sixth Amendment right to counsel. (Doc. 52 at 47–49). Specifically, Mr. George argues that the 50-hour limit on trial investigation and preparation prevented counsel from "testing" the prosecution's case in a "meaningful" manner. (*Id.* at 48–49).

Warden Raybon answers that unexhausted procedural default bars substantive habeas review because Mr. George did not pursue the claim on state collateral appeal. (Doc. 22 at 25–26 ¶ 75). As explained above, exhaustion of a claim through the state's appellate structure is normally a precondition to obtaining habeas relief. 28 U.S.C. § 2254(b)(1)(A). Consistent with that requirement, Warden Raybon argues that Mr.

George's failure to invoke Alabama's appellate review process coupled with the procedural obstacles to obtaining a remedy from the state courts now support unexhausted procedural default in this Court. (Doc. 23 at 20–21). Warden Raybon adds that Mr. George has not overcome unexhausted procedural default through showing cause and prejudice or a fundamental miscarriage of justice. (*Id.* at 20).

Mr. George acknowledges in his petition that he did not appeal the Rule 32 court's denial of the fee cap claim. (Doc. 52 at 49 n.40). Still, Mr. George maintains that his failure to exhaust does not defeat this claim because the "[s]tate corrective process" was either unavailable or "ineffective to protect his rights." (*Id.*) (citing 28 U.S.C. § 2254(b)(1)(B)(i)–(ii). The wording which Mr. George uses in these contentions tracks the two statutory exceptions to § 2254's exhaustion requirement. 28 U.S.C. § 2254(b)(1)(B)(i)–(ii).

Mr. George argues differently in reply, including that the fee cap claim is not defaulted. (Doc. 28 at 20). Alternatively, Mr. George asserts that procedural default is inapplicable here for three reasons:  (1) "Alabama provided no . . . post-conviction counsel," (2) "the rule was not firmly established and regularly followed," and (3) he has "cause to overcome default." (*Id.* at 20–21).

The Court considers Mr. George's points in turn. To save his fee cap claim from the exhaustion requirement under § 2254(b)(i) or (ii), Mr. George does not develop any facts or case authority to support his reliance on those exceptions. (Doc.

24

52 at 49 n.40). And based on the Court's own research, the situations in which (i) and (ii) have applied do not resemble Mr. George's circumstances.

For example, in *Carter v. Buesgen*, 10 F.4th 715, 723 (7th Cir. 2021), "[m]ore than four years ha[d] passed since [the petitioner]'s conviction and sentence" without "move[ment] [of the case] beyond the trial court and toward [the] direct appeal." The United States Court of Appeals for the Seventh Circuit commented that such an "extreme . . . . delay should have sounded an alarm bell" and described the petitioner's case as "stuck in park." *Id.* The *Carter* court concluded that the state's "postconviction review process ha[d], for all practical purposes, proved itself unavailable to [the petitioner] or, at the very least, 'ineffective to protect [his] rights.'" *Id.* (citing 28 U.S.C. § 2254(b)(1)(B)(i)–(ii)). Consequently, the court "excused [the petitioner] from [efforts to] exhaust[] and [permitted him to] bring the claims alleged in his state motion for postconviction relief directly to federal court." *Carter*, 10 F.4th at 723; *see also Evans v. Wills*, 66 F.4th 681, 682, 687 (7th Cir. 2023) (referencing *Carter* and concluding that a petitioner's twenty-year pursuit of postconviction relief in state court satisfies the "'ineffective'" exception to the exhaustion requirement "within the meaning of 28 U.S.C. § 2254(b)(1)(B)(ii)").

Comparable to *Carter*, the Eleventh Circuit has recognized that "[s]tate remedies will be found ineffective and a federal habeas petitioner will be excused from exhausting them in the case of unreasonable, unexplained state delays in acting

on the petitioner's motion for state relief." *Cook v. Fla. Parole & Prob. Comm'n*, 749 F.2d 678, 680 (11th Cir. 1985) (citing pre-split decisions from the former Fifth Circuit Court of Appeals). But unlike *Carter*, the *Cook* court declined to excuse the exhaustion requirement, despite "almost [a] three and one-half year[]" delay, "under the peculiar circumstances of [the] case." 749 F.2d at 679–80. The explanations behind the absence of movement in state court were "an initial one year delay allegedly resulting from a clerical error" and "the petitioner's own activities" in another jurisdiction which made him "unavailable for a hearing." *Id.* at 680. Given that background, the Eleventh Circuit "c[ould] not say that [the] delay in ruling . . . [wa]s so unreasonable and unjustified as to excuse the § 2254 exhaustion requirements." *Id.*; *cf. Slater v. Chatman*, 147 F. App'x 959, 960 (11th Cir. 2005) (per curiam) ("question[ing]" delay of 14 months to appoint appellate counsel but declining to apply § 2254(b)(1)(B)(i)–(ii) because of recent state court "mov[ement]" on the petitioner's direct appeal); *McDaniel v. Holland*, 631 F. Supp. 1544, 1545 (S.D.W. Va. 1986) ("Even where it is not apparent from the face of the rule whether there is a state remedy, a federal court should defer until the question of whether a state remedy is available is decided in the state forum." (citing *Richardson v. Turner*, 716 F.2d 1059, 1062 (4th Cir. 1983)).

    Given the analyses in *Carter*, *Cook*, and other cases, Mr. George's bare assertion that he benefits from § 2254(b)(1)(B)(i)–(ii), without developing any

unreasonable circumstances encountered in state court as support, is a fruitless habeas exercise. Thus, the Court rejects—as unpersuasive and unproven—Mr. George's conclusory reliance on those exceptions to salvage his fee cap claim on habeas review.

Unrelated to § 2254(b)(1)(B)'s exhaustion exceptions, Mr. George fares no better with his remaining arguments against the application of unexhausted procedural default. Specifically, Mr. George contends in reply that he exhausted this independent fee cap claim on collateral appeal because it was embedded within his claims asserting trial counsel's ineffectiveness. (Doc. 28 at 21). Mr. George points to an argument he made in a footnote in his brief appealing the denial of his Rule 32 petition. *Id*. There, he argued that Alabama's page limitations on such briefs "make it impossible to reraise all of [his] challenges to dismissal. Therefore, Mr. George continues to rely on the arguments he made below in objections and motions to reconsider." *Id.* citing (Doc. 11-90 at 158). However, exhaustion for habeas purposes requires more than relying on an embedded or ambiguous presentation of that claim on state appeal. *See Baldwin v. Reese*, 541 U.S. 27, 31 (2004) ("[A] petitioner [does not] 'fairly present[]' a federal claim when an appellate judge can discover that claim only by reading lower court opinions in the case.").

Instead, to have satisfied the reasonable reader standard, Mr. George would have had to raise the fee cap issue as a freestanding claim in state court—the same

way in which he pursues it in the habeas petition. *see McNair v. Campbell*, 416 F.3d 1291, 1302 (11th Cir. 2005) ("[T]o ensure that state courts have the first opportunity to hear all claims, federal courts have required a state prisoner to present the state courts with the same claim he urges on federal habeas review.") (cleaned up). In his habeas petition, Mr. George vaguely argues that the fee cap prevented his attorneys from adequately defending him. (Doc. 52 at 48–49) (the fee cap rendered counsel "unable to submit the prosecution's case to a meaningful adversarial testing in direct violation of *Gideon*.") However, in his brief appealing the denial of his Rule 32 petition, Mr. George's arguments about counsels' guilt-phase ineffectiveness rested on their alleged failure to adequately prepare and present a mental-health defense. Those arguments did not specifically tie counsels' alleged failures to a lack of funds. Rather, they were couched in terms of an unreasonable trial strategy, i.e., deciding not to investigate certain matters and not requesting specific experts. *See* (Doc. 11-90 at 65–76. Consequently, Mr. George's freestanding fee cap claim is unexhausted and, for that reason, supports Warden Raybon's defense of procedural default on habeas review.

To challenge the asserted procedural default, Mr. George argues that the purported unavailability of state postconviction counsel precludes Warden Raybon from relying on a procedural defense. (Doc. 28 at 23). Mr. George fails to develop this point with any authority. (*Id.*). Regardless, as the record confirms, Mr. George

had legal representation postconviction, including on appeal. (Doc. 11-11 at 3, 7, 17–18; Doc. 11-90 at 162). Thus, this theory to avoid procedural default is baseless.

Mr. George's reference to the absence of a "firmly established and regularly followed" state rule counters only the application of state-barred procedural default, which defense Warden Raybon contends applies also to Claim I. (Doc. 28 at 22–23). As the Court summarized in the habeas principles governing default, a state court dismissal based on a consistently-applied rule supports state-barred procedural default. Noncompliance with the state appellate process, as opposed to a specific procedural rule, is the foundation for unexhausted procedural default. Here, the Court focuses on the parties' points about exhaustion and does not reach their positions on state-barred procedural default.

To the extent that Mr. George maintains that he has cause under *Martinez v. Ryan*, 566 U.S. 1 (2012), to excuse the failure to exhaust his freestanding fee cap claim, that approach misses the mark too. (Doc. 28 at 24). In general, there is no constitutional right to counsel in postconviction proceedings, thus, ineffective assistance of postconviction counsel is typically not a valid claim. *Coleman v. Thompson*, 501 U.S. 722, 752, (1991) ("There is no constitutional right to an attorney in state post-conviction proceedings.") However, *Martinez* carved out an exception for situations in which postconviction counsel fails to raise "a substantial ineffective-assistance-of-trial-counsel claim" in the initial part of the Rule 32 process. 566 U.S.

at 11, 15. Mr. George maintains that "[l]ogically, the [*Martinez*] rule should also apply where a claim was abandoned during the initial collateral proceedings." (Doc. 28 at 24). But Mr. George does not directly assert any specific ineffective-assistance-of-trial-counsel arguments in Claim I; his main argument is that Alabama's fee cap rendered his defense unconstitutional as a whole.

Nevertheless, postconviction counsel raised the fee cap claim on review with the Rule 32 court and, therefore, did not abandon it "during the initial collateral proceedings" but rather on appeal of that collateral proceeding. (*Compare* doc. 28 at 24, *with* doc. 52 at 49 & n.40). By the opinion's own repeated terms, *Martinez* is a "limited" holding. 566 U.S. at 15–16. Consequently, post-*Martinez* "an attorney's negligence in a postconviction proceeding does not establish cause" if the error occurred after the initial review. *Id.* at 15. Further, the *Martinez* Court explicitly stated that "[t]he holding in this case does not concern attorney errors in other kinds of proceedings, including appeals from initial-review collateral proceedings…." *Id.* at 16.

Mr. George's reference to *Trevino v. Thaler*, 569 U.S. 413 (2013), does not alter the Court's conclusion that Mr. George lacks cause. (Doc. 28 at 24). The holding in *Trevino* is an extension of the *Martinez* equitable exception. Specifically, the *Trevino* Court considered a "procedural regime" which permitted theoretically, but impractically, the option of first "rais[ing] a claim of ineffective assistance of trial

30

counsel on direct appeal." 569 U.S. at 417. The Court concluded that, despite an avenue to appeal directly, the petitioner could rely on "[in]effective counsel during his first state collateral review proceeding" as cause to excuse a defaulted ineffective trial counsel claim. *Id.*

And accepting for analysis purposes that Mr. George could establish cause consistent with *Martinez* and *Trevino*, he has not addressed the second component of the cause and prejudice standard adequately. (Doc. 28 at 25). Prejudice, within the meaning of overcoming procedural default, requires Mr. George to show that the merits of his capped compensation claim create a reasonable probability of a different guilt-phase or sentencing outcome. *Mincey v. Head*, 206 F.3d 1106, 1138, 1147 & n.86 (11th Cir. 2000); *Strickler v. Greene*, 527 U.S. 263, 289 (1999). Neither case which Mr. George cites—*United States v. Chronic*, 466 U.S. 648 (1984), or *Strickland v. Washington*, 466 U.S. 668 (1984)—establishes that his capped compensation claim states a Sixth Amendment constitutional violation. (Doc. 28 at 25). Nor does Mr. George link "an underfunded indigent defense system" to specific prejudicial deficiencies in his convictions or sentence. (Doc. 28 at 25). Thus, Mr. George has shown neither cause nor prejudice to overcome procedural default on his unexhausted capped compensation claim.

### B.   Subclaim II.B—Trial Counsel Ineffectiveness on the Motion to Change Venue

In Claim II, Mr. George asserts partially that trial counsel were ineffective for failing to pursue a motion to change venue. (Doc. 52 at 49–52). Warden Raybon identifies this alleged constitutional violation as Subclaim II.B and, akin to Claim I, argues that unexhausted procedural default applies. (Doc. 23 at 20–21; Doc. 22 at 30–31 ¶ 78).

Referencing portions of his collateral brief filed with the ACCA, Mr. George maintains that "he exhausted the claim in the state courts." (Doc. 28 at 26; Doc. 11-90 at 2, 158 & n.63). According to Mr. George, "page limitations" precluded him from reasserting "'all . . . challenges to [the] dismissal'" of his ineffective assistance of trial counsel claims. (Doc. 28 at 26; Doc. 11-90 at 158 n.63). Mr. George contends too that because he referenced this ineffectiveness claim generally through "incorporat[ion] [of] his arguments made in trial court," he satisfies the exhaustion requirement. (Doc. 28 at 26); (*see also* doc. 11-38 at 41) (referencing proving prejudice on the "change of venue issue" and arguing to the Rule 32 court a right "to present evidence that no . . . hearing [on the motion] was held"). This is essentially the same argument he made in Claim I, and it fares no better here.

Mr. George's piecemeal approach to appellate exhaustion is problematic. Specifically, Mr. George referenced this claim (and others) ambiguously in a footnote

and incorporated sections of the Rule 32 record without any corresponding explanation. Doc. 11-90 at 158 n.63. Without any meaningful breakdown of the ineffectiveness issues mentioned collectively in the footnote, Mr. George did not fairly present the venue claim at the ACCA level, and unexhausted procedural default bars relief in this Court. *Cf. Baldwin v. Reese*, 541 U.S. 27, 31 (2004) ("[A] petitioner [does not] 'fairly present[]' a federal claim when an appellate judge can discover that claim only by reading lower court opinions in the case.").

Even accepting, alternatively, that Mr. George did fairly present the claim to the ACCA, he did not to the Alabama Supreme Court. As his petition for a writ of certiorari reflects, Mr. George did not assert that trial counsel were ineffective for failing to pursue a change in venue. (Doc. 11-93). Likewise, Mr. George does not argue on habeas review that he presented the venue claim to the Alabama Supreme Court. (Doc. 28 at 26). Consequently, Mr. George failed to "alert" the Alabama Supreme Court about this potential federal claim, and unexhausted procedural default applies regardless of whether Mr. George exhausted it properly before the ACCA. *Pruitt*, 348 F.3d at 1359. Similarly, because Mr. George relies on no exception to excuse the defaulted certiorari link in the exhaustion chain, whether Mr. George could rely on the ACCA's page limitation on briefing as cause is inconsequential. (Doc. 28 at 25–26).

Related to this venue subclaim, Mr. George mentions, in passing, that

33

"[a]ppellate counsel (who were also trial counsel) failed to ensure a complete record on appeal" and that without an adequate record, "Mr. George could not obtain relief." (Doc. 52 at 52). To the extent Mr. George contends that appellate counsel's failure to develop the record on direct review adequately supports a separate ground for habeas relief, unexhausted procedural default bars that claim too. (Doc. 22 at 31–32 at n.3; Doc. 11-93 at 5–8).

### C.    Claim IV—Living Conditions Evidence

In Claim IV, Mr. George contends that the state's penalty-phase evidence of his living conditions post-arrest violated his Fourteenth Amendment rights to due process and fundamental fairness. (Doc. 52 at 63–67). Mr. George asserts additionally that this evidence resulted in an unfair and unreliable sentence under the Eighth Amendment. (*Id.* at 67–69).

Again, Warden Raybon counters that substantive review is inappropriate because of unexhausted procedural default. (Doc. 22 at 35–37 ¶ 80; Doc. 23 at 21). Specifically, Warden Raybon contends that Mr. George did not "fully exhaust[]" the claim because he did not pursue a freestanding due process violation based on the living conditions evidence admitted in state court. (Doc. 23 at 21–22; Doc. 22 at 36–37 ¶ 80). Instead, Warden Raybon maintains that "the claim . . . [Mr. George] p[ursued] in . . . state court was that the prosecution improperly presented a

nonstatutory aggravating circumstance when it [introduced] evidence during the penalty phase about [his] arrest in Delaware." (Doc. 22 at 36–37 ¶ 8).

. Relatedly, Warden Raybon challenges several of Mr. George's factual contentions—tied to a due process theory of relief—as unexhausted too. (Doc. 22 at 35–36 ¶ 80).

Independent of exhaustion, Warden Raybon answers that habeas relief is inappropriate because the subpart which corresponds most closely with what Mr. George "raised in state court . . . presents only a question of state law." (Doc. 22 at 37 ¶ 80). Additionally, Warden Raybon maintains that Mr. George cannot overcome AEDPA deference. (Doc. 22 at 37–38 ¶ 80).

Mr. George asserts that he exhausted this living conditions claim on direct appeal. Referencing portions of his brief to the ACCA in *George Direct I*, Mr. George contends that he "presented his argument under both state and federal law." (Doc. 28 at 42; Doc. 11-6 at 21–22). According to Mr. George, the gist of his contentions was that the "improper aggravating evidence violated both the Alabama capital sentencing statute and his right to a fair sentencing." (Doc. 28 at 41). As support, Mr. George relies on the point in his appellate brief that "'the jury['s] consideration [of] flight and other improper evidence'" meant that "'his death sentence [could not] stand.'" (*Id.*; Doc. 11-6 at 19). Additionally, Mr. George references a section of that brief in which he cited several Supreme Court decisions and argued that "'[t]he introduction of flight

35

evidence . . . violated the constitutional mandate'" prohibiting arbitrary or capricious death sentences. (Doc. 28 at 42) (alteration added) (quoting Doc. 11-6 at 21–22).

The ACCA decided *George Direct I* on state-law grounds in favor of Mr. George. (Doc. 28 at 42–43). Consequently, Mr. George explains that the focus of his brief to the Alabama Supreme Court on certiorari review was to "defend[] the ACCA's decision" under Alabama law. (*Id.* at 43). Still, Mr. George mentions his introductory reference in that brief as fairly presenting a federal claim. (*Id.*). Specifically, Mr. George asserted that "[t]he presentation of highly prejudicial flight evidence . . . violated his rights to due process, a fair trial[,] and a reliable sentencing determination as guaranteed by the Fifth, Sixth, Eighth[,] and Fourteenth Amendments." (Doc. 11-7 at 117); (Doc. 28 at 43) (internal quotation marks omitted). But Mr. George did not develop these constitutional theories within that certiorari brief. (Doc. 11-7).

Mr. George does not discuss the second brief he filed with the Alabama Supreme Court after the ACCA ruled against him on the living conditions penalty-phase claim post-remand in *George Direct III*. (Doc. 28 at 41–44). The contents of that certiorari brief connected to Mr. George's evidentiary challenge are comparable to the issues he raised with the ACCA in *George Direct I*. (*Compare* doc. 11-8 at 80, 84, 150–65, *with* doc. 11-6 at 2–4, 18–32). Consequently, the federal issue which Mr. George fairly presented to the Alabama courts was whether the jury's consideration

36

of the flight evidence, as reflected in his living conditions after the murders, violated his Eighth Amendment right to a fair sentencing process. (*See* doc. 11-8 at 154, 157–58) (citing *Furman v. Georgia*, 408 U.S. 238 (1972) (per curiam judgment with five concurring opinions), Mr. George argued that "[t]he introduction of flight evidence at [his] trial violated the constitutional mandate that death sentences not be meted out in an arbitrary or capricious manner.").

Although Warden Raybon asserts that Mr. George "relies on facts that were not presented to the state courts on direct appeal," Mr. George claims that this assertion is belied by the record.(Doc. 28 at 43). He maintains that he satisfies the exhaustion requirement because the new information he references is either part of the trial transcript or the opinion in *George Direct II* and was within the Alabama Supreme Court's evaluative scope given its remark that it conducted "a thorough review of the record" in *George Direct II*. (Doc. 28 at 43–44) (internal quotation marks omitted).

Against this backdrop, the Court concludes that Mr. George exhausted the Eighth Amendment improper flight evidence subclaim on direct appeal. But the same is untrue with respect to Mr. George's freestanding Fourteenth Amendment subpart and the corresponding factual contentions which are new on habeas review. Exhaustion requires more than "that the federal habeas petitioner has been through the state courts," "that all the facts necessary to support the claim were before the

37

state courts," "or that a somewhat similar state-law claim was made." *McNair*, 416 F.3d at 1302 (cleaned up). Likewise, "'scatter[ing] some makeshift needles in the haystack of the state court record'" falls short of presenting a federal claim fairly to a reasonable reader. *Kelley v. Sec'y, Fla. Dep't of Corr.*, 377 F.3d 1317, 1345 (11th Cir. 2004) (quoting *Martens v. Shannon*, 836 F.2d 715, 717 (1st Cir. 1988)).

Instead, to exhaust properly, the state court record must reveal a federal claim's "particular legal basis and specific factual foundation." *Kelley*, 377 F.3d at 1345. Accordingly, "'[t]he ground relied upon must be presented face-up and squarely; the federal question must be plainly defined. Oblique references which hint that a theory may be lurking in the woodwork will not turn the trick.'" *Id.* (quoting *Martens*, 836 F.2d at 717).

As his appellate briefing confirms, Mr. George never gave the state courts an opportunity to decide whether evidence of his living conditions violated his freestanding federal due process rights. Although Mr. George relies on a laundry list of federal amendments mentioned once on direct appeal to establish exhaustion of this due process subclaim, the Eleventh Circuit rejected that generalized approach in *McNair*. *See id.*, 416 F.3d at 1303 ("[The petitioner]'s references to federal law in his state habeas proceedings are exactly the type of needles in the haystack that . . . are insufficient to satisfy the exhaustion requirement."). Consequently, unexhausted procedural default applies to that newly crafted habeas subpart and its underlying

38

factual contentions. The Court will consider Mr. George's Eighth Amendment claim tied to the challenged evidence with the other exhausted claims subject to AEDPA review.[3]

### D.    Claim VIII—Systemic Racism in Alabama's Death Penalty

Mr. George contends in Claim VIII that his death sentence is unsustainable under the Eighth and Fourteenth Amendments because Alabama's death penalty "is rooted in racism" and his "death sentence is a product of systemic racism . . . rather than justice." (Doc. 52 at 108). Warden Raybon answers that unexhausted procedural default applies because "[Mr.] George never raised this substantive claim in the state courts." (Doc. 22 at 55 ¶ 90); (*see also* doc. 23 at 22–23) (similar).

Mr. George concedes in his petition and reply that he did not raise this claim in the Alabama courts. (Doc. 52 at 108 n.62; Doc. 28 at 76). According to Mr. George (and akin to his unpersuasive position in Claim I), the failure to exhaust this systemic

---

[3] Mr. George supports the due process version of this claim supplementally with *Andrew v. White*, 604 U.S. ___, 145 S. Ct. 75 (2025). (Doc. 43-1). In *Andrew*, the Supreme Court held that *Payne v. Tennessee*, 501 U.S. 808 (1991), clearly established, *i.e.*, in 1991, as an additional holding that the due process clause is available to challenge irrelevant and "'unduly prejudicial'" evidence generally (not just victim impact testimony—the evidentiary issue in *Payne*). *Andrew*, 145 S. Ct. at 82–83; *Payne*, 501 U.S. at 825. In the hearing, Mr. George argued that *Andrew* and *Payne* open the door to penalty-phase relief due to the constitutionally prejudicial living conditions evidence. But without an exhausted corresponding claim, *Andrew*'s substantive clarification of what *Payne* clearly established under the Fourteenth Amendment does not benefit Mr. George. 28 U.S.C. § 2254(b)(1)(A). Consequently, a deeper discussion of *Andrew* and *Payne* is unnecessary. Likewise, this Court does not undergo a prejudicial assessment of the video footage of Mr. George's living conditions, added to the record as context for his defaulted due process challenge. (Docs. 44, 46–47).

racism claim is nonfatal because he satisfies the exceptions in § 2254(b)(1)(B)(i)–(ii). (Doc. 52 at 108 n.62). But again, Mr. George offers nothing to prove that Alabama has a non-existent—under (i)—or an ineffective—under (ii)—process to review this claim. Rather, he simply states, *ipse dixit*, that he could not have raised this claim "because there is an absence of available State corrective process, and even if there were, circumstances exist that would render such process ineffective to protect his rights." (Doc. 52 at 108, n. 62). Instead, Mr. George maintains mistakenly that his bare reference to the exceptions satisfies his statutory burden, overcomes his admitted default, and requires a response from Warden Raybon. (Doc. 28 at 76). To close, unexhausted procedural default bars Mr. George's Eighth Amendment claim of systemic racism consistent with the Court's analysis of Claim I.

Warden Raybon's remaining procedural default contentions apply to portions of Mr. George's factual allegations as opposed to entire claims. Consequently, the Court will address those procedural issues as they arise under a particular claim.

### E.    Subclaim II.A—Venue Change

The Court addressed above the second part of Claim II—ineffective assistance in pursuing a venue change due to pretrial publicity. In Claim II's first part, Mr. George argues that he suffered unconstitutional prejudice because the trial court did not grant his motion to change venue to a different county, despite significantly damaging pretrial publicity. (Doc. 52 at 49–52). Mr. George points to testimony from

33 members of the venire who "were familiar with [the] case and had watched . . . highly inflammatory crime shows portraying him as guilty." (*Id.* at 49) (emphasis omitted).

Procedurally, Warden Raybon answers that "[Mr.] George has alleged facts [on habeas review] that were not presented to the state courts on appeal." (Doc. 22 at 28 ¶ 77). Substantively, Warden Raybon argues that Mr. George cannot overcome AEDPA deference. (*Id.* at 29 ¶ 77; Doc. 23 at 23–25). The Court addresses Warden Raybon's defenses in turn.

### 1.    Procedural Analysis

Warden Raybon maintains that Mr. George did not exhaust the following habeas allegations in support of his venue claim in state court:

> The search for Mr. George spanned six years and was profiled on the television show *America's Most Wanted* seven times. It was also profiled on the television show *Unsolved Mysteries* 15 times. Mr. George's story was front-page news in the county's local newspaper *The Daily Home* for several weeks surrounding the crime, as was Mr. George's arrest in Delaware, his extradition to Alabama, and his arraignment. . . .

> No evidence of abuse was presented at trial. However, at least three of the jurors on Mr. George's case had seen the inflammatory re-enactment. Moreover, this news show included an interview with one victim's mother, Jessie Morris, arguing that Mr. George deserved the death penalty. Many of the media reports contained equally prejudicial, inflammatory, and inadmissible facts.

(Doc. 22 at 28 ¶ 77; Doc. 52 at 50).

Mr. George is silent in reply about Warden Raybon's defense that unexhausted procedural default applies to these factual allegations. (Doc. 28 at 25). Specifically, in support of his free-standing venue claim, Mr. George replies only that his habeas petition contains "extensive [allegations of] pretrial publicity [which] prevented him from receiving a fair trial in Talladega County." (*Id.*). Additionally, Mr. George does not indicate in his petition or reply where he presented these facts in support of prejudicial publicity to the state courts. (Doc. 52 at 49–52; Doc. 28 at 25). Given Mr. George's failure to counter Warden Raybon's procedural position, the Court will not consider these flagged facts for the first time on habeas review.

### 2.    State Court Proceedings

The ACCA denied Mr. George's venue claim on direct review. *George Direct I*, 717 So. 2d at 833. The Alabama Supreme Court affirmed without commenting directly on this claim. *See George Direct IV*, 717 So. 2d at 859 ("find[ing] no error, plain or otherwise, in either the guilt phase or the sentencing phase of [the] trial that would warrant a reversal of [Mr. George's] conviction or . . . sentence"). Accordingly, this Court evaluates the ACCA's analysis in *George Direct I* as the last reasoned decision for AEDPA purposes.

In that review, the ACCA discussed the venue claim's procedural history. *George Direct I*, 717 So. 2d at 833. The ACCA noted that although "the parties [had] agreed to hold a hearing on the venue motion during the week before the trial," "no

ruling or argument" appeared in the record "during or after voir dire examination" or as a docket sheet entry. *Id.* Additionally, the ACCA pointed out that the parties had agreed in a post-judgment order that "there were no pretrial hearings, sidebar conferences[,] and conferences in chambers that were not made part of the record." *Id.* (internal quotation marks omitted).

Referencing Alabama authority, the ACCA set forth the standard for granting a change in venue. *Id.* As the ACCA explained, Mr. George had the burden to show either that "the pretrial publicity ha[d] so pervasively saturated the community as to make the court proceedings nothing more than a hollow formality" or demonstrate actual prejudice. *Id.* (internal quotation marks omitted) (quoting *Oryang v. State*, 642 So. 2d 979, 983 (Ala. Crim. App. 1993)).

Against this backdrop, the ACCA assumed for analysis purposes that the trial court had denied the motion based on the parties' arguments. *George Direct I*, 717 So. 2d at 833. The ACCA concluded that no reversible error existed because the record lacked evidence "from which [it] c[ould] determine whether [Mr. George] [had] met his burden in showing that the venire was prejudiced by pretrial publicity." *Id.*

### 3.    AEDPA Analysis[4]

Consistent with the Court's earlier breakdown of AEDPA, 28 U.S.C. § 2254(d) protects the ACCA's merits-based denial from an award of habeas relief unless Mr. George satisfies (d)(1) or (d)(2). The (d)(1) and (d)(2) standards are demanding and require more from Mr. George than relying merely on allegations of a constitutional violation.

Despite the heavy burden Mr. George faces, in reply, he does not indicate which AEDPA pre-conditional standard he invokes or otherwise develop a response to Warden Raybon's substantive defense to this venue subclaim. (Doc. 28 at 25). Instead, Mr. George focuses on ineffective assistance in handling the venue issue discussed above in section Subclaim II.B. (*Id.* at 25–29).

Similarly, Mr. George does not reference any Supreme Court precedent under (d)(1) or unreasonable factual determination under (d)(2) with respect to this subclaim. (Doc. 52 at 49–51). Mr. George does cite *Coleman v. Zant*, 708 F.2d 541 (11th Cir. 1983), for constitutional principles governing prejudicial pretrial publicity. (Doc. 52 at 49–50). While *Zant* is binding on this Court, Mr. George does not develop

---

[4] The Court acknowledges Mr. George's preliminary contention that § 2254(d)(1) is unconstitutional. (Doc. 52 at 45–46). Of course, this Court is bound to follow Supreme Court and Eleventh Circuit precedent, neither of which supports Mr. George's position. Consequently, the Court rejects that unpersuasive AEDPA argument.

the facts in *Zant* or, much less, explain how that authority benefits him on AEDPA review. Such a minimalist approach fails to satisfy Mr. George's hefty (d)(1) burden.

Alternatively, a contextual examination of *Zant* reveals that the authority does not aid Mr. George in overcoming AEDPA deference. In *Zant*, the capital petitioner sought habeas relief based on the state court's denial of his motion to change venue. *Id.* at 543. The petitioner requested discovery and an evidentiary hearing in district court to prove his allegations of unconstitutional pretrial publicity. *Id.* at 544. The district court denied "the change of venue issue" without any additional development concluding that the state court hearings had been "full and adequate," but the Eleventh Circuit remanded for an evidentiary hearing. *Id.* The *Zant* court disagreed with the district court that "the pretrial . . . [and] state habeas hearings developed a well-rounded description of the nature of television/radio news accounts (whether prejudicial or not) and the audience for th[o]se programs in [the venue-challenged] . . . [c]ounty." *Id.* at 546. Absent from the *Zant* decision is any objectively unreasonable analysis—a hallmark of AEDPA review.

Mr. George does not develop why *Zant*'s pre-AEDPA status is adequate to show an unreasonable application error in the ACCA's decision. (Doc. 52 at 49–50). Critically, whether a federal district court committed reversible error pre-AEDPA for not holding an evidentiary hearing on a change of venue claim, as addressed in *Zant*, is a different legal question than whether the ACCA erred objectively in rejecting Mr.

45

George's motion for lack of evidence on appeal. *Cf. Gavin v. Comm'r, Ala. Dep't of Corr.*, 40 F.4th 1247, 1269 (11th Cir. 2022) (observing that non-AEDPA cases "'offer no guidance'" when § 2254(d) applies to the prejudice prong of an ineffective mitigation assistance claim) (quoting *Pinholster*, 563 U.S. at 202), *cert. denied sub nom. Gavin v. Hamm*, 143 S. Ct. 2438 (2023).

Even accepting that the *Zant* court's non-AEDPA holding could be useful to Mr. George here, a factual comparison shows otherwise. Specifically, the circumstances of Mr. George's venue motion are too different from *Zant* to establish that the ACCA applied clearly established constitutional law unreasonably.

First, in contrast to *Zant*, the trial court did not deny Mr. George's venue motion outright. Instead, the court referenced the importance of voir dire as a component to the pretrial publicity inquiry and its general "practice" to postpone ruling on that type of motion. (Doc. 11-1 at 18–19). The court suggested also that counsel request a hearing "before the actual trial week" to consider the media coverage and community exposure evidence that they intended to use and decide that part of the claim. (*Id.* at 18). Counsel did not object to this plan. (*Id.* at 18–20). Still, absent from the record is an indication that counsel followed up to schedule a hearing on the pretrial publicity evidence. Alternatively, after hearing the answers during voir dire, trial counsel had the opportunity but did not revisit the requested venue change.

46

Second, the state habeas court in *Zant* "declined to provide funds" to the indigent petitioner for depositions on the venue issue. 708 F.2d at 548. Unlike the petitioner's thwarted discovery efforts in *Zant*, Mr. George did not face a similar financial hurdle in pursuing his venue claim in state court. These contrasting facts mean that *Zant* falls short of satisfying Mr. George's (d)(1) burden regardless of its non-AEDPA scope. Thus, the Court denies Claim II.A because Mr. George has not overcome AEDPA deference.

### F.    Claim III—Discrimination in Jury Selection

Mr. George asserts in Claim III that he "established a prima facie case of racial [and gender] discrimination [in the state's peremptory strikes]." (*See* doc. 52 at 53) (emphasis omitted) (citing *Batson v. Kentucky*, 476 U.S. 79 (1986), *holding modified by Powers v. Ohio*, 499 U.S. 400 (1991); *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994)). Warden Raybon answers that Mr. George failed to present some of the factual allegations in his petition to the state courts. (Doc. 22 at 32 ¶ 79). For the exhausted portions of Claim III, Warden Raybon asserts that AEDPA bars relief. (*Id.* at 33 ¶ 79; Doc. 23 at 25–29).

#### 1.    *Batson* Background

Before undergoing any habeas analysis, the Court provides some *Batson* background. Under *Batson*'s seminal holding, using peremptory challenges to exclude "potential jurors solely on account of their race" is a violation of the

Fourteenth Amendment's equal protection clause. *Batson*, 476 U.S. at 89. The Court has established a "three-step inquiry" for evaluating "[a] defendant's *Batson* challenge to a peremptory strike." *Rice*, 546 U.S. at 338.

Here, the *Batson* analysis turns on the first step—whether Mr. George "has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race." *Rice*, 546 U.S. at 338. The foundation for this initial step is, in turn, based on three components. As the *Batson* Court broke down the particulars of the first-step inquiry, a "defendant first must show that he is a member of a cognizable racial group and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race." 476 U.S. at 96 (citation omitted). The Supreme Court modified this *Batson* requirement in *Powers* to allow a challenge "whether or not the defendant and the excluded juror share the same races." *Powers*, 499 U.S. at 402.

Next, "the defendant is entitled to rely on the fact . . . that peremptory challenges constitute a jury selection practice that permits those to discriminate who are of a mind to discriminate." *Batson*, 476 U.S. at 96 (internal quotation marks omitted). "Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race." *Id.* The *Batson* Court summarized that "[t]his combination of factors in the empaneling of the petit jury, as

48

in the selection of the venire, raises the necessary inference of purposeful discrimination." *Id.*

The *Batson* Court provided some guidance on the type of inferential circumstances which may support a prima facie case of discrimination: "(1) engaging in a pattern of strikes against venire members of one race, or (2) [asking] questions or [making] statements during voir dire or in exercising challenges that suggest a discriminatory purpose." *United States v. Ochoa-Vasquez*, 428 F.3d 1015, 1039 (11th Cir. 2005) (cleaned up). Regarding the *Batson* Court's first example, the Eleventh Circuit "has cautioned that the mere fact of striking a juror or a set of jurors of a particular race does not necessarily create an inference of racial discrimination." *Ochoa-Vasquez*, 428 F.3d at 1044 (cleaned up).

Other information which the Eleventh Circuit has considered as relevant to *Batson*'s inferential assessment include whether: (1) "members of the relevant racial or ethnic group served unchallenged on the jury," *Ochoa-Vasquez*, 428 F.3d at 1044; (2) "the striker struck all of the relevant racial or ethnic group from the venire, or at least as many as the striker had strikes," *id.* at 1045; (3) "a substantial disparity between the percentage of jurors of a particular race or ethnicity struck and the percentage of their representation on the venire [existed]," *id.*; and (4) "a substantial disparity between the percentage of jurors of one race [or ethnicity] struck and the

percentage of their representation on the jury [existed]," *id.* (last alteration added) (internal quotation marks omitted).

If a defendant establishes a prima facie case of prosecutorial discrimination, then "the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question." *Rice*, 546 U.S. at 338. "Although the prosecutor must present a comprehensible reason, the second step of this process does not demand an explanation that is persuasive, or even plausible; so long as the reason is not inherently discriminatory, it suffices." *Id.* (internal quotation marks omitted).

In the third step, "the court must . . . determine whether the defendant has carried his burden of proving purposeful discrimination." *Id.* "This final step involves evaluating the persuasiveness of the justification proffered by the prosecutor, but the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Id.* (internal quotation marks omitted). In *J.E.B.*, the Supreme Court held that *Batson*'s same equal protection framework applies when the challenged strike is based on gender. 511 U.S. at 129.

## 2. Procedural Analysis

Warden Raybon challenges the following *Batson* allegations as unexhausted in state court:

> At the time of voir dire, there were 54 potential jurors available for questioning. (ECF No. 11-5 at 9-12). Of those potential jurors, 12 were African-American; six female and six male. (*Id.*). These 12

potential jurors represented 22.2% of the remaining 54-person jury pool. These 54 persons were divided into smaller panels for group questioning. (ECF No. 11-1 at 39). Each panel was collectively death-qualified, questioned on potential conflicts, and analyzed for any disqualifiers. (ECF No. 15-1 at 96-120). This questioning was initially conducted by the trial court. The court also granted each side an opportunity to question the panels.

After completion of voir dire and excusals for cause, 42 potential jurors remained. (ECF No. 11-5 at 12). Of those potential jurors, 12 African-Americans remained. (*Id.*). The prosecutor struck five African-Americans (one female and four males) from the jury venire pool. (*Id.*). These five stricken African-American jurors represented 41.6% of the total available African-American jurors and, more specifically, the four male African-American jurors that were struck represented 66.6% of the total available African-American male jurors. Therefore, although African-Americans represented only 28.5% of the entire jury pool, the [s]tate struck 41.6% of those African-American jurors (66.6% of the males). A substantial disparity between the percentage of their representation on the venire and the percentage of African-American jurors struck was obvious.

Mr. George is an African-American male. The [s]tate exercised peremptory challenges to remove 41% of *all* the potential African-American jurors and, of those jurors, the [s]tate struck 66% of the African-American males in a jury pool comprised of only 28.5% African-American jurors. This alone establishes a prima facie inference of racial discrimination and satisfies the first step of *Batson* and *J.E.B.* The record also shows the disparate treatment of African-Americans from similarly situated white jurors. The [s]tate should have been required to provide race and gender-neutral explanations *as to each juror*.

Adding further support for his claim, Mr. George can point to instances of disparate treatment of members of the jury venire with the same characteristics and who answered the voir dire questions in a similar manner. For example, white juror, Larry Barnett, raised his hand and indicated that he had heard of the case in the television or newsprint media but indicated that he could put the information he had seen out of

51

his mind and render a verdict based on the evidence and the law. (ECF No. 11-1 at 43). Mr. Barnett was not stricken and served on Mr. George's jury. (ECF No. 15-1 at 100). Freddie Morris, an African-American man had identical responses during voir dire but was stricken by the [s]tate and did not serve. (ECF No. 11-5 at 12).

Likewise, Ronnie Browning and George Smelley, both white jurors, testified that they had heard of the case but could put it out of their minds. (ECF No. 11-1 at 43-44; ECF No. 15-1 at 24-25). They were not stricken and both served. Barry Smith, an African-American juror, testified similarly, but was stricken. (ECF No. 15-1 at 24-25). In both instances, the record is completely silent as to why the African-American jurors were excluded when a similarly situated white juror served. Further, the record reflects that the [s]tate failed to ask any meaningful questions to the stricken African-American jurors. (ECF No. 15-1 at 29-48). Indeed, the record is silent on why these jurors would have been excluded at all. *See Flowers*, 139 S. Ct. at 2248. ("Comparing prospective jurors who were struck and not struck can be an important step in determining whether a *Batson* violation occurred.").

(Doc. 52 at 56–58) (footnote omitted); (Doc. 22 at 32 ¶ 79).

Mr. George replies that Warden Raybon's defense of unexhausted procedural default to these factual contentions is "baseless" under the proper scope of the fair presentation requirement. (Doc. 28 at 30). According to Mr. George because he supports these facts with "14 specific references" to the record, he presented them fairly to the state courts. (*Id.*). Additionally, Mr. George maintains—without citing an on-point holding—that unexhausted procedural default cannot apply "when the state court adjudicated the merits of the claim on direct appeal using facts in the state court record." (*Id.* at 31). Likewise, Mr. George attempts to discount Warden Raybon's reliance on *Borden* and *Pinholster* because the state courts decided his

*Batson* claim "on the merits on direct appeal, using the same record here that was before the state court[s]." (Doc. 28 at 31).

But given the *Batson* framework discussed above, pointing to the presence of additional facts in the record that are probative of discrimination in jury selection on habeas review is not the equivalent of presenting those facts fairly for exhaustion purposes. Instead, a prisoner must give the state courts fair notice of the facts which he contends establishes a prima facie case under *Batson. Cf. McGahee v. Comm'r, Ala. Dep't of Corr.*, 560 F.3d 1252, 1263 (11th Cir. 2009) ("Because the [ACCA] omitted from step three of its analysis crucial facts which [the petitioner] raised in his brief . . . the [ACCA] did not review 'all relevant circumstances' as required by *Batson*.") (quoting *Batson*, 476 U.S. at 96). Otherwise, the claim's first-step evaluation in state court would be incomplete in comparison to the more developed and fundamentally different one on habeas review—an approach that is incongruent with the exhaustion requirement. Consequently, the Court will limit the scope of Mr. George's *Batson* claim to those facts he identified in the record and argued in state court to satisfy his first-step burden.

### 3.    State Court Proceedings

Mr. George asserted a *Batson* but not a *J.E.B.* challenge at trial. (Doc. 15-1 at 102). In arguing the *Batson* claim, counsel recalled that the panel had "twelve black members" and the state "struck five, the last one being the alternate." (*Id.*). Counsel

53

calculated "[t]he makeup of the jury []as 28.5 percent black." (*Id.*). Counsel argued that the state's decision to strike five black venire members constituted a prima facie case under *Batson*. (Doc. 15-1 at 102). The prosecutor asked counsel, "Is that all on your showing for the prima facie case?" and counsel responded, "Yes." *Id.*

In opposition to the *Batson* challenge, the prosecutor drew a comparison between the composition of the jury venire calculated to be 29 percent black and the state's strikes which removed about the same percentage of black members from serving on the jury, excluding the alternate juror. (*Id.* at 103). The prosecutor calculated the racial split on the state's preemptory strikes (without the alternate) to be "29 percent . . . African American" and "71 percent . . . Caucasian." (*Id.* at 104). The adjusted percentages, when including the alternate, were 33 percent African American and 67 percent Caucasian. (*Id.*). According to the prosecutor, "about 28 percent of the population of Talladega County and 58 percent of the jury is black" without counting the alternate. (*Id.* at 104). The prosecutor continued that "the participation [on the jury] [wa]s over twice" the racial representation in Talladega County." (*Id.*).

As for the racial breakdown before the use of any strikes, the prosecutor reported that 30 of the 42 panel members were white and 12 were African American. (*Id.* at 105). Seven of the deliberating jurors were African American and five were

white. Additionally, the jury had two alternates—one African American and one white. (*Id.*).

Before ruling, the trial court asked if there was "anything else from the defendant?" (*Id.*). Counsel responded, "No, sir." (*Id.*). The trial court denied the claim finding that Mr. George had not established a prima facie case "based on the information presented" under *Batson*'s first step. (Doc. 15-1 at 105). The court noted also that it "ha[d] judicial knowledge of some of the statistic[al]" information discussed. (*Id.*).

Because the Alabama Supreme Court did not address this claim specifically, the ACCA provided the last-reasoned decision that is subject to habeas review. *George Direct I*, 717 So. 2d at 835–37. Applying a clearly erroneous standard, the ACCA affirmed the trial court's *Batson* decision. *Id.* at 837.

The ACCA began with a summary of *Batson*'s core principles. *George Direct I*, 717 So. 2d at 835. Turning to jury selection, the ACCA noted that the state had used 5 of its 14 peremptory strikes "to remove black veniremembers" and that "seven black veniremembers remained on the jury," plus one black alternate juror. *Id.*

Excerpting from *Ex parte Branch*, 526 So. 2d 609, 622 (Ala. 1987), the ACCA provided "a nonexhaustive list of nine types of evidence that could be used to raise th[e] inference" of racial discrimination, including "[a] pattern of strikes against black jurors." *Id.* at 836 (cleaned up). Still, the ACCA observed that "[w]hen considered

alone, . . . a prosecution's use of a large number of its peremptory strikes to exclude black jurors would allow, but would not compel, a finding of prima facial discrimination." *George Direct I*, 717 So. 2d at 836 (cleaned up).

Returning to Mr. George's *Batson* claim, the ACCA agreed with the trial court that he had not satisfied his prima facie burden. *Id.* at 837. Specifically, the ACCA explained that "[t]he only evidence [that Mr. George] presented . . . [of] a *Batson* violation . . . was . . . the state['s] use[] [of] 5 [out of] . . . 14 strikes to remove blacks." *Id.*

Because Mr. George did not raise a *J.E.B.* claim at trial, the ACCA applied Alabama's plain error doctrine. *George Direct I*, 717 So. 2d at 837. Specifically, Alabama Appellate Procedure Rule 45A gives the ACCA the authority to "notice any plain error or defect in the [capital] proceedings under review . . . and take appropriate appellate action . . . whenever such error has or probably has adversely affected the substantial right of the appellant." Ala. R. App. P. 45A. The ACCA clarified that before applying Rule 45A to a *Batson* claim, "the record must supply an inference that the prosecution engaged in purposeful discrimination." *George Direct I*, 717 So. 2d at 837 (cleaned up).

In his brief, Mr. George supported his unpreserved *J.E.B.* violation with the circumstance that "[f]our of the five black[] [members] whom the state removed peremptorily were men." (Doc. 11-6 at 35). Mr. George pointed to Alabama authority

recognizing that "use of peremptory challenges to remove African-American males may violate both *Batson* and *J.E.B.*" (Doc. 11-6 at 36). Mr. George argued at the end of his *J.E.B.* section that "unless the state c[ould] rebut the presumption that it excluded the overwhelming majority of the black men on [the] venire," he should receive a new trial "because of race and gender" discrimination in jury selection. (Doc. 11-6 at 36).

The ACCA concluded that "[t]he record d[id] not supply an inference of gender discrimination." *Id.* The ACCA considered evidence that "[t]he state struck four of the six black men who were on the venire" but also "used its third, sixth, seventh, eighth[,] and ninth strikes to remove women." *Id.* The ACCA described the voir dire examination as "extensive[]" and "c[ould] [not] say that the record raise[d] an inference of gender discrimination" based upon Alabama's *Branch* factors. *George Direct I*, 717 So. 2d at 837.

### 4.    AEDPA Analysis

Mr. George contends that he satisfies both the contrary to and unreasonable application prongs of (d)(1) on his *Batson* and *J.E.B.* claims. (Doc. 28 at 30, 34). According to Mr. George, "the trial court conflated the constitutional requirements and increased [his] *prima facie* burden beyond what *Batson* and *J.E.B.* require," which error the ACCA and the Alabama Supreme Court affirmed. (Doc. 28 at 34). Problematic for Mr. George is that he fails to identify clearly established law which

demonstrates that the Alabama courts did, in fact, conflate the appropriate constitutional framework or erred beyond any fairminded disagreement in the first-step rejection of his *Batson* claim.

Two of the Supreme Court cases which Mr. George maintains satisfy his AEDPA burden are *Batson* and *J.E.B.* (Doc. 52 at 53; Doc. 28 at 32–35, 37). But the Court did not establish a litmus test for stating a prima facie case of racial or gender discrimination in either decision. Instead, the Court formulated the equal protection framework for racial challenges in *Batson* and extended *Batson*'s reach to gender claims in *J.E.B.* Importantly, Mr. George does not explain how the context of these opinions shows that the ACCA erred objectively in the first-step rejection of his racial or gender discrimination claim. (Doc. 28 at 34–40). Additionally, in neither opinion did the Supreme Court prohibit the use of jury venire or community racial percentages to counter an alleged inference of discrimination, as the state did here. And, as reflected in *Ochoa-Vasquez*, the Eleventh Circuit endorses the use of venire racial percentages as relevant to the first-step inquiry. *See Ochoa-Vasquez*, 428 F.3d at 1045 (in determining whether the totality of the circumstances supports an inference of discrimination "we have considered whether there is a substantial disparity between the percentage of jurors of a particular race or ethnicity struck and the percentage of their representation on the venire.").

58

Likewise, Mr. George's references to *Powers*, *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (plurality opinion), *Rose v. Mitchell*, 443 U.S. 545 (1979), *Smith v. Texas*, 311 U.S. 128 (1940), *Avery v. Georgia*, 345 U.S. at 559 (1953), *Holland v. Illinois*, 493 U.S. 474 (1990), and *Early v. Packer*, 537 U.S. 3 (2002) (per curiam), do not show that the ACCA committed (d)(1) error under *Batson*'s first step. (Doc. 52 at 53–55; Doc. 28 at 30, 33–34). In *Powers*, for example, the Supreme Court modified *Batson* by "hold[ing] that a criminal defendant may object to race-based exclusions of jurors effected through peremptory challenges whether or not the defendant and the excluded juror share the same races." 499 U.S. at 402. Consequently, *Powers* is not clearly established law for the purpose of a prima facie inference under *Batson*.

*Woodson*, *Rose*, and *Early* are unhelpful to Mr. George under (d)(1) because the Supreme Court did not address a *Batson* claim in them. *Woodson*, 428 U.S. at 282; *Rose*, 443 U.S. at 547; *Early*, 537 U.S. at 362. In *Smith*, a pre-*Batson* decision, the Supreme Court addressed "racial discrimination in the selection of grand juries." 311 U.S. at 132. In *Avery*, another pre-*Batson* opinion, the Supreme Court considered a claim of racial discrimination in the jury venire process tied to the "use of white and yellow tickets." 345 U.S. at 562. The Supreme Court discussed *Batson* in *Holland*, but the Sixth Amendment was the source of the constitutional questions presented in *Holland*. 493 U.S. at 475–76.

Mr. George discusses *Flowers v. Mississippi*, 588 U.S. 284 (2019), and mentions, with little contextual development, *Foster v. Chatman*, 578 U.S. 488 (2016), *Snyder v. Louisiana*, 552 U.S. 472 (2008), and *Johnson v. California*, 545 U.S. 162 (2005), as support for his *Batson* and *J.E.B.* claims. (Doc. 52 at 53, 56, 58; Doc. 28 at 33, 35–39). But because the Supreme Court decided all four after the conclusion of Mr. George's direct appeal, the holdings in the opinions do not qualify as "clearly established law" under (d)(1). Thus, Mr. George cannot satisfy his AEDPA burden with any of them. (*See also* doc. 28 at 34) (pointing out that *Johnson* and two Eleventh Circuit decisions, which Warden Raybon cites to counter Mr. George's *Batson* and *J.E.B.* claims, did not "exist at the time of the direct appeal").

As part of his (d)(1) efforts, Mr. George points out that the ACCA referred to *Swain v. Alabama*, 380 U.S. 202 (1965), *overruled by Batson*, in its opinion. (Doc. 28 at 37–38); *George Direct I*, 717 So. 2d at 836. But in context, the ACCA did not unreasonably apply *Swain* in analyzing Mr. George's jury selection claims. Instead, *Swain* was merely an internal citation in the list of inferential examples discussed in *Branch*. *George Direct I*, 717 So. 2d at 836. Consequently, the ACCA's mention of *Swain*—as an embedded authority—does not establish that the ACCA applied *Batson* or *J.E.B.* unreasonably.

Additionally, Mr. George relies on the Eleventh Circuit's *Batson* decision in *McGahee* to overcome AEDPA deference. (Doc. 28 at 34–35). But like *Snyder*,

60

*Flowers*, and *Johnson*, *McGahee* postdates the conclusion of Mr. George's direct appeal. Regardless, the underlying facts and *Batson* analysis in *McGahee* are unlike Mr. George's claim.

In *McGahee*, "the prosecution . . . removed all of the African-American jurors from the venire panel through challenges for cause and peremptory challenges." 560 F.3d at 1256–57. The petitioner raised a "*Batson* challenge at the end of jury selection" that was unsuccessful. *Id.* at 1256. The *McGahee* court was critical of the trial court's *Batson* analysis and flagged as unreasonable error its "den[ying] [the] *Batson* motion based only upon the [s]tate's proffer of generalized reasons for its peremptory challenges" and "fail[ing]to make any ruling following the [s]tate's proffer of individualized reasons for its peremptory challenges." 560 F.3d at 1257.

Still, the ACCA's merits-based decision was the focus of the Eleventh Circuit's AEDPA holding. *Id.* at 1260–61, 1265–66. Specifically, the *McGahee* court held that the state appellate court had applied the third step of *Batson* unreasonably in omitting "'all relevant circumstances'" from the analysis. 560 F.3d at 1266. The omitted circumstances included the state's "explicitly racial reason for striking" one juror, removal of all African-American potential jurors from the jury, and "remov[al] of multiple African-American jurors because of their 'low intelligence' when [that explanation] was unsupported by any evidence in the record." *Id.* at 1264–65.

61

As the third-step context of *McGahee* reflects, Mr. George's reliance on the authority to show a first-step unreasonable application error misses the mark. Likewise, the strength of the facts in support of the discriminatory inference in *McGahee* does not substantiate Mr. George's contention that the ACCA erred objectively by increasing his *Batson*'s inferential burden.

Another Eleventh Circuit case that Mr. George references is *Madison v. Comm'r, Ala. Dep't of Corr.*, 677 F.3d 1333 (11th Cir. 2012) (per curiam). (Doc. 52 at 55–56; Doc. 28 at 37, 40). Although the Eleventh Circuit decided *Madison* after Mr. George's direct appeal, the Court considers the analysis because the petitioner's challenge was under *Batson*'s first step. Comparable to Mr. George's circumstances, the prosecutor in *Madison* "used six of his eighteen peremptory strikes on the [thirteen] qualified black jurors." 677 F.3d at 1337. But to establish an inference of discrimination, the petitioner's counsel made several other points. *Id.* at 1338. For example, "counsel noted that the prosecutor had not asked meaningful questions to any of the challenged black jurors and in fact, for three such jurors, posed no questions at all." *Id.* Counsel observed that "the challenged jurors only shared the common characteristic of race as they had heterogen[e]ous backgrounds of different sexes, ages, occupations, and education." *Id.* Counsel added that "the subject matter of the case involved racial sensitivities as the defendant was black and the victim was a white police officer." *Id.* The Eleventh Circuit concluded that the ACCA had

committed error "within the 'contrary to' clause" because it "demanded that [the petitioner] establish purposeful discrimination at the outset rather than merely produce evidence sufficient to raise an inference of discrimination." *Id.* at 1339.

Mr. George's *Batson* claim differs from the one analyzed in *Madison* in two important ways. First, neither the trial court nor the ACCA required Mr. George to show purposeful discrimination at the first step. Second, Mr. George did not identify other circumstances to establish an inference of discrimination beyond the peremptory strike information. Thus, *Madison* does not establish that the ACCA rejected Mr. George's inference of discrimination within either one of (d)(1)'s clauses.

When reviewed contextually, the remaining Eleventh Circuit cases do not help Mr. George with his AEDPA burden under *Batson*'s first step either. (Doc. 28 at 35, 37); *see, e.g.*, *United States v. David*, 803 F.2d 1567, 1569–70 (11th Cir. 1986) (discussing the significance of *Batson* as an intervening change in "[t]he legal environment" and, on direct appeal, "remand[ing] to the district court to determine whether a prima facie case has been established, and, if so, whether the prosecution has rebutted it"); *Parker v. Allen*, 565 F.3d 1258, 1271–72 (11th Cir. 2009) ("assum[ing] that a *prima facie* showing [existed]" because of the ACCA's "remand for the prosecution to offer race-neutral reasons for striking the jurors" and concluding that "the district court did not err in finding that the state court reasonably

applied *Batson*"); *Fleming v. Kemp*, 794 F.2d 1478, 1480, 1484 (11th Cir. 1986) (per curiam) (considering a "colorable" *Batson* claim raised in a successive petition pre-AEDPA).

Mr. George references several Alabama cases involving "claims of racial or gender bias by prosecutors in Talladega County." (Doc. 28 at 38). But none of them qualifies as clearly established federal law under (d)(1). Plus, Mr. George does not explain why the circumstances in those decisions mean that the ACCA erred objectively in rejecting his *Batson* and *J.E.B.* claims for lack of a first-step inference.

Mr. George argues also that the absence of transcripts on certain aspects of jury selection has hampered his ability to develop his *Batson* and *J.E.B.* claims adequately. (Doc. 52 at 61–62). Specifically, he points to the absence of a transcript of the proceedings where peremptory challenges were made and claims that, if those records existed, they "*could* provide additional support for Mr. George's claim of race and gender-based discrimination." *Id.* But he notes in his petition that the peremptory challenges were done off the record "in accordance with Alabama law[.] *Id.* at 61, citing Ala. R. Crim. P. 19.4(a). Thus, there was no state-law requirement that those proceedings be transcribed, and Mr. George has failed to point to any authority, federal or otherwise, that would suggest the lack of such a requirement violated his constitutional rights. Difficult state processes without a federal constitutional component do not overcome AEDPA deference or otherwise support habeas relief.

64

Thus, Mr. George has not shown that the ACCA's decision to affirm the trial court's denial of his *Batson* or *J.E.B.* claim was contrary to or an unreasonable application of Supreme Court precedent.

Although Mr. George does not invoke expressly (d)(2), he challenges part of the ACCA's *Batson* decision as factually unreasonable. (Doc. 28 at 36–37). Specifically, Mr. George argues that other inferential evidence supported his *Batson* violation besides "'the state's use[] [of] 5 of its 14 strikes to remove blacks.'" (*Id.* at 37). Mr. George contends, instead, that the record shows that "the [s]tate struck 4 out of the only 6 black jurors in the pool." (*Id.*). The Court rejects this (d)(2) contention for two reasons. First, Mr. George does not substantiate where the 4 out of 6 jury-pool information appears in the state court record. (*Id.*). Second, regardless of actual record substantiation, counsel did not rely on that inferential evidence at trial. Instead, to satisfy *Batson*'s first step, counsel referenced solely the state's use of peremptory strikes to remove 5 African-American venire members. Consequently, the ACCA did not rely on an unreasonable factual determination to support its decision but rather referenced the inferential evidence counsel argued to the trial court was sufficient to satisfy *Batson*'s first step.

Finally, Mr. George maintains in a footnote, the potential that counsel provided ineffective assistance on his *Batson* and *J.E.B.* claims. (Doc. 52 at 61 n.43). To the extent Mr. George contends that counsel's failures in substantiating cognizable

*Batson* and *J.E.B.* violations support additional habeas claims, unexhausted procedural default bars relief based on those alleged errors. (Doc. 22 at 35 at n.4; Doc. 11-93 at 5–8).

### G.    Claim V—Coerced Capital Verdict

Mr. George contends in Claim V that, instead of ending deliberations for the evening, the trial court pressured the jury to reach a death penalty verdict in violation of his due process rights under the Eighth and Fourteenth Amendments. (Doc. 52 at 69–70; Doc. 28 at 51–53). Generally, the Supreme Court has expressed that "[a]ny criminal defendant, and especially any capital defendant, being tried by a jury is entitled to the uncoerced verdict of that body." *Lowenfield v. Phelps*, 484 U.S. 231, 241 (1985).

Procedurally, Warden Raybon counters that "[Mr.] George relies on facts that were not presented to the state courts on appeal." (Doc. 22 at 39 ¶ 81). Substantively, Warden Raybon argues that Mr. George cannot overcome AEDPA deference. (Doc. 22 at 40–41 ¶ 81; Doc. 23 at 37–38). The Court begins with Warden Raybon's procedural contentions.

### 1.    Procedural Analysis

The Court rejects Warden Raybon's procedural position for several reasons. First, a fair presentation in the Eleventh Circuit "do[es] not require a verbatim restatement of the claims brought in state court." *McNair*, 416 F.3d at 1302. Second

and unlike the additional facts argued in support of his *Batson* claim, Mr. George amplifies this claim's factual underpinnings with information disclosed plainly in the state court record. Third, these additional facts do not alter—fundamentally—the type of constitutional claim under review.

## 2.    State Court Proceedings

The ACCA reviewed the merits of Mr. George's "[un]preserved" coercion claim for plain error. *George Direct III*, 717 So. 2d at 851. The Alabama Supreme Court affirmed the ACCA's decision in *George Direct III* , without analyzing the coercion claim specifically. *George Direct IV*, 717 So. 2d at 859. Consequently, the ACCA provided the last-reasoned decision denying this claim—the merits-based ruling subject to AEDPA review.

The ACCA set the stage for the analysis with an excerpted discussion among the trial court and counsel of the jury's written request sent at 9:30 to recess for the night. *George Direct III*, 717 So. 2d at 851. The prosecutor shared his initial reaction that the court could not deny the request. *Id.* The court responded:

> What I thought I would do is write back in there and ask them if they felt like they could go a reasonable length of time longer. If they say they can, that will probably take care of that. If they say they don't want to, we will do what they request. Is that all right?

*Id.* (internal quotation marks omitted). Both sides agreed with that proposal. *Id.* The court continued:

67

> It is just 9:30. It is not too late. All right. On my request of them is that I would appreciate you deliberating for further reasonable time before we recess for tonight. You have only been deliberating for 50 minutes at this time. Consider this request, and if this is okay, continue deliberating. Is that all right with the State? All right with the Defendant?

*Id.* (internal quotation marks omitted); (Doc. 12-3 at 165). The lawyers expressed their approval again. *George Direct III*, 717 So. 2d at 851. After considering the court's response to the requested recess, the jury deliberated 30 minutes longer and returned a 10-2 capital verdict. (Doc. 15-3 at 167).

Referencing Alabama law, the ACCA concluded that "the trial court did not err [in] suggesting . . . that [the jury] continue its deliberations." *George Direct III,* 717 So. 2d at 852. The ACCA explained that "[t]he trial court merely urged . . . continu[ing] [with] . . . deliberations because the jury had been deliberating for less than an hour." *Id.* at 851. And in contrast with the caselaw concerning cognizable coercive conduct, the ACCA observed that "[t]he trial court did not suggest to the jury which way its verdict should be returned." *Id.*

### 3.    AEDPA Analysis

Challenging the ACCA's coercion analysis, Mr. George argues that the decision contains clearly established error under § 2254(d)(1). (Doc. 28 at 52–53). As explained earlier in the opinion, only Supreme Court holdings predating the ACCA's decision qualify as clearly established law for (d)(1) purposes.

Consequently, the Court examines the Supreme Court authorities which Mr. George cites to satisfy that AEDPA standard.

A coercion decision which Mr. George describes as "analogous" to his claim is *Jenkins v. United States*, 380 U.S. 445 (1965) (per curiam). (Doc. 28 at 52; Doc. 52 at 71–72). Setting aside that the Supreme Court based the *Jenkins* ruling "on [its] supervisory power over the federal courts," *Lowenfield*, 484 U.S. at 239 n.2, the Court disagrees that the two coercion claims are similar enough to establish an unreasonable application error.

The *Jenkins* jury—after deliberating "[s]lightly more than two hours"— reported to the trial court that it had reached a standstill. *Jenkins*, 380 U.S. at 446. Specifically, the jury could not "agree upon a verdict 'on both counts because of insufficient evidence.'" *Id.* In reacting to the jury's reported impasse, the court responded, "'You have got to reach a decision in this case.'" *Id.* After additional deliberations, the jury found the defendant "guilty" on the first count and "not guilty" on the second. *Id.* at 445. Reviewing the record contextually, the Supreme Court concluded that the trial court's "statement had the coercive effect attributed to it" and reversed the conviction. *Id.* at 446. The *Jenkins* Court referenced, with approval, the respondent's observation that "the principle that jurors may not be coerced into surrendering views conscientiously held is so clear as to require no elaboration." *Id.* (internal quotation marks omitted).

69

Mr. George's circumstances deviate from those in *Jenkins* in several critical ways. Unlike *Jenkins*, the jury in Mr. George's case never reported a breakdown in sentencing deliberations, and the trial court never commanded the jury to reach a verdict. Instead, the court requested that the jury consider continuing with deliberations in the hope of obtaining a verdict and completing the advisory portion of the penalty phase that evening. Additionally, the trial court's response was phrased as a request and left the ultimate decision on whether to recess to the jury. (Doc. 15-3 at 166) (The court told counsel that "[i]f [the jurors] say they don't want to [continue deliberations], we will do what they request."). Consistent with the court's recommendation, the jury changed its mind about recessing and reached a verdict in favor of capital punishment. Thus, the mandatory message to the conflicted jury in *Jenkins* is too dissimilar from the request that the jury reconsider recessing for the night in Mr. George's case to satisfy his (d)(1) burden.

Additionally, the Supreme Court's analysis of jury coercion in *Lowenfield* reinforces, rather than detracts from, the reasonableness of the ACCA's rejection of Mr. George's claim. In *Lowenfield*, the trial court responded to a reported impasse with a supplemental charge and jury polling on the "question . . . whether further deliberations might assist [in] the[] [process] [of] returning a verdict." 484 U.S. at 240. Causing some concern for the Court was that the jury reached a verdict "soon"— in 30 minutes—after returning to deliberations. *Id.* at 235, 240. Still, the Supreme

70

Court held that the "combination" of the two actions "was not 'coercive' in such a way as to deny petitioner any constitutional right." *Id.* at 241.

The facts leading up to the Court's holding included that "defense counsel did not object to either the polls or the supplemental instruction." *Id.* at 240. The Supreme Court reasoned that, while not a "waive[r]," counsel's "omission indicate[d] that the potential for coercion . . . was not apparent to one on the spot." *Id.* This *Lowenfield* fact of no objection is like the unpreserved claim of coercion in Mr. George's penalty phase.

Another common circumstance is that the *Lowenfield* petitioner relied on *Jenkins* to support his coercion claim. *Lowenfield*, 484 U.S. at 239. Unhesitatingly, the Supreme Court rejected any attempted comparison of the supplemental instruction to the overbearing statement in *Jenkins*. *See Lowenfield*, 484 U.S. at 239 ("The difference between the language used there and the language used in the present case is sufficiently obvious to show the fallacy of petitioner's reliance."). By extension, the *Lowenfield* Court's firm rejection of *Jenkins* as inapposite contextually likewise casts doubt on Mr. George's reliance on *Jenkins* as an analogous authority.

Finally, the *Lowenfield* Court endorsed a trial court's "incontestabl[e]" right "to insist" on additional deliberations if, "after only one hour," a jury reported an inability "to achieve unanimity on the first ballot." 484 U.S. at 238. Given this *Lowenfield* line, the ACCA's denial of Mr. George's claim that the trial court coerced

71

the penalty-phase jury, who, likewise, had been deliberating for less than one hour, was not objectively wrong.

From a more fundamental standpoint, Mr. George's other cited authorities are inadequate to detach AEDPA deference too. Specifically, absent from those remaining decisions is a coerced verdict claim. (Doc. 52 at 71–73). Consequently, what the Supreme Court clearly established in them is inconsequential to Mr. George's AEDPA burden. *See, e.g.*, *Lisenba v. California*, 314 U.S. 219, 236–37 (1941) (recognizing that fundamental unfairness occurs under the due process clause "when a coerced confession is used as a means of obtaining a verdict of guilt"); *Woodson*, 428 U.S. at 305 (discussing "the need for [a] reliab[le] . . . determination that death is [an] appropriate punishment" in the invalidation of North Carolina's former capital sentencing structure); *Caldwell v. Mississippi*, 472 U.S. 320, 329, 341 (1985) (remarking that "the [capital] sentencing process should facilitate the responsible and reliable exercise of . . . discretion" and vacating the death sentence because the prosecutor's argument attempted "to minimize the jury's sense of responsibility for determining the appropriateness of death"); *McGautha v. California*, 402 U.S. 183, 185, 208 (1971) (analyzing constitutionality of "absolute [jury] discretion" in capital sentencing and expecting that "jurors confronted with the truly awesome responsibility of decreeing death for a fellow human will act with due regard for the consequences of the[] decision"), *reh'g granted*, *judgment vacated sub*

*nom. Crampton v. Ohio*, 408 U.S. 941 (1972). Therefore, § 2254(d) prohibits habeas relief because Mr. George has not overcome AEDPA deference.

### H.     Claim IV—Exhausted Living Conditions Subclaim

Here, the Court returns to Claim IV and considers the AEDPA merits of Mr. George's exhausted living conditions subclaim under the Eighth Amendment.

### 1.     State Court Proceedings

The Alabama Supreme Court provided the last-reasoned decision in rejecting Mr. George's subclaim that the living conditions evidence introduced in the penalty phase violated his Eighth Amendment right to a fair sentence. *George Direct II*, 717 So. 2d at 848. As the court explained Mr. George's position, he contended that "the [s]tate's only evidence offered during the penalty phase pertained to the details surrounding his flight and his subsequent apprehension, which . . . were not relevant to the one aggravating circumstance" of robbery-murder. *Id.* at 847. The state countered that the purpose of this evidence was to rebut Mr. George's mitigating evidence of his mental status based on Dr. Ronan's testimony. *Id.*

Reversing the ACCA's judgment, the Alabama Supreme Court disagreed with Mr. George. As the court reasoned:

> From a thorough review of the record, we think it clear that the evidence the [s]tate presented at the penalty phase of the trial pertaining to where and how [Mr.] George was living when he was captured and returned to Alabama was offered to rebut the evidence of mental instability that he had offered in mitigation of the capital offenses for

which he was convicted. This evidence was probative and relevant to the sentencing and, as Judge Cobb said in dissent, it was "offered to show that [Mr. George] was not emotionally disturbed to any appreciable degree" and "to show that, in fact, [Mr. George] was extremely clever and calculating about ensuring his safety and seclusion." Although the trial court did not find emotional instability to be a mitigating circumstance, had the [s]tate not offered, or not been allowed to introduce, evidence of emotional stability to rebut the evidence [Mr.] George had presented to show emotional instability, the trial court might have found otherwise. The trial court properly admitted that evidence.

*Id.* at 848 (some alterations added or modified) (citation omitted).

### 2.   AEDPA Analysis

To overcome AEDPA deference on this subclaim, Mr. George relies on (d)(1) and (d)(2). Beginning with (d)(1), Mr. George references core constitutional principles from several Supreme Court decisions. (Doc. 52 at 67–68; Doc. 28 at 42 & n.18, 49–50). These include *Woodson*, *Payne*, *Furman*, *Gardner v. Florida*, 430 U.S. 349 (1977), *Gregg v. Georgia*, 428 U.S. 153 (1976) (plurality opinion), *Johnson v. Mississippi*, 486 U.S. 578 (1988), and *Zant v. Stephens*, 462 U.S. 862 (1983). (Doc. 52 at 67–68; Doc. 28 at 42 & n.18, 49–50). For example, Mr. George cites *Woodson* for the proposition that death sentences must be reliable. (Doc. 52 at 67). He similarly cites *Gardner* for the well-settled proposition that "'any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion.'" *Id.* at 67–68. But generalized references to Supreme Court cases are not holdings and do not clearly establish anything under (d)(1). *See, e.g.*, *Lopez v. Smith,* 574 U.S. 1, 5–6

74

(2014) ("the Court of Appeals cited three older cases that stand for nothing more than the general proposition that a defendant must have adequate notice of the charges against him…. This proposition is far too abstract to clearly establish the specific rule respondent needs [to obtain relief under § 2254(d)(1)]."). Additionally, Mr. George makes no effort to develop the contexts of these cases and compare them to his Eighth Amendment circumstances consistent with (d)(1)'s demanding disjunctive standards.

Nor has this Court's independent assessment of Mr. George's cited Supreme Court authorities revealed a viable (d)(1) basis to detach AEDPA deference. Instead, each case is too distant contextually to clearly establish that the Alabama Supreme Court committed outrageous Eighth Amendment error in reversing the ACCA on Mr. George's living conditions claim. *See Woodson*, 428 U.S. at 305 (concluding that death sentences "under North Carolina's mandatory . . . statute violated the Eighth and Fourteenth Amendments"); *Gardner*, 430 U.S. at 351 (holding that a trial court's reliance on undisclosed parts of a presentence investigative report to impose a death sentence violated the Fourteenth Amendment's due process clause); *Gregg*, 428 U.S. at 196, 198 (concluding that Georgia's post-*Furman* sentencing framework "narrow[s] the class of murderers subject to" and "safeguard[s] against arbitrariness and caprice" in capital punishment); *Payne*, 501 U.S. at 827 (holding that "the Eighth Amendment erects no *per se* bar" against the introduction of victim impact evidence);

*Johnson*, 486 U.S. at 580, 584 (rejecting the state court's conclusion that a death sentence based on a prior but, later, reversed conviction requires no "reexamination" under the Eighth Amendment); *Zant*, 462 U.S. at 864, 891 (upholding a death sentence under Georgia's non-weighing capital framework when one of the three jury findings in aggravation later became "invalid"); *Furman*, 408 U.S. at 239–40 (remanding on the "imposition and carrying out of the death penalty . . . [as] cruel and unusual punishment" unrelated to any flight or living conditions evidence). Consequently, Mr. George has not shown that the Alabama Supreme Court committed extreme Eighth Amendment error in viewing the state's evidence of his life post-offense as proper rebuttal to the mental health portion of his mitigation case.

Mr. George argues also that he satisfies the (d)(2) unreasonable factual standard. (Doc. 28 at 45–49). Specifically, Mr. George contends that the Alabama Supreme Court determined unreasonably that the state's evidence was in rebuttal because of the order of witnesses and that his later living conditions were relevant to his "mental state at the time of the offense." (Doc. 28 at 46). Additionally, Mr. George maintains that the Alabama Supreme Court "ignore[ed] . . . actual evidence presented of [his] mental instability." *Id.*

Mr. George's factual attacks are unpersuasive. At the penalty phase of Mr. George's trial, the state did not present any evidence initially but told the jury that it "may have some in rebuttal depending on what evidence the Defendant presents."

76

(Doc. 15-3 at 38). The defense called Mr. George's sisters as lay witnesses and then planned to call Dr. Ronan. However, Dr. Ronan was not able to arrive until later in the evening, so the state offered to call rebuttal witnesses to counter her forthcoming testimony, and defense counsel agreed. (Doc. 15-3 at 60–61). Contrary to Mr. George's argument, the timing of the testimony—in terms of a different order of witnesses—does not mean that the Alabama Supreme Court characterized the nature of the state's living conditions evidence as "rebuttal" unreasonably. (Doc. 28 at 46).

George also argues that the Alabama Supreme Court's finding that his living conditions at the time of his capture were relevant rebuttal evidence to his mental state at the time of the offense was unreasonable. But pointing to gaps in the analysis about the elapsed time between the offenses and Mr. George's post-crime living conditions does not establish that the Alabama Supreme Court based its decision on a fact contradicted by evidence in the record. (*Id.* at 46–47). Finally, challenging the appellate reasoning because of an omission that Dr. Ronan's testimony focused on Mr. George's mental status with respect to personal relationships, is not enough to show that the Alabama Supreme Court based its Eighth Amendment reasoning on an objectively wrong fact. (Doc. 28 at 48–49). In sum, there is room for fairminded disagreement that the Alabama Supreme Court based its decision on facts which the state record contradicted.

Nor do the (d)(2) authorities which Mr. George mentions alter the Court's AEDPA factual analysis. (Doc. 28 at 48–49). Although the courts in those situations identified unreasonable factual determinations based on evidence in the state court record, Mr. George, again, offers no contextual link between those cases and the allegedly unreasonable factual determination behind the denial of his Eighth Amendment living conditions claim. And such a connection does not exist. *Cf. Brumfield v. Cain*, 576 U.S. 305, 307 (2015) (analyzing (d)(2) in the context of an intellectual disability claim); *Wiggins v. Smith*, 539 U.S. 510, 528 (2003) (analyzing (d)(2) in the context of an ineffective mitigation investigation); *Brantley v. Fla. Att'y Gen.*, No. 19-13214, 2021 WL 3077017, at *6 (11th Cir. July 21, 2021) (per curiam) (analyzing (d)(2) in the context of counsel's deficient performance based on "conduct after receiving . . . belated discovery"); *Jones v. Ryan*, 1 F.4th 1179, 1187, 1193 (9th Cir. 2021) (analyzing (d)(2) in the context of a mental health expert claim), *amended and superseded on denial of reh'g en banc*, 52 F.4th 1104 (9th Cir. 2022). Consequently, Mr. George's generalized caselaw efforts to illustrate a (d)(2) error are unpersuasive, and AEDPA deference bars habeas relief on the exhausted portion of Claim IV.

## I.     Claim VI—Ineffective Assistance of Counsel

### 1.     Introduction

In Claim VI, Mr. George asserts that trial counsel provided ineffective assistance in the guilt and penalty phases. Relying on *Sneed v. Raybon*, No. 5:16-CV-1442-AKK, 2022 WL 3974490, at *8–9 (N.D. Ala. Aug. 31, 2022), the Court describes some common ineffective assistance concepts before addressing these subclaims.

In *Strickland* (cited fully in the procedural default section), the Supreme Court established a two-pronged Sixth Amendment standard for evaluating the effectiveness of counsel. To prove that a conviction or sentence is unconstitutional due to ineffective assistance, "[f]irst, the defendant must show that counsel's performance was deficient." 466 U.S. at 687. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed [to] the defendant by the Sixth Amendment." *Id.* "Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* "[B]oth showings" are necessary for a petitioner to establish ineffective assistance—"a breakdown in the adversary process that renders the [conviction or sentence] unreliable." *Id.* Therefore, "the court need not address

the performance prong if the defendant cannot meet the prejudice prong, or vice versa." *Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000) (citation omitted).

A petitioner bears the burden of proving *Strickland*'s first prong "by a preponderance of competent evidence." *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc). To establish deficient performance, a petitioner "must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. "[P]revailing professional norms" are the benchmarks for judging reasonableness. *Id.* Moreover, courts must be "highly deferential" in the "scrutiny of counsel's performance" and "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

Under the *Strickland* framework, a petitioner "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (internal quotation marks omitted). The Court observed that "countless ways [of] . . . effective assistance [exist] in any given case" and that "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Id.* The Court cautioned that "[i]t is all too tempting for a [petitioner] to second-guess counsel's assistance after conviction or [an] adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Id.* at 689.

80

Consequently, an evaluating court must make "every effort . . . to eliminate the distorting effects of hindsight, . . . reconstruct the circumstances of counsel's challenged conduct, and . . . evaluate the conduct from counsel's perspective at the time" of representation. *Id.*; *see, e.g.*, *Newland*, 527 F.3d at 1184 ("We review counsel's performance 'from counsel's perspective at the time,' to avoid 'the distorting effects of hindsight.'") (quoting *Strickland*, 466 U.S. at 689). Simply put, "a petitioner must establish that no competent counsel would have taken the action that his counsel did take" to overcome the presumption that counsel's conduct "f[e]ll within the wide range of competent assistance." *Chandler*, 218 F.3d at 1315, 1317.

Further, when a habeas court reviews an ineffective assistance claim resolved on the merits, "it is important to keep in mind that [i]n addition to the deference to counsel's performance mandated by *Strickland*, the AEDPA adds another layer of deference." *Williams v. Allen*, 598 F.3d 778, 789 (11th Cir. 2010) (alteration in *Williams*) (internal quotation marks omitted) (quoting *Rutherford v. Crosby*, 385 F.3d 1300, 1309 (11th Cir. 2004)). "Thus, [a petitioner] not only has to satisfy the elements of the *Strickland* standard, but he must also show that the [s]tate court applied *Strickland* to the facts of his case in an *objectively unreasonable manner*." *Williams*, 598 F.3d at 789 (cleaned up). Because *Strickland* & § 2254(d) incorporate "'highly deferential' [standards], . . . when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105 (citations omitted). The focus of this doubly deferential

inquiry "is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard" as opposed to "whether counsel's actions were reasonable." *Id.*; *see also id.* at 101 (contrasting "whether the state court's application of the *Strickland* standard was unreasonable" under § 2254(d)(1) with "whether defense counsel's performance fell below *Strickland*'s standard" under the Sixth Amendment). Accordingly, this "[d]ouble deference is doubly difficult for a petitioner to overcome, and it will be a rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding." *Evans v. Sec'y, Fla. Dep't of Corr.*, 699 F.3d 1249, 1268 (11th Cir. 2012) (alteration added) (internal quotation marks omitted).

The burden of proof for the prejudice prong is less demanding than the performance prong's preponderance of the evidence standard. 466 U.S. at 694. To satisfy the prejudice component, a habeas petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* "A reasonable probability is [one] sufficient to undermine confidence in the outcome." *Id.* Stated differently, "[a] finding of prejudice requires proof of unprofessional errors so egregious that the trial was rendered unfair and the verdict . . . suspect." *Johnson v. Alabama*, 256 F.3d 1156, 1177 (11th Cir. 2001) (internal quotation marks omitted). But the fact that counsel's "errors had some conceivable effect on the outcome of the proceeding" is insufficient

to show prejudice. *Strickland*, 466 U.S. at 693. Additionally, if the state court has rejected the prejudice prong on the merits, then a petitioner must—consistent with AEDPA deference—demonstrate the unreasonableness of that ruling. Otherwise, habeas relief is unavailable. *See Pinholster*, 563 U.S. at 197–98 ("Even if his trial counsel had performed deficiently, [the petitioner] also has failed to show that the [state court] must have unreasonably concluded that [he] was not prejudiced.").

The test for penalty-phase prejudice under *Strickland* is distinct from evaluating prejudice in the guilt phase of a capital case. Specifically, "when a [capital] petitioner challenges a death sentence, 'the [constitutional] question is whether there is a reasonable probability that, absent the [attorney] errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Stewart v. Sec'y, Fla. Dep't of Corr.*, 476 F.3d 1193, 1209 (11th Cir. 2007) (alterations added) (quoting *Strickland*, 466 U.S. at 695).

### 2.     Guilt Phase

Mr. George alleges several guilt-phase subclaims in his petition. The Court addresses each in turn.

### a.     Failure to Remove a Biased Juror

In Subclaim VI.A, Mr. George contends that trial counsel's failure to remove a biased juror—Juror D.H.—denied him "his right to a fair and impartial jury" under the Sixth and Fourteenth Amendments. (Doc. 52 at 73–74; Doc. 11-1 at 70). The

Sixth Amendment test for dismissing a juror for cause because of bias is "did [the] juror swear that [s]he could set aside any opinion [s]he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed." *Patton v. Yount*, 467 U.S. 1025, 1036 (1984).

Here, the alleged source of the unconstitutional bias was the juror's familiarity with Ms. George (and her daughter) from church. (Doc. 15-1 at 8; Doc. 11-20 at 52–53). Warden Raybon answers that habeas relief is unavailable because Mr. George cannot overcome AEDPA deference. (Doc. 22 at 42–43 ¶ 83; Doc. 23 at 41, 44–45).

### i.    State Court Proceedings

After conducting an evidentiary hearing on this and Mr. George's other *Strickland* subclaims that survived summary dismissal, the Rule 32 court denied it on the merits. (Doc. 11-11 at 30–31). Focusing on deficient performance, the court found that Mr. George had failed to prove that trial counsel represented him inadequately. (Doc. 11-11 at 31). The ACCA affirmed the Rule 32 court's judgment. *George Collateral*, 333 So. 3d at 1061.

As background to the subclaim, the ACCA noted that during voir dire, Juror "D.H. raised her hand, indicating that she knew [Mr.] George's wife." *Id.* at 1059. The ACCA continued that trial counsel did not ask her any follow-up questions, and Juror "D.H. served on the jury." *Id.*

The ACCA summarized next Juror D.H.'s testimony at the Rule 32 hearing. Juror "D.H. testified that she went to church with [Mr.] George's wife but that she did not know [him]" or "the other victims." *Id.* Juror D.H. explained that she attended the funerals of those victims "'out of remorse of knowing [Mr. George's wife] and the situation that had happened.'" *Id.* (alteration modified). When questioned about her recollection of the funeral, Juror D.H. described it as "'very sad.'" *Id.* Juror D.H. remembered seeing Mr. George's photograph on *America's Most Wanted* and *Unsolved Mysteries* but nothing "specific[] about the television programs . . . that featured [Mr.] George." *Id.* (internal quotation marks omitted).

The ACCA pointed out that postconviction counsel did not question either one of Mr. George's trial attorneys about how they handled voir dire of Juror D.H.—a fact which the Rule 32 court mentioned as well. *Id.*; (Doc. 11-11 at 30). Additionally, the ACCA referenced the Rule 32 court's determination that the hearing lacked testimony "indicat[ing] that [J]uror D.H. was biased." *George Collateral*, 333 So. 3d at 1059; (Doc. 11-11 at 30).

Referencing Alabama and federal authorities, the ACCA highlighted several *Strickland* principles. *Id.* at 1060. Regarding ineffectiveness for failing to strike a juror, the ACCA explained that evidence of prejudice for "counsel's failure to exercise the challenge[]" must exist. *Id.* (cleaned up). Similarly, if "failing to raise or preserve a cause challenge" is the source of the ineffectiveness, then a petitioner

85

"must demonstrate that a juror was actually biased." *Id.* (cleaned up). Additionally, the ACCA observed that if the record sheds no light on "the reasoning behind counsel's actions, the presumption of effectiveness is sufficient to deny relief on [an] ineffective assistance of counsel claim." *Id.* (cleaned up).

Separate from these *Strickland* concepts, the ACCA mentioned that "a silent record" would not support postconviction error and that, instead, Mr. George had the burden to prove a right to relief. *George Collateral*, 333 So. 3d at 1061. Against this backdrop, the ACCA concluded that "[Mr.] George [had] failed to prove that [J]uror D.H. was biased and that his trial counsel was ineffective for failing to remove [her] on that basis." *Id.*

### ii.    AEDPA Analysis

Mr. George contends that the ACCA's decision "was unreasonable in law and fact and contrary to governing Supreme Court law." (Doc. 28 at 60). Attempting to benefit from (d)(1), Mr. George cites numerous state and federal authorities, many of which are nonstarters under that AEDPA provision. (Doc. 28 at 54–61). As discussed above, satisfying either one of (d)(1)'s standards requires Mr. George to identify Supreme Court holdings with contextual relevancy to his subclaim. But after reviewing the Supreme Court decisions which he mentions, Mr. George lacks any decisions involving a *Strickland* claim based on trial counsel's failure to remove a biased juror. After considering every authority Mr. George mentions, the Court limits

86

the following discussion to those which are closer to meeting (d)(1)'s disjunctive standards, even though none do.

For example, Mr. George cites *Ross v. Oklahoma*, 487 U.S. 81 (1988), *United States v. Martinez-Salazar*, 528 U.S. 304 (2000), and *Parker v. Gladden*, 385 U.S. 363 (1966) (per curiam), for the point that a verdict reached with a biased juror's involvement cannot stand. (Doc. 52 at 74, 76–77; Doc. 28 at 57–58). But these Supreme Court direct review decisions do not satisfy (d)(1) for various reasons.

The *Ross* Court examined whether a trial court's failure to excuse for cause a juror, unwilling to consider a life sentence in the penalty phase, violated the petitioner's rights to an impartial jury and due process. 487 U.S. at 85; *see also Wainwright v. Witt*, 469 U.S. 412, 423–24 (1985) (discussing "the proper standard" for excusing a juror for cause because of his positions on capital punishment). Ultimately, the potential juror did not serve because trial counsel removed him peremptorily and "as effectively as if the trial court had excused him for cause." 487 U.S. at 85–86. Thus, *Ross* does not speak about the type of bias that Mr. George asserts in his subclaim—juror impartiality from knowing a surviving victim and attending the funeral of the murder victims. Plus, *Ross* is not a *Strickland* decision.

Similarly, in *Martinez-Salazar*, the Supreme Court did not address a dispute over actual or implicit juror bias. Instead, the Court held that striking peremptorily "to cure [a] judge's error" on cause and exhausting all peremptory strikes during jury

selection do not "deprive[] [a convicted defendant] of any rule-based or constitutional right" if "no biased juror sat" on the jury. 528 U.S. at 307. Again, ineffective assistance of counsel was not an issue in *Martinez-Salazar*.

And Mr. George's reliance on *Martinez-Salazar* to argue presumed prejudice under *Strickland* attributable to a biased juror does not account for the Court's more recent decision in *Weaver v. Massachusetts*, 582 U.S. 286 (2017), or conflicting Eleventh Circuit precedent. (Doc. 52 at 76–77). Addressing a public-trial violation in *Weaver*, the Supreme Court drew a distinction between structural error "[i]n the direct review context" and that same conduct challenged "in the context of an ineffective-assistance-of-counsel claim." 582 U.S. at 290. Under the *Weaver* framework, "when a defendant raises a public-trial violation via an ineffective-assistance-of-counsel claim, *Strickland* prejudice is not shown automatically." *Id.* at 300–01. "Instead, the burden is on the defendant to show either a reasonable probability of a different outcome . . . or, as . . . assumed for [analytical] purposes, ... the particular public-trial violation was so serious as to render . . . [the] trial fundamentally unfair." *Id.* at 301 (citation omitted). After considering several authorities, including *Strickland*, the Eleventh Circuit has expressed more broadly "that prejudice may not be presumed but must be shown in order to establish ineffective assistance of counsel based on the failure to raise a claim of structural error at trial." *Purvis v. Crosby*, 451 F.3d 734,

743 (11th Cir. 2006). Thus, this Court rejects Mr. George's contention that presumed prejudice applies to this *Strickland* structural-error subclaim.

Returning to a discussion of Mr. George's cited cases, *Parker* is contextually different than his subclaim. Factually, the *Parker* Court addressed a jury impartiality claim caused by a bailiff's improper statements made to several jurors, including, "Oh that wicked fellow (petitioner), he is guilty." 385 U.S. at 363, 365–66 (internal quotation marks omitted). Legally, *Strickland* played no role in *Parker*.

Additionally, Mr. George's references to *Aldridge v. United States*, 283 U.S. 308 (1931), *Remmer v. United States*, 347 U.S. 227 (1954), *Smith v. Phillips*, 455 U.S. 209 (1982), and *Chandler v. Florida*, 449 U.S. 560 (1981), are unhelpful under (d)(1). (Doc. 52 at 75–76 & n.50, 78). Unlike Mr. George's bias challenge, the *Aldridge* Court held that the trial court's refusal to allow questions to prospective jurors about racial prejudices as "a disqualifying state of mind" was reversible error. *Id.* at 313, 315. Ineffective assistance of counsel was not a factor in *Aldridge*.

Distinct from Mr. George's subclaim, *Remmer*, a pre-*Strickland* decision, involved a new trial request based on allegations of juror tampering. 347 U.S. at 228. The Supreme Court vacated the criminal judgment "with directions to hold a hearing to determine whether the incident complained of was harmful to the petitioner," and, if so, "grant a new trial." *Id.* at 230.

89

The issue of bias in *Smith* was that a juror "submitted during the trial an application for employment as a major felony investigator in the [d]istrict [a]ttorney's [o]ffice" responsible for prosecuting the case. *Id.* at 212. And the *Smith* Court did not face a *Strickland* claim connected to that juror's impartiality.

In *Chandler*, another pre-*Strickland* authority, the constitutional question was "whether . . . a state may provide for radio, television, and still photographic coverage of a criminal trial for public broadcast, notwithstanding the objection of the accused." 449 U.S. at 562. Consequently, the constitutional issue addressed in *Chandler* was much different than Mr. George's subclaim based on a juror's particularized impartiality.

*Teasley v. Warden, Macon State Prison*, 978 F.3d 1349 (11th Cir. 2020), is another juror bias case which Mr. George cites to satisfy his (d)(1) burden. (Doc. 52 at 74). Setting aside *Teasley*'s temporal limitations, Mr. George seizes on part of the Eleventh Circuit's discussion of bias: "To exclude a prospective juror for cause, a party must demonstrate that the juror in question exhibited 'actual bias' by showing either an express admission of bias *or facts demonstrating such a close connection to the present case that bias must be presumed*." *Id.* at 1356 (emphasis added) (cleaned up); (Doc. 52 at 74).

But the concerning evidence in *Teasley* was a juror's "nonverbal gesture"—raising a hand—"in response to [a] question about impartiality" during voir dire. 978

90

F.3d at 1356. Specifically, the question was, given the murder charge, "[I]s there anyone here who feels that you can't be fair and impartial in this case?" 978 F.3d at 1353 (internal quotation marks omitted). Consequently, presumed bias was a non-issue. *Id.* Evaluating actual bias under the constraints of AEDPA, the *Teasley* court held that the juror's "hand raise in response to [an] [un]specific question" was "insufficient to justify overturning the state court's factfinding." *Id.* at 1356. After providing several plausible theories about what the juror intended to convey, the court concluded such "[un]certain[ty]" meant that it "c[ould] [not] say the state court's finding [of no actual bias] was unreasonable." *Id.* at 1357. If the juror's actions in *Teasley* were insufficient to justify overturning the state court's findings of fact, this Court cannot see how Juror D.H.'s actions would suffice.

Also dissimilar to Mr. George's habeas challenge, the ineffectiveness claim which the *Teasley* court analyzed was an appellate counsel one. *Id.* at 1358. After concluding that "the state court's factfinding was not unreasonable" on the question of the juror's bias, the Eleventh Circuit stated that the answer on *Strickland* prejudice for counsel's failure to raise the claim on appeal was "clearly no." 978 F.3d at 1358.Thus, as this sampling of referenced authorities shows, Mr. George has not satisfied his (d)(1) burden on this *Strickland* subclaim.

Additionally, Mr. George argued in the post-briefing hearing that *Guardado v. Sec'y, Fla. Dep't of Corr.*, 112 F.4th 958 (11th Cir. 2025)—one of his supplemental

authorities—confirms that the ACCA resolved this subclaim unreasonably under *Strickland*. (Doc. 43-2). In *Guardado*, the Eleventh Circuit held that the Florida Supreme Court committed a (d)(1) AEDPA error in applying an objectively wrong and more demanding prejudice standard. 112 F.4th at 990. The *Guardado* court specified that, rather than testing for a reasonable probability of a different sentencing outcome, the state appellate court had required proof of the jurors' actual bias to support *Strickland* prejudice. 112 F.4th at 990. After analyzing this unreasonable application of *Strickland*'s second prong, the Eleventh Circuit applied de novo review and affirmed the denial of habeas relief because the jurors' answers during voir dire confirmed that they could be fair. 112 F.4th at 994–95. Absent from the *Guardado* court's AEDPA and de novo analyses of this claim is a discussion of *Strickland*'s first prong.

Mr. George contends that the Alabama courts followed a similar unreasonable requirement of actual prejudice in rejecting his biased juror claim. This Court disagrees. While the ACCA discussed the need to show actual bias in its decision, the context of that reference was related to deficient performance—not prejudice. *George Collateral*, 333 So. 3d at 1060. Under the ACCA's assessment, Mr. George did not prove that a bias-based reason to remove Juror D.H. existed in the record, and the presumption of trial counsel's reasonable representation remained intact. The court noted that George's postconviction counsel did not question trial counsel at the Rule

92

32 hearing about their reasoning for leaving D.H. in the venire unchallenged and noted that such testimony would be needed to "rebut this presumption by proving that his attorney's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy." *Id.* quoting *Kimmelman v. Morrison*, 477 U.S. 365, 106 S.Ct. 2574, 2588, 91 L.Ed.2d 305 (1986). Thus, it is evident that the ACCA's holding was confined to the deficient-performance prong of *Strickland* as opposed to the prejudice prong. *See Daniels v. State*, 650 So. 2d 544, 552 (Ala. Crim. App. 1994), quoting *Strickland*, 466 U.S. at 688 ("The performance component outlined in Strickland is an objective one: that is, whether counsel's assistance, judged under 'prevailing professional norms,' was 'reasonable considering all the circumstances.'"). Because the Alabama courts denied Mr. George's subclaim for lack of deficient performance and never reached the prejudice prong of *Strickland*, *Guardado* simply does not apply from an AEDPA standpoint.

Mr. George fails also to show that the ACCA relied on unreasonable factual determinations under (d)(2) to reject this subclaim. (Doc. 28 at 57). Specifically, the ACCA based its decision on the absence of testimony from the evidentiary hearing that demonstrated Juror D.H.'s actual bias. *George Collateral*, 333 So. 3d at 1059. The court also noted that postconviction counsel did not question Mr. George's trial counsel about Juror D.H. and their reasons for not attempting to remove her or questioning her further. These factual determinations were consistent with the Rule

32 court's finding that Mr. George had failed to prove Juror D.H.'s impartiality. (Doc. 11-11 at 30). Mr. George argues that the postconviction court precluded one bias-based question because of the risk that it would invade the jury's deliberative process. (Doc. 52 at 75–76 & n.50; Doc. 11-20 at 50, 56). While a true statement, Mr. George fails to acknowledge that postconviction counsel could have pursued other lines of questioning on the issue of Juror D.H.'s impartiality that avoided this prohibited area. As examples, postconviction counsel could have asked Juror D.H. why she "expected to be eliminated from the jury," how long she had known Ms. George and her daughter, or had she done anything besides attend church with Ms. George such as participating in a Bible study or meeting for lunch. (Doc. 11-20 at 54); *cf. Miller v. Webb*, 385 F.3d 666, 678 (6th Cir. 2004) (concluding that the state court applied *Strickland*'s deficient performance prong unreasonably).

In *Miller*, the petitioner premised trial counsel's deficient performance on an empaneled juror, who, as a minister, had known "the only eyewitness to [and surviving victim of] the crime" "for two to three years through Bible study." *Id.* at 668. That same juror equivocated on voir dire that she "could be fair" even though she "d[id] have some feelings for [the witness]." *Id.* at 675 (internal quotation marks omitted). Unlike the equivocating juror in *Miller* or the rehabilitated Juror D. discussed in Claim VII below, Juror D.H. did not indicate a doubt, verbally or nonverbally, about her ability to serve on the jury fairly.

94

While it is true that Juror D.H. testified to certain facts at the postconviction hearing that could indicate bias, the ACCA did not find that testimony sufficient. As noted above, "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood*, 558 U.S. at 301. Therefore, "even if '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's . . . determination.'" *Id.* Under these circumstances, this Court concludes that the ACCA's factual determinations underlying the denial of this subclaim were not objectively unreasonable. And accepting that (e)(1) applies here too, Mr. George has not overcome any presumptively correct factual findings with clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

### iii.    De Novo Analysis of Prejudice

Alternatively, and akin to *Guardado*, this Court considers whether Mr. George has proven *Strickland* prejudice de novo. Reviewing the voir dire and Rule 32 transcripts anew establishes that Mr. George "has not shown that there was a substantial likelihood" that "absent . . . trial counsel['s] . . . fail[ure] to challenge for cause or peremptorily strike [Juror D.H.]," the guilt-phase outcome would have been different or "'he'd receive a life sentence." 112 F.4th at 990.

95

Juror D.H. was part of a second panel consisting of 13 potential jurors. (Doc. 11-1 at 69–70). Juror D.H. raised her hand when the prosecutor asked whether anyone had knowledge about the case from the radio or television. (Doc. 11-1 at 78). In a follow-up question, the prosecutor asked Juror D.H. and other members of the venire to let him know if they could not "render a fair and impartial verdict," despite what they had "heard," "read," or "seen" before the trial. (Doc. 11-1 at 78). Juror D.H. did not express a concern that seeing Mr. George's on television pretrial would compromise her ability to be fair and impartial in the trial. (Doc. 11-1 at 78–79).

Later, the prosecutor asked the panel members if they had reasons which would prevent them from sitting on the jury as "a fair and impartial juror" and setting aside "whatever [their] personal feelings may be" about the case. (Doc. 11-2 at 3). Again, Juror D.H. did not respond with doubts about serving impartially on the jury. (Doc. 11-2 at 3–4).

When trial counsel questioned the venire members whether they knew Ms. George or her daughter, Snobia George, Juror D.H. raised her hand. (Doc. 11-2 at 7). After naming other witnesses, trial counsel asked those responding members if they could "just base [their] verdict on the law and the evidence," despite "know[ing] these people[?]" (Doc. 11-2 at 9). Trial counsel followed up, "Is there anybody that couldn't do that?" (Doc. 11-2 at 9). Juror D.H. did not raise her hand or otherwise

indicate that her connections to Ms. George and Snobia would cause her to be biased against Mr. George. (Doc. 11-2 at 9–10).

Later, trial counsel asked the jury panel, "Do any of you think just because Mr. George is sitting in this [c]ourtroom that he's got to be guilty of something or he wouldn't be here?" (Doc. 11-2 at 15). Trial counsel continued, "Do y'all believe in innocence until proven guilty beyond a reasonable doubt and to a moral certainty?" and "Do you all believe in that theory of law?" (Doc. 11-2 at 15). The transcript reflects that "(ALL JURORS ANSWER[ED] AFFIRMATIVELY)." (Doc. 11-2 at 15).

Trial counsel ended with questions about whether the panel members had "already formed an opinion as to the guilt or innocence of Mr. George?" and whether anyone "wouldn't consider life without parole" "in the event Mr. George [wa]s found guilty?" (Doc. 11-2 at 15–16). No members responded that they had "already made up [their] mind[s]" on the issue of Mr. George's guilt or that they "could not vote for life without parole." (Doc. 11-2 at 15–16).

Juror D.H. was not subject to individualized voir dire, which did occur in *Guardado*. 112 F.4th at 994. Still, Juror D.H. had several opportunities during panel questioning to reveal concerns about her ability to be fair and impartial, which she never did.

Similarly, Juror D.H.'s Rule 32 testimony does not prove *Strickland* prejudice on this subclaim. (Doc. 11-20 at 50–57). Although Juror D.H. testified that she did not expect to serve on the jury, her explanation behind that belief—and whether her answer would have revealed a concern about her fairness—are not part of the record. (Doc. 11-20 at 54). Juror D.H. stated that she knew Ms. George from church and had attended the "very sad" funeral of the murder victims even though she did not know them. (Doc. 11-20 at 54). Juror D.H. confirmed that she had seen Mr. George on *America's Most Wanted* and *Unsolved Mysteries* before trial and knew "they w[ere] looking for him." (Doc. 11-20 at 54–55).

But this testimony—against the backdrop of Juror D.H.'s unequivocal responses in voir dire—does not prove that she could not keep an open mind and deliberate fairly. Unlike the challenged juror in *Miller* above, Juror D.H. did not qualify her ability to be impartial with a statement that she "had some feelings for" or was close to Ms. George. *Miller*, 385 F.3d at 375; (Doc. 11-20 at 50–57). At best, the information which Juror D.H. provided on collateral review establishes a possibility, but not a reasonable probability, of a more favorable guilt- or sentencing-phase outcome without her on the jury. And the possibility of a different result is insufficient to prove prejudice. *Frady*, 456 U.S. at 170. Accordingly, Mr. George "has not met his burden to show that Juror[ D.H.] could not be fair or that trial counsel's acceptance of [her] as [a] juror[] otherwise prejudiced the result of the [guilt or]

98

penalty phase." *Guardado*, 112 F.4th at 995; *cf. also Purvis*, 451 F.3d at 743 ("prevail[ing] on . . . [*Strickland*] claim stemming from . . . trial counsel['s] [failure] to . . . object[] to the closing of the courtroom . . . [requires] show[ing] a reasonable probability of a different result in the trial if counsel had objected").-

### b.   Failure to Investigate and Pursue a Mental Health Defense

In Subclaim VI.B, Mr. George contends that trial counsel failed unreasonably to investigate and pursue a mental health defense. (Doc. 52 at 78). Related to this subclaim are trial counsel's failures to investigate Mr. George's behavior and background adequately and "request an independent mental health expert." *Id.* (emphasis omitted). Warden Raybon answers that AEDPA deference on the deficient performance prong precludes habeas relief on this subclaim and subparts. (Doc. 22 at 44–49 ¶¶ 85–87). Warden Raybon argues also that Mr. George has not proven prejudice de novo on one issue. (Doc. 23 at 48).

### i.   State Court Proceedings

The Rule 32 court considered the parts of this subclaim separately in its order. (Doc. 11-11 at 24–30). On the inadequate investigation of his behavior and background, the postconviction court found that Mr. George had "failed to prove" his allegations. (Doc. 11-11 at 24). The court supported that finding with testimony from the evidentiary hearing, including separate accounts from witnesses that Mr. George

"was a 'plain [and] normal guy,'" "'just fine,'" "normal," and "like himself" in the weeks and on the day before the incident. (*Id.* at 24–25). The court noted other witnesses who described Mr. George as an "average child" with parents who "had normal disagreements" and "a good student [who] played football." (*Id.*).

On the mental health defense, the court found that Mr. George had not proven his allegations at the evidentiary hearing. (*Id.* at 27–29). This included Mr. George's assertions that he "'had been hearing voices several weeks before the crime'" and that "his nephew had seen [him] 'sobbing in his car for hours on the day of' . . . and acting in an agitated and distraught manner for several weeks before'" the crimes. (*Id.* at 27).

In this section of the order, the court discussed the opinions of Mr. George's postconviction expert, "Dr. Byron Hudson, a clinical neuro-psychologist," who "administered tests to," interviewed, and studied "school, military, and other records" on Mr. George. (*Id.* at 27–28). Dr. Hudson "diagnosed [Mr.] George with [s]chizotypal [d]isorder." (*Id.* at 28). Additionally, Dr. Hudson testified that "factors conducive to a psychotic break were present [in Mr. George] around the time of the murders" and, if a break had occurred, he "could have had a breach in reality." (*Id.*).

The court summarized the competing information from Dr. Glen King, the state's "expert in clinical and forensic psychology." *Id.* After reviewing information from test results and "other data sources" and "conduct[ing] a clinical interview," Dr.

King disagreed with Dr. Hudson that Mr. George "m[et] the criteria for . . . [s]chizotypal [d]isorder." *Id.* Additionally, the court found that "Dr. King . . . [had] concluded that [Mr.] George was able to understand the nature and wrongfulness of his actions at the time of the murders." *Id.*

The court permitted Dr. Hudson to rebut Dr. King's opinions. *Id.* In that rebuttal deposition, Dr. Hudson challenged "the reliability and accuracy of Dr. King's conclusions and . . . qualifications to render those opinions." *Id.* The court noted that during cross examination, "Dr. Hudson indicated that [Mr.] George knew that shooting the victims was wrong." *Id.*

A third expert which the court mentioned was Dr. Ronan of Taylor Hardin. *Id.* Dr. Ronan evaluated Mr. George's mental status and prepared a report. *Id.* One of Dr. Ronan's documented findings was "no evidence that [Mr.] George was psychotic . . . or that he suffered from any major mental health illness that would have interfered with his ability to understand right from wrong" when the offenses occurred. *Id.*

Additionally, the court referenced trial counsel's testimony of "no recollection of [Mr.] George ever complaining about hearing voices" and that Mr. George "never displayed any behavior or psychotic symptoms" or explained his "sho[oting] [of] the victims because voices told him to murder his wife." (*Id.*). Overall, the court found that Dr. Hudson's testimony "d[id] not prove that [trial counsel] were ineffective during the guilt phase." (*Id.* at 29).

101

Regarding the last guilt-phase subpart, the court found that Mr. George had "failed to prove [that trial counsel's] performance was deficient . . . because they did not request funds . . . [for an] evaluat[ion] by another mental health expert." (*Id.* at 30). Quoting *Holladay*, 209 F.3d at 1250, the court observed that "counsel is not required to seek an independent evaluation when the defendant does not display strong evidence of mental problems." (Doc. 11-11 at 29) (internal quotation marks omitted).

Factually, the court noted that none of the Rule 32 witnesses "had any indication that [Mr. George] was suffering from a mental illness." (*Id.* at 29). Regarding the lay witnesses, the court pointed to the "repeated testimony that [Mr. George] appeared and acted normal" in the weeks and the day before the incident. (*Id.*). While maybe not a "storybook perfect" childhood, the court characterized Mr. George's early life as comparable to that of "other boys in similar socio-economic and geographic positions." (*Id.*). Additionally, the court referenced the absence of information in Dr. Ronan's report "indicating that additional psychological testing and/or investigation would have produced any beneficial information for the guilt phase." (*Id.*).

The ACCA affirmed the Rule 32 court's guilt-phase decision. Regarding Mr. George's allegations about an inadequate investigation into his "'odd behaviors and escalating conflict with his wife,'" the ACCA noted the court's "f[inding] that

102

counsel's investigation was reasonable." *Id.* at 1035. The ACCA reviewed the Rule 32 testimony from lay witnesses and trial counsel extensively. *Id.* at 1035–37.

After discussing several *Strickland* principles governing counsel's duty to investigate, the ACCA summarized what counsel did "in preparing to defend [Mr.] George on capital-murder and attempted-murder charges." *Id.* at 1038. This included "speaking with [Mr.] George and his family, touring the crime scene, [interviewing] witnesses, and requesting psychological and psychiatric evaluations." *Id.* The ACCA rejected Mr. George's contention that "his behavior in the weeks leading up to the crime suggested a mental illness that warranted a more extensive investigation than the investigation conducted by trial counsel." *Id.* As factual support, the ACCA mentioned the lay-witness descriptions of Mr. George as "'normal'" and "'average'" and trial counsel's "observ[ation] [of] no behaviors . . . that would call into question [Mr. George's] mental health." *Id.*

The ACCA noted too that one trial attorney had "requested further psychiatric evaluation" of Mr. George "to prepare for the penalty phase of trial, given the damning evidence of guilt." *Id.* The ACCA concluded that "the circuit court did not abuse its discretion in denying relief" because of an ineffective background investigation. *Id.* at 1038–39.

In addressing Mr. George's mental health defense allegations, the ACCA restated the circuit court's analysis and concluded that the record supported "[t]hose

findings." *George Collateral*, 333 So. 3d at 1039. The ACCA discussed the expert testimony and added some directly quoted mental health information. This included Dr. Hudson's opinion—in response to a question—that Mr. George "'had all the makings for a psychotic break'" at the time of the murders and "'[i]f [he] had a psychotic break, by nature [he had] breached reality.'" *Id.* at 1040.

In the *Strickland* analysis, the ACCA referenced Eleventh Circuity authority. *George Collateral*, 333 So. 3d at 1041. Among several principles, the ACCA observed that "the mere fact a defendant can find, years after the fact, a[n] . . . expert who will testify favorably for him does not demonstrate that trial counsel was ineffective for failing to produce that expert at trial." *Id.* (cleaned up).

The ACCA explained that "[t]he evidence presented at the Rule 32 hearing indicated that trial counsel did not believe that insanity was a viable defense." *Id.* This evidence included trial counsel's "interaction with [Mr.] George" and the results of Dr. Ronan's psychiatric evaluation. *Id.* The ACCA pointed to trial counsel's testimony including the need for an additional expert to evaluate Mr. George "only . . . to prepare for the penalty phase . . . and to ascertain any nonstatutory mitigating evidence." *Id.* The ACCA referenced too counsel's conclusion that consulting with other experts on the guilt phase was "unnecessary" given their "interaction with [Mr.] George and Dr. Ronan's evaluation." *Id.*

104

The ACCA continued that Dr. Hudson's testimony did not support Mr. George's "assertion that trial counsel was ineffective for not presenting an insanity defense," despite the diagnoses of "a schizotypal personality disorder and static encephalopathy"[—]a mild cognitive disorder. *Id.* at 1039, 1041; (Doc. 11-19 at 144–45). As support, the ACCA observed that Dr. Hudson "did not testify that [Mr.] George suffered a break from reality when he committed the crimes." *George Collateral*, 333 So. 3d at 1041. Rather, this Court's review of the record from the Rule 32 hearing revealed Dr. Hudson's opinion that Mr. George had factors "that would be *conducive* to him having a psychotic break [and that] *if* he had a psychotic break, by nature [he] breached reality." (Doc. 11-21 at 79–80) (emphasis added). Additionally, the ACCA pointed to Dr. Hudson's testimony in the rebuttal deposition that "[Mr.] George knew that shooting the victims was wrong." *Id.* Overall, the ACCA "agree[d] with the circuit court that Dr. Hudson's testimony d[id] not prove that [the] decision to not pursue an insanity defense . . . constituted deficient performance." *Id.*

On the independent expert issue, the ACCA restated the circuit court's analysis and concluded that the findings "[we]re supported by the record on direct appeal and . . . the evidence presented at the Rule 32 hearing." *Id.* at 1042. This included counsel's conclusion that an insanity defense would not be viable "after meeting with [Mr.] George on several occasions, speaking with some of [Mr.] George's family

105

members, and reviewing Dr. Ronan's forensic evaluation." *Id.* Additionally, counsel's personal observations of Mr. George's behavior did not cause them "to question [his] mental-health status." *Id.*

After citing several *Strickland* authorities, the ACCA concluded that "trial counsel had no reason to pursue additional expert opinions regarding [Mr.] George's mental health based on [their] initial investigation, their interaction with [him], and the results of Dr. Ronan's forensic evaluation." *Id.* at 1043. The ACCA added that "[t]he mere fact that [Mr.] George found a psychiatric expert who gave favorable testimony years after the fact did not render trial counsel's performance in this case deficient." *Id.*

The ACCA moved next to Mr. George's challenge under *Ake v. Oklahoma*, 470 U.S. 68 (1985), that trial counsel failed unreasonably "to request the assistance of a defense expert." *George Collateral*, 333 So. 3d at 1043. Relying on *Ex parte Moody*, 684 So. 2d 114 (Ala. 1996), and other cases, the ACCA described Alabama's threshold showing on *Ake* claims:

> [To receive] expert assistance at public expense, [an indigent defendant] must show a reasonable probability that the expert would be of assistance in the defense and that the denial of expert assistance would result in a fundamentally unfair trial. To meet this standard, the indigent defendant must show, with reasonable specificity, that the expert is absolutely necessary to answer a substantial issue or question raised by the state or to support a critical element of the defense. If the indigent defendant meets this standard, then the trial court can authorize the hiring of an expert at public expense.

106

*George Collateral*, 333 So. 3d at 1044 (cleaned up).

The ACCA concluded that "the facts and evidence" in the record meant that "trial counsel could not show a reasonable probability that an additional examination by an independent mental-health expert would aid in [Mr.] George's defense and that the denial of his request for an expert would result in a fundamentally unfair trial." *Id.* The ACCA continued that, "[t]herefore, trial counsel was not ineffective for failing to request funds to hire an independent mental-health expert." *Id.*

### ii.    AEDPA Analysis

To satisfy his AEDPA burden on this *Strickland* subclaim, Mr. George refers to "five key factual findings . . . which were unreasonable in light of the evidence presented in the [s]tate court proceedings." (Doc. 28 at 64). The Court addresses these (d)(2) challenges in turn.

Mr. George argues, "[f]irst, the ACCA found [unreasonably] that counsel premised their strategy on the 'fact' that [he] had given a statement about the offense to the police." (Doc. 28 at 65). As discussed above, the circuit court and the ACCA determined that trial counsel's focus was on the penalty phase because of the "overwhelming evidence" of Mr. George's guilt. (Doc. 11-11 at 27); *see George Collateral*, 333 So. 3d at 1038 (similar). Mr. George acknowledges that trial counsel testified about discovering that he had made a statement to the police about the crimes

at the Rule 32 hearing. (Doc. 28 at 65). But in the absence of a written confession in the record, Mr. George maintains that "[t]rial counsel's testimony was in error." (*Id.*).

One problem for Mr. George is that the absence of a written statement in the record does not mean that the ACCA's reliance on trial counsel's testimony that they learned from police about his confession was objectively unreasonable—beyond any fairminded disagreement. At the most fundamental level, the absence of evidence in the record is not the equivalent of unreasonably conflicting evidence in the record— an integral component of (d)(2). Additionally, other reasonable explanations exist for the purportedly missing statement, including that first, Mr. George's statement was an undocumented verbal one, or second, someone misplaced it, or third, someone placed it in a file that never became part of the state court record.

Mr. George's reliance on the confession argument is unconvincing for another (d)(2) reason. Specifically, other compelling evidence of Mr. George's guilt supported the state court determination that trial counsel's penalty-phase strategy was reasonable. This included:  (1) Ms. George's eyewitness testimony of the murders and as a victim; (2) Mr. George's daughter's testimony that she witnessed her father "exit[ing] the apartment with a gun after she heard shots;" and (3) Mr. George's post-incident flight and avoidance of law enforcement "for over 6 years." (Doc. 11-11 at 27). To succeed under (d)(2) when a court uses multiple pieces of evidence to support a factual determination, a petitioner must demonstrate an unreasonable conflict with

108

each item—not just one. Therefore, because other evidence of guilt in the record supports the determination that counsel's pursuit of penalty-phase strategy was reasonable, Mr. George's (d)(2) attack based on his allegedly non-existent confession is unavailing.

The second fact that Mr. George challenges as unreasonable is the ACCA's reliance on trial counsel's testimony that "nothing led them to believe that Mr. George had mental problems and that [he] did not report hearing voices." (Doc. 28 at 66). To establish the unreasonableness of this determination, Mr. George refers to a Taylor Hardin form with his name at the top and Mr. Fannin's business card attached. (Doc. 11-39 at 25). "Side 1" of the form contains the following information in support of a psychiatric evaluation: "Defendant stated to his attorneys that at the time of the alleged offense, he heard voices saying 'shoot her.'" (*Id.*). "Side 2" of the form has a place for counsel to sign but no signature appears on the document. (Doc. 11-39 at 26). The document does not disclose who provided the information about Mr. George's report of hearing voices or who completed the form. (*Id.* at 25–26). Nor has Mr. George—the party with the AEDPA burden—developed the foundation for this form. (Doc. 28 at 66). Likewise, the circumstances surrounding Mr. Fannin's business card attached to the form are uncertain.

With these many contextual unknowns and without an attorney's verification, the unreliable contents on the form and the ambiguous meaning of the attached card

do not demonstrate that the ACCA relied unreasonably on trial counsel's Rule 32 testimony on strategy. Additionally, the gist of counsel's testimony was that Mr. George had never told them personally that he heard voices or that hearing voices led to the murders. That factual testimony is distinct from what Mr. George may have told someone else who then filled out the form or shared that information with Taylor Hardin personnel to complete the form. Stated differently, the Rule 32 testimony and the form support two facts that are not objectively unreasonable. First, Mr. George reported to someone—perhaps the therapist from Cheaha Mental Health Center who evaluated him as part of counsel's initial investigation—that he (Mr. George) had told counsel about the voices. (Doc. 23 at 48; Doc. 11-39 at 16). Second, Mr. George never reported hearing voices to counsel directly consistent with the Rule 32 testimony. Consequently, the ACCA did not base its *Strickland* decision on an unreasonable factual determination that trial counsel were unaware of Mr. George's claim of hearing voices.

Alternatively, accepting that trial counsel were aware of the contents of the Taylor Hardin form, other evidence in the record supports the finding that trial counsel did not believe that Mr. George's mental health—as a guilt-phase defense— reasonably required additional investigation. Specifically, Dr. Ronan's report did not raise any red flags about Mr. George's mental health—to a degree that he was incapable of appreciating right from wrong or the reality of his actions. Accordingly,

the ACCA's reliance on the determination that trial counsel believed reasonably that Mr. George's mental health was not a viable guilt-phase issue was not unreasonable given Dr. Ronan's report.

To discredit the ACCA's reliance on this second fact, Mr. George relies also on a "PROFILE" document describing his personal life. (Doc. 11-45 at 20). Counsel acknowledged at the Rule 32 hearing that this document was one he would have reviewed. (Doc. 11-20 at 74–75). The document describes difficulties that Mr. George has encountered in his life, his reputation as a "loner" and "introvert," and his interest in "voodooism and ritualistic acts." (Doc. 11-45 at 20) (capitalization omitted). But there are no references to Mr. George's hearing voices, experiencing psychotic breaks, or dealing with major mental health issues. (*Id.* at 20–23). Consequently, this evidence does not establish that the ACCA based its decision unreasonably on trial counsel's testimony that in interacting with Mr. George he did not do or say anything that caused concerns about his mental health.

Mr. George's third factual challenge pertains to the ACCA's determination that trial counsel's investigation was adequate. (Doc. 28 at 67). Here, Mr. George faults the ACCA for omitting that "discovery was not even collected until Mr. Fannin['s]" appointment as penalty-phase counsel and finding that counsel "spoke with some of [his] family members before trial." (Doc. 28 at 66–67) (internal quotation marks omitted). According to Mr. George, the second part is unreasonable because "[t]he

111

record shows that [counsel] . . . did not interview any family members until they traveled to Alabama for the trial." (*Id.* at 67) (internal quotation marks omitted).

As mentioned earlier, overcoming AEDPA deference under (d)(2) requires record evidence that a state court relied on an unreasonable factual determination in denying a constitutional claim. *See* 28 U.S.C. § 2254(d)(2) (providing that the decision "was based on an unreasonable determination of the facts in light of the evidence presented" in state court). As detailed below, missing from Mr. George's argument is a conflicted fact that was consequential to the state court's reasoning.

Here, Mr. George alleges that trial counsel failed unreasonably to investigate and pursue a mental health defense. In denying this guilt-phase subclaim, the ACCA relied on witness testimony which failed to substantiate that counsel should have investigated a potential mental health defense to the murders. Thus, the timing of when the appointments of counsel or the witness interviews took place—several weeks before or the week of trial—was unessential to the state court reasoning. And without that "based on" connection that (d)(2) requires, Mr. George has not overcome AEDPA deference with this factual contention. 28 U.S.C. § 2254(d)(2).

Mr. George's fourth factual challenge has the same (d)(2) deficiency as the third. Specifically, Mr. George maintains that the ACCA misconstrued unreasonably the meaning of Dr. Hudson's expert testimony on what Mr. George realized later about the wrongness of his conduct. (Doc. 28 at 67). But that fact—reasonably or

unreasonably determined—is inconsequential to whether the ACCA based its deficient performance decision on unreasonable facts. Instead, the facts that mattered in the ACCA's analysis of that prong were the absence of pretrial clues that would have placed counsel on notice that Mr. George could have developed a viable mental health defense to the crimes. Consequently, Mr. George does not overcome AEDPA deference based on the ACCA's allegedly unreasonable factual determination tied to the timing of Mr. George's awareness of his murderous actions.

In the fifth section, Mr. George maintains that "the ACCA's analysis of [his] [expert] claim is based on a false premise—that he is arguing that trial counsel failed to secure *another* mental health expert." (Doc. 28 at 68) (internal quotation marks omitted). Mr. George argues that, instead, the ACCA should have framed the issue as "*the* mental health expert to which [he] was entitled under *Ake*." (*Id.*). According to Mr. George, the state court decision was "unreasonable" because the ACCA "ignore[d] . . . [his] claim and controlling Supreme Court precedent." (Doc. 28 at 69). But, as discussed above, the ACCA did address Mr. George's alleged *Ake* violation underlying ineffective assistance in its opinion. *George Collateral*, 333 So. 3d at 1043–44 ("Given the facts and evidence in this case, trial counsel could not show a reasonable probability that an additional examination by an independent mental-health expert would aid in George's defense and that the denial of his request for an

expert would result in a fundamentally unfair trial."). Consequently, Mr. George's last position is contrary to the contents of the record and unpersuasive.

In sum, Mr. George has not overcome AEDPA deference with respect to the ACCA's merits-based decision on *Strickland*'s first prong. Specifically, Mr. George has not shown that the ACCA relied on an unreasonable factual determination in rejecting his contention that counsel performed deficiently in failing to investigate his background, pursue a mental health defense, and retain an independent expert. And factoring in (e)(1), if applicable as well, Mr. George has not overcome any presumptively correct factual findings with clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

The ACCA did not reach the issue of *Strickland* prejudice in its appellate review of Mr. George's collateral allegations. Nor does Warden Raybon argue that the look-through presumption should apply on habeas review. Although Warden Raybon mentions *Strickland* prejudice in briefing this subclaim, he limits the argument to counsel's failure to raise an insanity as opposed to a psychotic-break or other non-insanity mental health defense. (Doc. 23 at 48). Under these circumstances, the Court does not reach the de novo question on this guilt-phase subclaim—whether Dr. Hudson's testimony that Mr. George had the markers to support a "breach in reality" during the offenses is sufficient to undermine confidence in the jury's guilty verdict. (Doc. 11-11 at 28).

114

### 3.    Penalty Phase

#### a.    Failure to Investigate and Present Personal Background and Mental Health Mitigation

In Subclaim VI.B, Mr. George contends that his personal background and mental health evidence argued on Rule 32 review establish that trial counsel investigated and presented his mitigation case inadequately. (Doc. 52 at 78). Related to this subclaim is Mr. George's position that trial counsel should have retained an independent expert to present mitigating mental health information in the penalty phase. (*Id.*). The mitigating areas of evidence which Mr. George maintains that trial counsel failed to investigate and present effectively are his experiences with extreme poverty, domestic violence, physical abuse, mental health issues, visual and auditory hallucinations, and paranoia. (Doc. 52 at 100–01).

#### i.    State Court Proceedings

The circuit court denied relief on Mr. George's mitigation subclaim, doc. 11-11 at 31–40, and the ACCA affirmed, *George Collateral*, 333 So. 3d at 1056. For its part, the Rule 32 court started with *Strickland*'s framework for evaluating mitigation, including the need to consider cognizable errors cumulatively, doc. 11 at 31–32; divided the subclaim into six sections, *id.* at 32–39; and concluded that Mr. George "ha[d] failed to meet his burden of proof regarding the[] claims," *id.* at 40. The mitigating subcategories which the court analyzed were Mr. George's (1) personal

115

history; (2) exposure to domestic violence and alcoholism; (3) childhood poverty, neglect, and mental health symptoms; (4) high school, employment, and family life experiences; (5) interactions with witnesses closely before committing the crimes; and (6) need for an independent psychological evaluation. (Doc. 11-11 at 32, 34, 37–39).

In the last-reasoned decision, the ACCA revisited the Rule 32 evidence (largely discussed in the guilt-phase section) and considered the mitigation trial counsel presented in the penalty phase. *George Collateral*, 333 So. 3d at 1049–53. Importantly, Mr. George's allegations of "a childhood riddled with poverty" and "beat[ings] [of] him and his siblings" by their parents were not part of the new mitigation picture. *Id.* at 1046.

This is because, prior to addressing the mitigation subclaim, the ACCA considered Mr. George's challenge of the circuit court's refusal to consider an affidavit from his deceased brother—Calvin George—confirming this new childhood information. *George Collateral*, 333 So. 3d at 1045; (Doc. 11-11 at 37). The circuit court had rejected that affidavit evidence because "many years had passed between the filing of the initial Rule 32 petition and the death[] of the . . . witness[,] . . . the [s]tate had not been given the opportunity to cross-examine the witness[], and . . . the affidavit[] indicate[d] that the testimony would be cumulative to other [anticipated] testimony." *George Collateral*, 333 So. 3d at 1047.

116

According to Mr. George, the court's exclusion of that mitigating evidence on Rule 32 review "denied [him] due process and a full and fair hearing." *Id.* at 1045 (internal quotation marks omitted). Referencing Eleventh Circuit and Supreme Court authority, the ACCA disagreed and explained that Mr. George's "liberty interest [wa]s more limited" and the state's procedures "more flexib[le]" on postconviction than pre-conviction review. *Id.* at 1048 (internal quotation marks omitted). The ACCA concluded that the evidentiary exclusion on collateral review "did not render [Mr. George's] . . . hearing unfair or violate his due process rights." *Id.*

Returning to the mitigation subclaim, the ACCA examined the circuit court's lay witness findings based on the Rule 32 evidentiary hearing:

> Regarding [Mr.] George's allegations that trial counsel failed to adequately investigate [his] character and mental health, the circuit court noted that "family and friends who testified at the evidentiary hearing portrayed a normal childhood" and that two of [his] sisters who testified at trial gave no indication that [he] had anything other than a normal childhood and that he has shown no signs of mental illness.

*Id.* at 1052–53.

Additionally, the ACCA considered the circuit court's deficient performance and prejudice findings:

> During the penalty phase, Mr. Giddens and Judge Fannin called two of [Mr.] George's sisters to testify about his personal character and the fact he did not have any criminal history. Mr. Giddens and Judge Fannin also called Dr. Ronan to testify relative to [Mr.] George's state of mind at the time of the offense. Dr. Ronan testified that [Mr.] George suffered from a mixed personality disorder. Dr. Ronan also testified that [Mr.] George

117

had a history of unstable relationships and that at times of extreme stress he could lapse into 'disorganized' thoughts.

Under the facts of the case, this [c]ourt finds that Mr. Giddens' and Judge Fannin's penalty phase strategy was reasonable. Additional testimony regarding [Mr.] George's background and testimony from another mental health professional does not establish that Mr. Giddens and Judge Fannin were ineffective.

Moreover, this [c]ourt notes that [Mr.] George was 32 years old at the time of the offense. [Mr.] George served almost 10 years active duty in the U.S. Army and was still in the Army Reserves at the time of the offenses. [Mr.] George was married to Geraldine George and had fathered two children. Under the facts of this case, this [c]ourt is confident that, even if there was testimony [Mr.] George had witnessed or been subjected to domestic abuse some years before he murdered the victims, there is no reasonable probability the outcome of the penalty phase would have been different.

*Id.* at 1053 (internal quotation marks omitted) (citations omitted).

The ACCA summarized the circuit court's findings on the independent expert

subpart:

Trial counsel called Dr. Ronan at the penalty phase of the trial regarding [Mr. George's] capacity to appreciate the criminality of his conduct and w[h]ether it was substantially impaired. She concluded that Mr. George: suffered from a personality disorder; had a history of being unstable, especially in personal relationships; had paranoid features and was 'mistrustful' of others; that he reported things that could suggest schizotypal features and when under great stress could exhibit disorganized thought and may have 'perceptual aberrations' (hearing voices). However, she also stated that there was no evidence that [Mr. George] was psychotic at the time of the offense or that he suffered from a major mental illness.

At the evidentiary hearing, Dr. Hudson testified similarly, concluding that [Mr. George] had a personality disorder and an occasional quasi-

psychotic disorder. Dr. Hudson also testified that there was no evidence of him hearing things. However, he goes on to testify that Mr. George had a psychotic break. After the evidentiary hearing a deposition was taken of the [s]tate's witness, Dr. Glen King, a clinical and forensic psychologist. He concluded that [Mr. George] understood the nature and the quality of his actions and does not suffer from a serious mental illness.

Then a deposition was taken of Dr. Hudson after he reviewed Dr. King's deposition. He claimed that Dr. King did not do a thorough investigation, but he also concluded that [Mr. George] knew his act was wrong.

*Id.* at 1053–54 (some alterations added or modified) (internal quotation marks omitted) (citations omitted).

As legal background, the ACCA reviewed several principles applicable to claims of ineffective assistance on mitigation and expert issues. *George Collateral*, 333 So. 3d at 1054–56. Part of this discussion drew a distinction between a nonexistent versus an inadequate mitigation investigation. *Id.* 1054–55. Additionally, the ACCA observed that *Strickland* does not require trial counsel "to shop around for additional experts." *George Collateral*, 333 So. 3d at 1054 (internal quotation marks omitted).

Turning to the application of *Strickland*, the ACCA remarked preliminarily that Mr. George's mitigation claim was not one in which "trial counsel conducted no investigation or where [they] had information concerning [his] childhood that would warrant a more thorough investigation." *George Collateral*, 333 So. 3d at 1056. Instead, the ACCA noted that counsel "spoke to [Mr.] George" and several witnesses,

119

including family members, and did not discover indicators of "any mental-health issues." *Id.* Additionally, the ACCA pointed to trial counsel's review of "[Dr. Ronan's] psychiatric evaluation[,] . . . . [and her] conclu[sion] that [Mr.] George did not present any signs or symptoms of a major psychiatric disorder." *Id.*

Focusing on Mr. George's "character" information, the ACCA expressed that no "substantial[] deviat[ion]" existed between the old mitigation and the new Rule 32 evidence. *Id.* To illustrate, the ACCA compared Mr. George's two sisters' penalty-phase testimony that he "was a normal, well-behaved child" to several Rule 32 witnesses who testified that he was a "normal" child and adult. *Id.* Overall, the ACCA concluded that the record supported "the circuit court's finding that [Mr.] George did not prove . . . that trial counsel [had] failed to adequately prepare and present mitigation evidence." *Id.* Accordingly, "the circuit court [had] properly denied this claim of ineffective assistance of counsel." *Id.*

## ii.    AEDPA Analysis

Initially, the Court clarifies the scope of new mitigating evidence that Mr. George relies upon appropriately on habeas review. Specifically, Mr. George cannot support this *Strickland* subclaim with his deceased brother's affidavit evidence of childhood poverty and regular abuse. Instead, the scope of the new mitigating information on habeas review should reflect the same evidence considered on state collateral review. Although Mr. George requested that the Rule 32 court consider this

affidavit testimony as mitigation, the circuit court denied the motion and the ACCA affirmed. Additionally, Mr. George has not pursued a habeas claim challenging the constitutional unreasonableness of that state court ruling. Consequently, that mitigating but excluded Rule 32 childhood evidence does not factor into this Court's habeas analysis.

On habeas review, Mr. George mixes together his penalty-phase and guilt-phase arguments. (*See, e.g.*, doc. 52 at 99) ("Indeed, that same defense expert could have been used to support a life sentence."); (Doc. 28 at 61). Under this approach, Mr. George references the same "key" (d)(2) contentions discussed above to establish AEDPA error in the ACCA's analysis of trial counsel's deficient mitigation investigation and presentation. (Doc. 28 at 64).

Mr. George's reliance on these (d)(2) examples to overcome AEDPA deference on penalty-phase deficient performance fails for the same reasons explained in the *Strickland* guilt-phase section. Specifically, Mr. George has not shown that the factual foundation for the ACCA's rejection of his deficient performance showing on mitigation overlaps with those facts he flags as unreasonable. Nor has Mr. George overcome (e)(1)'s factual presumption of correctness with clear and convincing evidence.

Turning to prejudice, Mr. George maintains that the ACCA did not discuss that *Strickland* component in reviewing his mitigation subclaim. (Doc. 28 at 71). Under

that impression, Mr. George argues that this Court should review the prejudice prong de novo. (*Id.*). But because Mr. George has not satisfied his first-prong burden under AEDPA, this Court has no obligation to continue with the habeas analysis. Consequently, the Court does not decide de novo whether Dr. Hudson's testimony that Mr. George had the markers to support a "breach in reality" during the offenses is sufficient to undermine confidence in the jury's minimal support for the recommended punishment of death. (Doc. 11-11 at 28); c*f. Wiggins*, 539 U.S. at 537 ("Had the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance.").

Alternatively, the Court concludes that Mr. George cannot demonstrate prejudice due to a combination of AEDPA deference and a first-prong failure on his mental health allegations. AEDPA deference is a factor because, contrary to Mr. George's position, the ACCA determined directly that Mr. George lacked cognizable prejudice with respect to his new character evidence. *See George Collateral*, 333 So. 3d at 1056 ("This case does not present a situation where George's trial counsel conducted no investigation or where George's counsel had information concerning George's childhood that would warrant a more thorough investigation."). Additionally, in relying on the circuit court's analysis of Mr. George's admitted domestic violence evidence, the ACCA rejected the prejudice component of that new

information. *Id.* at 1053, 1059. Consequently, AEDPA deference insulates those aspects of the ACCA's mitigation decision. The Court dives deeper into the alternative AEDPA question of *Strickland* prejudice below.

Generally, the question for this Court to resolve when AEDPA deference applies to *Strickland*'s second prong is "whether [the] state court has unreasonably determined that prejudice is lacking." *Pinholster*, 563 U.S. at 202 (emphasis omitted). To prevail on his mitigation subclaim under AEDPA, Mr. George's combined mitigating information—upon rebalancing with the (in his case) unadjusted aggravating evidence—would need to create a reasonable probability of a different sentencing outcome that is devoid of uncertainty—beyond reasonable debate.

On the character evidence, Mr. George makes no effort to satisfy that strenuous burden. Instead, the ACCA's second-prong Rule 32 assessment that the new character evidence did not deviate substantially from the penalty-phase record was not objectively wrong.

As for the admitted evidence of domestic violence, a childhood friend—Eddie Jones—testified at the Rule 32 hearing that Mr. George's "mom and dad used to fight." (Doc. 11-20 at 141, 143; Doc. 11-11 at 24). When counsel asked, "Was there anything towards the children?", Mr. Jones responded, "Yes, sir. Well, back then, all of us got -- we always got beat." (Doc. 11-20 at 143; Doc. 11-11 at 24). Mr. Jones

confirmed that he witnessed Mr. George's beatings, more than once, and saw his bruises. (Doc. 11-20 at 143).

The Rule 32 court found that Mr. Jones's testimony about Mr. George's parents' fighting presented "nothing unusual." (Doc. 11-11 at 24). Likewise, the court discounted the mitigating weight of Mr. George's violent childhood due to the passage of time and his experiences as an adult. (Doc. 11-11 at 36). Here, the court observed that Mr. George was a 32-year-old husband and father when the murders occurred. (*Compare* doc. 11 at 12, *with* doc. 11-39 at 25). Additionally, the court noted that Mr. George had served actively in the United States Army for nearly ten years and was a reservist "at the time of the offenses." (Doc. 11-11 at 36).

Mr. George does not challenge these findings underlying the Rule 32 court's judgment on *Strickland* prejudice. And because "several decades" had elapsed between Mr. George's exposure to domestic violence and the offenses, any mitigating value attributable to experiencing an abusive childhood "is minimal." *Callahan v. Campbell*, 427 F.3d 897, 937 (11th Cir. 2005). Accordingly, reasonable minds could disagree about the correctness of the circuit court's finding—as the ACCA restated in its opinion—that Mr. George had not shown prejudice based on the admitted abuse evidence. *George Collateral*, 333 So. 3d at 1053.

Additionally, in another section of its opinion, the ACCA observed that "the circuit court . . . was not presented with overwhelming evidence that [Mr.] George

124

had witnessed or had been subjected to domestic violence during his childhood." *Id.*

at 1059. "Instead, the circuit court heard testimony from . . . [Mr.] Jones . . . that [Mr.]

George had been beaten as a child" and, in contrast, from a half-sister that "[Mr.]

George's father never got physical with the children." *Id.* The ACCA explained that

"[t]he circuit court [had] considered this evidence, in addition to . . . [Mr.] George's

age at the time of the murders, his length of military service, and other facts . . . in

concluding that [the] exposure . . . to domestic violence years before the murders

occurred would not have changed the outcome during the penalty phase." *Id.* The

ACCA determined that the Rule 32 court's "conclusion" that Mr. George's abuse

evidence failed to satisfy the prejudice prong "d[id] not run afoul" of Supreme Court

precedent, specifically *Porter v. McCollum*, 558 U.S. 30 (2009) (per curiam). *George

Collateral*, 333 So. 3d at 1059. Thus, this Court examines *Porter*.

    In *Porter*, childhood abuse was part of the petitioner's new mitigation picture.

558 U.S. at 33. According to the petitioner's siblings' deposition testimony, their

"father was violent every weekend." *Id.* The petitioner "routinely witnessed [their]

father beat [their] mother, one time so severely that she had to go to the hospital and

lost a child." *Id.* Additionally, the petitioner "was [their] father's favorite target,

particularly when [he] tried to protect [their] mother" from abuse." *Id.* "On one

occasion, [their] father shot at [the petitioner] for coming home late, but missed and

[resorted to] just beat[ing] [him] instead." *Id.*

125

The trial court "discounted the evidence of [the petitioner]'s abusive childhood because he was 54 years old at the time of the trial." *Id.* at 37. The state appellate court affirmed. *Id.* Disagreeing under AEDPA, the Supreme Court concluded that the state courts "unreasonabl[y] discount[ed] to irrelevance the evidence of [the petitioner]'s abusive childhood, especially when that kind of history may have [had] particular salience for a jury evaluating [his] behavior in [the] relationship with [his former girlfriend and victim]." *Id.* at 43.

But, in sharp contrast with Mr. George's mitigation claim, that was not the only unreasonable application of *Strickland* prejudice in *Porter*. Instead, the *Porter* Court pointed to similar unreasonable discounting of the petitioner's "brain abnormality and cognitive deficits" and "heroic military service" in the Korean War. *Id.* at 41–43. Also, the state appellate court erred objectively in evaluating prejudice under a "more likely than not" standard, rather than the applicable reasonable probability test. *Id.* at 44. Finally, contributing to the *Porter* Court's reasonable probability outcome was a reduced aggravating landscape. *Id.* at 41–42.

From an AEDPA standpoint, and unlike the overall rebalancing in *Porter*, the limited weight and impact of Mr. George's new background information when added to his prior mitigation picture and compared to the unreduced weight of his burglary-murder in aggravation mean that fairminded jurists could differ on the correctness of the ACCA's prejudice decision. *See Pinholster*, 563 U.S. at 202 ("Given what little

additional mitigating evidence [the prisoner] presented in state habeas, [the Supreme Court] c[ould] [not] say that the [state appellate] [c]ourt's [prejudice] determination was unreasonable."); *Callahan*, 427 F.3d at 938 (cautioning that when AEDPA deference applies, a habeas court's "role is not to determine whether . . . the state court correctly concluded [that the petitioner] was not prejudiced . . . [but, rather,] whether the state court's conclusion was unreasonable"). Thus, consistent with AEDPA's deferential framework, the Court denies habeas relief based on the character and abuse components of Mr. George's *Strickland* mitigation claim under both prongs.

Alternatively, to the extent the Court should assess cumulative prejudice de novo, habeas relief would remain inappropriate. Importantly, Mr. George has failed to establish that the new, but not substantially different, character and conflicting abuse information upon which he relies deserve more than minimal mitigating strength. Relatedly, Mr. George cites no authority in which combining the limited mitigating weight from two sources of new information creates a reasonable probability—versus a conceivable chance—that at least one juror would, in reweighing the totality of the penalty-phase evidence, vote for life over death. *Wiggins*, 539 U.S. at 537.

On the remaining mental health mitigation, neither state court applied *Strickland*'s second prong. (Doc. 11-11 at 39–40); *George Collateral*, 333 So. 3d at

127

1055. But because Mr. George has not satisfied his first-prong burden, *Strickland* does not require the inclusion of the new mental health allegations in his rebalanced sentencing picture. And akin to Mr. George's guilt-phase allegations, the Court does not assess the de novo question of prejudice on his mental health mitigation, individually or cumulatively with the (assumed) first-prong errors on the omitted character and abuse information.

### J.    Claim VII—Biased Potential Juror

Mr. George argues in Claim VII that the trial court wrongfully denied his motion to strike a potential juror for cause during venire. (Doc. 52 at 106). Warden Raybon answers that habeas relief is inappropriate "because [this claim] presents only a question of state law." (Doc. 22 at 53 ¶ 89; Doc. 23 at 69–71). Alternatively, Warden Raybon relies on AEDPA deference. (Doc. 22 at 53 ¶ 89; Doc. 23 at 72).

### 1.    State Court Proceedings

The juror bias claim arose when trial counsel was asking questions during voir dire about the state's burden of proof and whether anyone "believe[d] that [Mr. George] should prove himself innocent?" or "[Mr. George] must have done something, otherwise he wouldn't have been indicted[,] . . . charged[,] and in [c]ourt today?" (Doc. 11-1 at 63). One of the potential jurors—Juror D.— raised his hand and stated, "He wouldn't be here if he hadn't done something." (*Id.*). In a follow-up question to Juror D., counsel asked, "[I]f you believe that [Mr. George] wouldn't be

here if he hadn't done something . . . could you put that belief aside and render a verdict based strictly on the law and evidence?" (*Id.*). Juror D. responded, "What would come out of [c]ourt[?]" (*Id.*). Counsel replied with two questions, "What would come out of [c]ourt? You believe [Mr. George] must have done something or he wouldn't be here?" (*Id.* at 64). Again, Juror D. stated, "I wouldn't think so. I wouldn't think [Mr. George] would be here." (*Id.*). When counsel asked, "Is there anyone else that feels that way?" no other venire member responded. (Doc. 11-1 at 64–65). Trial counsel concluded questioning. (*Id.* at 65).

The prosecutor indicated that he had another question and limited the scope of that follow up to Juror D. (*Id.*). Before asking that question, the prosecutor commented on the state's "accept[ance]" of its burden to prove Mr. George's "guilt[] beyond a reasonable doubt and to a moral certainty." (*Id.*). The prosecutor continued, "Now regardless of any thoughts that you have that [Mr. George] must have done something or he wouldn't be here, could you put any thoughts like that aside and just render a fair and impartial verdict based strictly on what comes to you from the witness stand?" (*Id.* at 65–66). This time, Juror D. answered, "Yes, sir." (*Id.* at 66).

Trial counsel challenged Juror D. "[b]ased on the fact he said [Mr. George] wouldn't be here if he hadn't done something." (*Id.* at 68). The prosecutor countered, "That was kind of a vague and misleading question, Your Honor. When asked -- when I got back up and asked the question if he could put any thoughts like that out of his

129

mind and render a verdict based strictly on the law and evidence, he said he could." (*Id.* at 68–69). The court denied Mr. George's request to disqualify Juror D. for cause: "I heard [Juror D.'s] responses both times. I think it was cleared up the second time, so I deny the challenge at this time." (*Id.* at 69). After the unsuccessful removal for cause, Mr. George struck Juror D. peremptorily. (Doc. 11-6 at 44).

Mr. George raised this claim on direct appeal primarily as an issue of Alabama law. (Doc. 11-6 at 43, 45–47). In his brief, Mr. George cited two Supreme Court decisions—*Estelle v. Williams*, 425 U.S. 501 (1976), and *Murray v. Florida*, 421 U.S. 794 (1975)—without developing why either opinion supported a federal constitutional claim based on potential bias of a prospective juror. (Doc. 11-6 at 45–46).

The ACCA affirmed the trial court's denial of Mr. George's request to disqualify Juror D. and provided the last-reasoned decision on the subject. Referencing Alabama Code § 12–16–150(7)—the cause provision—and state decisions, the ACCA clarified that disqualification under Alabama law requires "more than a bias, or fixed opinion, as to the guilt or innocence of the accused." *George Direct I*, 717 So. 2d at 834 (cleaned up). Instead, the "opinion must be so fixed as that it would bias the verdict [the] juror would be required to render." *Id.* (cleaned up). Additionally, the ACCA recognized that "a trial judge's refusal to grant a motion to strike for cause is not error," "if further voir dire examination reveals that

the juror in question can and will base his decision on the evidence alone." *Id.*
(internal quotation marks omitted).

Referencing the voir dire transcript, the ACCA pointed out that despite Juror
D.'s "initial[]" opinion about Mr. George's guilt, "he unequivocally stated that he
could put [that] opinion aside and render a verdict based on the evidence presented
during the trial." *Id.* The ACCA concluded that "[t]he record d[id] not support a
finding that Juror D.'s opinion was so 'fixed' that it would bias his verdict." *Id.*
Likewise, the ACCA determined that "[t]he trial court did not err in refusing to strike
[Juror D.] for cause." *Id.* The ACCA did not discuss *Estelle*, *Murray*, or otherwise
analyze Mr. George's claim under federal law.

## 2. Habeas Analysis

Before analyzing Warden Raybon's express arguments, the Court considers
whether unexhausted procedural default bars habeas relief. Although in answering
this claim, Warden Raybon does not assert that defense, he has not waived the
exhaustion requirement expressly under 28 U.S.C. § 2254(b)(3) either. (Doc. 22 at
52–55 ¶ 89). Section 2254(b)(3) does not, "by its own language," address procedural
default due to lack of exhaustion. *McNair*, 416 F.3d at 1305. Still, the Eleventh
Circuit has clarified that § 2254(b)(3) "applies with full force" when "the procedural
bar arises only as a direct result of the petitioner's failure to exhaust his state law
remedies." 416 F.3d at 1305; *see id.* (holding that "because the [s]tate did not

expressly waive [the petitioner]'s procedural default in this case, . . . § 2254(b)(3) applies" and bars consideration of the unexhausted claim). Thus, the Court considers first whether Mr. George's reliance on *Estelle* or *Murray* in his collateral brief presented fairly a federal issue for the ACCA to decide.

In *Estelle*, the Supreme Court held that, upon objection, a "[s]tate cannot, consistently with the Fourteenth Amendment, compel an accused to stand trial before a jury while dressed in identifiable prison clothes." 425 U.S. at 512. Thus, biased jurors were not the constitutional issue in *Estelle*, and Mr. George did not fairly present a federalized juror bias claim to the ACCA based on that authority.

The petitioner in *Murray* raised an unfair trial claim "because members of the jury had learned from news accounts about a prior felony conviction or certain facts about the crime with which he was charged." 421 U.S. at 795. The Court concluded that the pretrial publicity in that case did not rise to the level of a due process violation. *Id.* As part of its analysis, the *Murray* Court mentioned that the trial court had excused 20 of 78 potential jurors "because they indicated an opinion as to petitioner's guilt." *Id.* at 803. The Court acknowledged that such an outcome "m[ight] indeed be 20 more than would occur in the trial of a totally obscure person." *Id.* Still, the Court concluded that "it by no means suggest[ed] a community with sentiment so poisoned against petitioner as to impeach the indifference of jurors who displayed no animus of their own." *Id.* Overall, the Court held that the "[p]etitioner ha[d] failed to

show that the setting of the trial was inherently prejudicial or that the jury-selection process . . . permit[ted] an inference of actual prejudice." *Id.* Although the Court discussed biased jurors in *Murray*, the context was not as an independent constitutional claim—like Mr. George's—but, rather, as information relevant to a claim of prejudicial pretrial publicity.

Given this discussion, the Court concludes that Mr. George did not fairly present his biased potential juror claim as a constitutional violation to the ACCA. Consequently, habeas relief is unavailable due to unexhausted procedural default.

Alternatively, and regardless of the exhaustion requirement, the Court considers Warden Raybon's contention that Mr. George bases habeas relief on an alleged misapplication of state law. To the extent Mr. George challenges only the state courts' application of Alabama's juror disqualification provision, such an alleged state law violation without a connected constitutional component states no viable claim under § 2254. Instead, "[f]ederal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension." *Smith*, 455 U.S. at 221.

Even if Mr. George had exhausted a federalized juror bias claim in state court, the authorities he cites on habeas review do not substantiate clearly established AEDPA error on the ACCA's part. (Doc. 28 at 75–76). Mr. George's core burden on (d)(1) review is to identify a Supreme Court decision that clearly embraces an

impartial jury violation under circumstances comparable to his claim. The Court has explained already why *Estelle* and *Murray* miss (d)(1)'s bullseye. (Doc. 28 at 76). Likewise, the other two Supreme Court decisions which Mr. George references in reply, without contextual development, do not satisfy either (d)(1) standard. (*Id.* at 75).

For example, Mr. George cites *Irvin v. Dowd*, 366 U.S. 717 (1961), for the core constitutional principle that "the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors." *Id.* at 722 (internal quotation marks omitted); (Doc. 28 at 75). However, unlike Mr. George's theory of individualized juror bias, the *Irvin* Court faced a change in venue claim based on "clear and convincing" evidence of community-wide prejudice. *Id.* at 725. Specifically, the *Irvin* Court detailed a "pattern of deep and bitter prejudice . . . present throughout the community" which, despite jurors' attesting to their ability to serve impartially after cause challenges on voir dire, undermined the fairness of petitioner's murder conviction and death sentence. *Id.* at 724, 727 (internal quotation marks omitted). Confirmation of the unconstitutional "build-up of prejudice" included "46 exhibits which . . . indicate[d] that a barrage of newspaper headlines, articles, cartoons[,] and pictures was unleashed against [the petitioner] during the six or seven months preceding his trial" and station broadcasts of "curbstone opinions" about the petitioner's guilt and appropriate punishment. *Id.* at 725. Consequently, the extensive

134

pretrial prejudice underlying the venue claim in *Irvin* does not clearly establish a (d)(1) error in the ACCA's analysis of Juror D.'s impartiality or the trial court's failure to remove him for cause.

Mr. George's reliance on *Ross*, discussed in Subclaim VI.A, is unhelpful to him under (d)(1) too. (Doc. 28 at 75). Contextually different, the *Ross* petitioner based the bias argument on a prospective juror's unambiguous declaration during voir dire that if the jury returned a guilty verdict, "he would vote to impose death automatically." 487 U.S. at 84. The juror's "automatic[]" commitment to the death penalty in *Ross*, *id.*, is more straightforward that Mr. George's evidence of potential bias, especially after the prosecutor's rehabilitation of Juror D. Consequently, the impartiality analysis in *Ross* does not clearly establish that the ACCA erred objectively in the assessment of Juror D.'s potential bias.

The *Ross* Court's constitutional conclusion "that no violation of petitioner's right to an impartial jury occurred" due to counsel's exercise of a preemptory strike does not demonstrate a (d)(1) error on AEDPA review either. *Id.* at 88. Instead, counsel's contextually similar reliance on a preemptory strike to remove the impartial venire member means that *Ross* reinforces, rather than detracts from, the reasonableness of the ACCA's rejection of Mr. George's claim. Thus, AEDPA deference precludes habeas relief to the extent that Mr. George exhausted a federal version of this juror bias claim in state court.

135

For these independent reasons, the Court denies Mr. George's last claim.

## K.    Evidentiary Hearing and Discovery Requests

After applying principles of procedural default or AEDPA review, Mr. George has not shown an entitlement to habeas relief based on his allegations of constitutional error in his capital convictions and sentence. Consequently, consistent with the above analysis of Mr. George's § 2254 petition, the Court will not hold an evidentiary hearing or allow discovery. *See Allen v. Sec'y, Fla. Dep't of Corr.*, 611 F.3d 740, 763 (11th Cir. 2010) ("Having alleged no specific facts that, if true, would entitle him to federal habeas relief, [the petitioner] is not entitled to an evidentiary hearing."); *see also Pinholster*, 563 U.S. at 182, 184 ("[l]imiting § 2254(d)(1) review to the state-court record" and precluding consideration of "evidence later introduced in federal court [a]s irrelevant" to the habeas analysis).

## IV.    CONCLUSION

The Court **DENIES** Mr. George's petition. This Court may issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make such a showing, a "petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Slack*, 529 U.S. at  484, or "the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (internal quotation marks omitted). For claims rejected

136

without reaching the merits, a petitioner must demonstrate that reasonable jurists would debate "whether the petition states a valid claim of the denial of a constitutional right" and "whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484. The Court finds that Mr. George's claims do not satisfy these  standards for granting a certificate of appealability.

The Court will enter a separate order in accordance with this opinion.

**DONE** and **ORDERED** April 24, 2025.

**LILES C. BURKE**
UNITED STATES DISTRICT JUDGE